FISHMAN HAYGOOD PHELPS
  WALMSLEY WILLIS & SWANSON, L.L.P.
James R. Swanson
Lance C. McCardle
201 St. Charles Avenue, Suite 4600
New Orleans, Louisiana  70170
Telephone: 504-586-5252
Facsimile:  504-586-5250

*Attorneys for Plaintiffs Louisiana Stadium &
Exposition District and State of Louisiana*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

<table>
<tr><td>

IN RE:  MERRILL LYNCH & CO., INC.,
AUCTION RATE SECURITIES (ARS)
MARKETING LITIGATION

---

This Document Relates to:

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
Docket No. 09-235

LOUISIANA STADIUM AND EXPOSITION
DISTRICT, et al.,

                        Plaintiffs,

            v.

FINANCIAL GUARANTY INSURANCE CO.,
et al.

                        Defendants,

</td><td>

09 MDL 2030 (LAP)
09 CV 5404 (LAP)
09 CV 6770 (LAP)
(ECF Case)




**THIRD AMENDED AND
SUPPLEMENTAL COMPLAINT**

</td></tr>
</table>

293820v.7

**Page**

| | | |
|---|---|---|
| I. | **Introduction** | 1 |
| | A.    **Summary:  MLPFS Manipulated the ARS Market and FGIC Sold a Worthless Guarantee** | 1 |
| | B.    **This Action is Unique** | 3 |
| | C.    **Auction Rate Securities** | 3 |
| | D.    **MLPFS Developed and Increased its Share of the ARS Market** | 4 |
| | E.    **Unknown to LSED, MLPFS Propped Up Auctions for ARS** | 5 |
| | F.    **Auctions for LSED's Bonds Failed When MLPFS Withdrew its Support** | 6 |
| | G.    **Plaintiffs Damaged** | 6 |
| II. | **The Parties** | 7 |
| III. | **Jurisdiction and Venue** | 9 |
| IV. | **Factual Allegations** | 11 |
| | A.    **LSED Sought to Restructure its Existing Debt and Issued its Request for Proposal** | 11 |
| | B.    **MLPFS Submitted its Proposal to LSED** | 11 |
| | C.    **Hurricane Katrina Struck the City of New Orleans** | 16 |
| | D.    **MLPFS's Advice And Recommendations to LSED on which LSED Relied (Including Advice about ARS and Swap Agreements)** | 18 |
| | E.    **LSED Issued the Bonds** | 28 |
| | F.    **MLPFS's Underwriting and Broker-Dealer Compensation** | 30 |
| | G.    **FGIC's Credit Enhancement** | 31 |
| | H.    **MLPFS's Support Bids from April of 2006 through February of 2008 and Their Effect of Preventing Auction Failures** | 36 |

**Page**

| | | | |
|---|---|---|---|
| I. | The SEC's Investigation and MLPFS's Misleading Notice of its ARS Practices | | 39 |
| J. | February 2008 Auction Failures | | 43 |
| K. | Following the Auction Failures, State and Federal Regulators Have Identified MLPFS's Wrongful Conduct, and MLPFS Has Accepted Censure and Paid Penalties | | 47 |
| L. | MLPFS did not Disclose a Number of Material Facts, Including its Support Bid Policy and Practice or that it Was Under Investigation by the SEC | | 58 |
| M. | FGIC Failed to Disclose its Overcommitted Balance Sheet | | 64 |
| N. | MLPFS was Reckless and had Fraudulent Motives | | 68 |
| O. | MLPFS Owed Duties to the State | | 76 |
| P. | Plaintiffs' Damages and Effort to Mitigate Damages | | 81 |
| V. | **Causes of Action** | | 85 |
| | First: Breach of Fiduciary Duty (Plaintiffs Against MLPFS) | | 85 |
| | Second: Intentional and Negligent Misrepresentation (Plaintiffs Against MLPFS) | | 87 |
| | Third: Fraud (Plaintiffs Against MLPFS) | | 88 |
| | Fourth: Breach of Contract (Plaintiffs Against MLPFS) | | 90 |
| | Fifth: Violation of §10(b) of the Exchange Act And Rule 10b-5 (LSED Against MLPFS) | | 93 |
| | Sixth: Violation of §10(b) of the Exchange Act And Rule 10b-5 (LSED Against MLPFS) | | 96 |
| | Seventh: Violation of §20(a) of the Exchange Act (LSED Against Merrill Lynch & Co.) | | 98 |

293820v.7

**Page**

**Eighth:  Breach of Warranties**
**(Plaintiffs Against MLPFS)**                                    **100**

**Ninth:  Detrimental Reliance**
**(Plaintiffs Against MLPFS)**                                    **103**

**Tenth:  Unjust Enrichment**
**(Plaintiffs Against MLPFS)**                                    **105**

**Eleventh:  Failure of Cause**
**(LSED Against FGIC)**                                           **106**

**Twelfth:  Breach of Contract**
**(LSED Against FGIC)**                                           **108**

**Thirteenth: Detrimental Reliance**
**(LSED Against FGIC)**                                           **111**

**Fourteenth: Unjust Enrichment**
**(LSED Against FGIC)**                                           **112**

iii

I.    **Introduction**

1.

Plaintiffs Louisiana Stadium and Exposition District ("LSED") and the State of Louisiana (the "State") respectfully file this Third Amended and Supplemental Complaint against Merrill Lynch & Co., Inc. ("Merrill Lynch & Co."), Merrill Lynch, Pierce, Fenner & Smith, Inc. ("MLPFS"), and Financial Guaranty Insurance Company ("FGIC").

A.    **Summary:   MLPFS Manipulated the ARS Market and FGIC Sold a Worthless Guarantee**

2.

MLPFS advised LSED to issue through MLPFS approximately $240 million of municipal bonds, structured as auction rate securities ("ARS"), to refinance existing higher-interest-rate debt and to rebuild the Superdome in New Orleans, which LSED owns and leases to the State.   MLPFS represented to LSED that the ARS structure (together with certain recommended credit derivative transactions) would assure the lowest cost of funds, allowing LSED to issue long-term bonds at short-term borrowing rates that would be reset at auctions every 7 days.   The MLPFS-proposed structure, which combines ARS with interest rate swaps, was supposed to provide LSED with a low synthetic fixed interest rate of approximately 2.25 percent for the first 3 years and 4.6 percent thereafter.   MLPFS, however, did not disclose during the course of its rendering advice:  that unless MLPFS supported the auction market with blanket bids for all outstanding bonds there would be an insufficient auction market to maintain the low ARS interest rates; that MLPFS routinely manipulated the ARS market with its own blanket bids to conceal that the market was inadequate; that MLPFS's blanket bids would typically set the interest rate and that the promised low synthetic fixed interest rate was therefore dependent on MLPFS's blanket bids; that MLPFS knew that the auctions would fail absent MLPFS's

continued blanket bidding; and that the fixed interest rates that MLPFS promised to LSED were entirely dependent on MLPFS's continued manipulation of the market by placing blanket bids throughout the 30-year term of the bonds.  MLPFS also did not disclose and, therefore, LSED was also unaware that MLPFS's policy of placing blanket bids in every auction for which it was the lead or sole underwriter/broker-dealer created an artificial appearance of demand for auction rate bonds and of liquidity in the auction rate market.  MLPFS was aware at the time of issuance that the ARS structure that MLPFS proposed to LSED would be successful if, and only if, MLPFS supported LSED's auctions.  MLPFS also, despite regular face-to-face and telephonic conferences with LSED after the issuance, failed to disclose what it knew about its blanket bidding in LSED's auctions and the likelihood of auction failures if it stopped bidding.  Less than two years after LSED issued the auction rate bonds, MLPFS stopped bidding, the auctions failed, and Plaintiffs have sustained tens of millions of dollars of damages in increased interest charges and other funding costs.

3.

FGIC provided credit enhancement for LSED's bonds, providing what FGIC called its "triple-A guaranty" of LSED's payments to "wrap" LSED's bonds with FGIC's triple-A credit rating, which was supposed to lower LSED's cost of borrowing over the 30-year life of the bonds by substituting FGIC's triple-A credit rating for LSED's lower rating.  FGIC charged LSED an up-front fee of more than $13 million to insure payments on the bonds, which was supposed to save LSED many times that amount in interest payments over the life of the Bonds. FGIC knew that LSED was paying for credit enhancement—the continued ability of FGIC's insurance to supply the bonds with the lower interest rates associated with a triple-A rating for the 30-year life of the bonds.  Although FGIC knew that its advertised "triple-A guaranty" was what LSED was purchasing, FGIC did not disclose that because FGIC was increasingly taking

on more and more risky guarantees, especially credit default swaps related to subprime mortgages, FGIC's insurance would not be able to accomplish its central purpose. FGIC lost its triple-A credit rating less than two years into the 30-year term of the bonds. Worse, on November 24, 2009, because of FGIC's self-inflicted, dire financial condition, the New York Insurance Department has ordered FGIC not to write any new policies and to "suspend paying any and all claims." As a result, LSED paid FGIC more than $13 million for credit enhancement promised by FGIC that it did not receive and seeks the return of the money that it paid to FGIC along with other applicable damages.

### B.    This Action is Unique

4.

This lawsuit is substantially different from the other ARS cases that have been consolidated and coordinated in this MDL proceeding, primarily because it is brought on behalf of issuers of—as opposed to investors in—ARS. The Plaintiffs in this case have sustained different damages (the payment of higher funding costs) than those suffered by investors (the loss of liquidity and, potentially, market value), and have not been the beneficiaries of settlements negotiated by the Securities and Exchange Commission or states' attorneys general, as many of the investors have. The duties owed by MLPFS and FGIC to the Plaintiffs in this situation were different than those owed to investors.

### C.    Auction Rate Securities

5.

Based on the findings of the state and federal regulators, ARS are long-term variable-rate instruments with interest rates that reset at frequent, periodic Dutch auctions. In a Dutch auction for ARS, buy orders are filled beginning from the lowest interest rate bid until all securities available for sale are matched with purchase orders. The rate at which the final sell order is

filled is known as the "clearing rate," and that rate applies to the entire issue of the ARS, including all other buy orders, as well as to the securities of existing holders that chose to hold, and not sell, their securities in the auction.

<div align="center">6.</div>

As explained by the state and federal regulators, ARS auctions are generally held every 7, 14, 28, or 35 days.  Orders to purchase or sell ARS at auctions can be placed only through designated broker-dealers that manage the auctions of the ARS that they have underwritten. These broker-dealers (in this case, MLPFS and the other members of its underwriting syndicate) collect "buy" and "sell" orders, and then forward them to the designated auction agent that administers the Dutch auction.

<div align="center">7.</div>

As further explained by the state and federal regulators, if the bids received by the auction agent are insufficient to purchase all the ARS offered for sale at a particular auction, the auction "fails."  Until the next successful auction, the ARS holders are unable to sell the securities that they hold (unless they can do so in a secondary market) and the interest rate on all of the ARS jumps to a "penalty" or "maximum" rate, in this and many other cases, 12 percent.

**D.    MLPFS Developed and Increased its Share of the ARS Market**

<div align="center">8.</div>

Based on the reports of several financial media outlets and state and federal regulators, by February of 2008, the ARS market had grown to approximately $330 billion in outstanding securities.

<div align="center">9.</div>

Upon information and belief, based on available market data, from 2000 through 2006, MLPFS grew its share of the auction-rate municipal bond market (as lead underwriter) from 6

bond issues totaling approximately $281 million par amount to 32 bond issues totaling approximately $3.4 billion par amount.

<p style="text-align:center">10.</p>

MLPFS promoted the ARS structure to LSED and, upon information and belief based on the marketing materials provided and representations made by MLPFS to LSED, to other municipal bond issuers as a means by which the issuers could borrow money long-term for capital projects but pay at short-term interest rates.  ARS purchasers interested in short-term investments (for example, to manage cash balances) were promised interest rates generally higher than those available through money-market funds with similar short-term liquidity.

### E.    Unknown to LSED, MLPFS Propped Up Auctions for ARS

<p style="text-align:center">11.</p>

Unbeknownst to LSED, MLPFS, as its routine practice, placed "support bids" in every ARS auction for which it was the lead underwriter, placing bids for the entire notional value of the issue being auctioned, regardless of the number of orders that MLPFS had received from customers.  MLPFS had followed this practice prior to the issuance of the LSED bonds and continued the practice into 2008.  Upon information and belief, based on the findings of the Massachusetts Securities Division and other regulatory agencies, press reports, and of all bids received in LSED bond auctions, in the absence of MLPFS's support bids, many auctions would have failed.  Prior to LSED's issuance, based on its experience with other issues, MLPFS knew that it would have to support LSED's auctions in order for the ARS structure proposed by MLPFS to be successful.  MLPFS's blanket bidding thereby created the artificial appearance of a liquid and efficient market, enabling MLPFS to market its ARS structure to issuers like LSED and the resulting securities to institutional and retail investors.  According to the Massachusetts Securities Division, "…Merrill Lynch and other broker dealers who used their own capital to

ensure auctions did not fail…generally touted the 20 year track record of very rare failures, and creat[ed] the impression with investors that there was a deep liquid market for the securities." *See In re Merrill Lynch, Pierce, Fenner & Smith, Inc*., Mass Sec. Div., No. 2008-0058, April 9, 2009, Consent Order (the "MA Consent Order") at ¶103.

### F.    Auctions for LSED's Bonds Failed When MLPFS Withdrew its Support

12.

LSED issued approximately $240 million of ARS in March 2006.  For the next two years, unbeknownst to LSED, MLPFS propped up the periodic auctions with its own support bids.  The interest rates at which the auctions cleared ranged between 3 percent and 5.5 percent.

13.

In February 2008, however, MLPFS stopped submitting its blanket support bids to maintain the low interest rates.  The auctions failed, and the interest rates on LSED's bonds jumped overnight to 12 percent.

### G.    Plaintiffs Damaged

14.

Plaintiffs seek to recoup from MLPFS and Merrill Lynch & Co. all losses that they have sustained, and will in the future sustain, as a result of MLPFS's and Merrill Lynch & Co.'s improper conduct, damages resulting from the tens of millions of dollars that Plaintiffs have paid and will in the future pay in excess of the benefit of the promised bargain, damages primarily incurred as a result of the substantially higher financing costs that the Plaintiffs have faced since MLPFS allowed the auctions to fail in February 2008.  Plaintiffs seek all other damages they have incurred, including all additional costs that they have and will incur as a result of MLPFS's continuing failure to disclose the nature of the market for LSED's bonds, the blanket bidding practices, the likelihood that MLPFS would not continue to support the market and the

implications that had on the "synthetic fixed rate" that LSED was relying upon.  Plaintiffs also seek all other legally available damages, including all of remuneration that MLPFS received in the subject transactions.  In addition, because FGIC could not deliver the credit enhancement it promised, LSED seeks to recover from FGIC the more than $13 million in premiums that it paid and other damages.

## II.    **The Parties**

15.

Plaintiff, LSED, is a body politic and corporate and political subdivision of the State with offices at 1500 Sugar Bowl Drive in New Orleans, Louisiana 70112.  LSED is the owner of and has jurisdictional authority over and responsibility for the Louisiana Superdome (the "Superdome").  LSED leases the Superdome to the State.

16.

Plaintiff, the State, is the lessee of the Superdome and is contractually obligated to provide funding necessary to pay certain Superdome operating expenses, especially including certain contractual obligations to the New Orleans Saints and New Orleans Hornets.  Because of these contractual obligations, as a practical matter, in years where LSED's expenses exceed its revenues (which occurs when LSED's financing costs rise), the State funds the LSED's shortfall.

17.

Upon information and belief, based upon documents prepared by it or its affiliates, including a proposal and various agreements, Defendant MLPFS is a Delaware corporation with its principal place of business in New York, New York and is a subsidiary of Merrill Lynch & Co.

18.

Based on information provided by MLPFS to the Financial Industry Regulatory Authority ("FINRA"), MLPFS was, at all material times, the employer of each of the following individuals:  Stephen Allan Claiborn ("Claiborn"); David Greeson Moffett ("Moffett"); David Alan Stephens ("Stephens"); and Paul Martin Sober ("Sober").  Claiborn (Central Registration Depository ("CRD") No. 702409) is currently employed by MLPFS and has been since March 1, 2005.  Moffett (CRD No. 4617016) was employed by MLPFS from June 2003 through August 2009.  Stephens (CRD No. 1736828) is currently employed by MLPFS and has been since March 13, 2002.  Sober (CRD No. 3093340) was employed by MLPFS from August 1998 through January 2009.  All promises, representations, acts, and omissions on the part of the Claiborn, Moffett, Stephens, and Sober in their dealings with the Plaintiffs are, therefore, attributable to MLPFS.

19.

Upon information and belief, based upon documents prepared by it or its affiliates, including a proposal and various agreements, Defendant Merrill Lynch & Co. is a Delaware corporation with its principal place of business in New York, New York and is the parent company of MLPFS.

20.

Upon information and belief, based on documents and agreements prepared by or for it or its affiliates, Defendant FGIC is a New York stock insurance company with its principal place of business in New York, New York, and is a wholly owned subsidiary of FGIC Corporation, which purports to be an insurance holding company.

### III.    Jurisdiction and Venue

21.

The Plaintiffs' chosen forum for this dispute is the United State District Court for the Eastern District of Louisiana.

22.

Under 28 U.S.C. § 1331, the Eastern District of Louisiana has subject matter jurisdiction over the claims asserted in this Complaint because they arise under the Constitution, laws, or treaties of the United States.

23.

Under 28 U.S.C. § 1332(a), the Eastern District of Louisiana has subject matter over the claims because the amount in controversy exceeds $75,000, exclusive of interest and costs, and there is complete diversity of citizenship between the Plaintiffs and the Defendants.

24.

Further, under 28 U.S.C. § 1367, the Eastern District of Louisiana has supplemental jurisdiction over all other claims that are so related to claims in the action within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

25.

On June 10, 2009, this action was transferred to this Court for coordinated and consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407.  *See In re MLPFS Lynch & Co., Inc. Auction Rate Securities (ARS) Marketing Litigation,* MDL 09-2030, 2009 WL 1649488 (J.P.M.L. Jun. 10, 2009).  In connection with the transfer, the Judicial Panel noted:  "It may be that pretrial proceedings involving certain actions may be completed in advance of other actions to this litigation.  This is particularly the case with the proceedings in LSED."  *Id.* at *2.  At a

9

minimum, Plaintiffs request that the claims that they have asserted against FGIC be remanded back to the Eastern District of Louisiana at this time. Upon submission of this amended complaint and in accordance with the Court's orders, Plaintiffs will so move.

26.

The Defendants are subject to both general and specific jurisdiction within the State of Louisiana. The Defendants regularly conduct business within the State of Louisiana, and the actions giving rise to this lawsuit occurred within the State of Louisiana. The Defendants made and directed statements and representations within the State of Louisiana, contacted the Plaintiffs within the State of Louisiana, the contracts at issue in this case were executed and performed within the State of Louisiana, and the Plaintiffs' damages were sustained within the State of Louisiana.

27.

Under 28 U.S.C. § 1391(a), the Eastern District of Louisiana is a proper venue for this proceeding because a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of this action lies, within the Eastern District of Louisiana. Moreover, under 28 U.S.C. § 1391(c), the Defendants are corporations or business entities that are subject to personal jurisdiction and deemed to reside within the Eastern District of Louisiana.

IV.    **Factual Allegations**

    A.    **LSED Sought to Restructure its Existing Debt and Issued its Request for Proposal**

28.

In early 2005, Plaintiffs sought advice regarding the restructuring of LSED's existing debt with the aim of reducing its funding costs by taking advantage of lower interest rates.

29.

To that end, LSED, through the Louisiana State Bond Commission (the "Commission"), issued a Solicitation for Offers for Senior Managing Underwriter (the "Solicitation") on April 4, 2005 seeking "the highest quality investment banking services at a reasonable cost."  Applicants were requested to "demonstrate[] to the State Bond Commission excellence in both structuring, managing and marketing tax-supported (particularly hotel occupancy tax) programs." Applicants were also requested to describe their firms' "abilities or resources" with respect to "technical and structural resources,"  "distribution capabilities," and "marketing," their "commitment to public finance," as well as "specific structuring scenarios and quantitative analyses, including but not limited to cost-effectiveness of credit enhancement for the Bonds, explaining the benefits of [their] structuring proposals from the perspective of debt service relief…."

    B.    **MLPFS Submitted its Proposal to LSED**

30.

On April 19, 2005, MLPFS submitted a Response to Solicitation for Offers for Senior Managing Underwriter (the "Proposal") to LSED and the Commission.  A cover letter accompanied the Proposal from Claiborn, identified as "Managing Director of Merrill Lynch-Global Markets and Investment Banking," which, according to the Proposal (page 3) is, "[f]or

functional purposes," one of "three primary lines of business" of MLPFS.  The Proposal presents the financial performance and operations of the various Merrill Lynch & Co. subsidiaries and affiliates on a consolidated basis (pages 3-6, 8, 10-11, 21 and related appendices), working together to provide "investment banking, brokerage, asset management, real estate, insurance and related services on a global basis," (page 2). As applied specifically to LSED bond offerings:

> Merrill Lynch will provide a full spectrum of client services to [LSED] by coordinating the activities of our entire firm.  We take a comprehensive approach to managing our client relationships and do this by bringing together the full complement of the Firm's resources at the onset of the retail order period in order to create the most innovative and cost effective financing program.

31.

The Proposal touted MLPFS's qualifications and experience, as well as its strength in Louisiana:

> **Unmatched Municipal Bond Distribution -** Merrill Lynch is the leading retail *and* institutional firm in distributing municipal bonds in the tax-exempt securities market.  Our firm has always maintained a strong commitment to the underwriting, trading and sales in the municipal bond market, evidenced by our *#1 position in competitive underwriting each of the past 14 years.*  The relationships that our retail and institutional sales people bring provide the distribution strength that no other firm can offer to [LSED].  We would also like to take this opportunity to describe how Merrill Lynch has renewed its commitment to providing issuers such as [LSED] with the highest level of service from public finance bankers who will provide innovative plans of finance that address the needs and objectives of [LSED] while providing an optimal solution based on market conditions at the time of pricing.
>
> **Commitment to the State of Louisiana** - Merrill Lynch has established its commitment to the State in several ways.  Merrill Lynch is a leading market maker in Louisiana municipal securities, with a 21% share of all primary and secondary municipal securities sold in Louisiana.  Our nearly 105,000 accounts in Louisiana hold $1.2 billion in municipal assets, which represents more than 10% of total account assets.  These accounts are managed by 170 Financial Advisors, located in Merrill Lynch's 9 offices throughout

12

the State. In addition, *our retail clients currently hold $23.8 million of [LSED's] bonds which equates to over 13% of [LSED's] outstanding bonds* - demand that can continue to be tapped to lower [LSED's] costs. In addition, Merrill Lynch has recently hired Stephen Claiborn, [LSED's] senior banker, who has decades of experience in covering issuers in Louisiana and structuring financings very similar to the transaction [LSED] is considering. With the support of Philip Rooney and David Moffett, the primary banking team has vast experience to leverage in partnering with [LSED] to achieve their financing goals.

32.

MLPFS's Proposal made many representations to LSED, including:

- "This listing of experience demonstrates the expertise of Merrill Lynch's financing team in developing new and innovative credits on behalf of our clients. It is this very expertise which will be available for [LSED] to draw upon to ensure the successful implementation of its financing program." *See* page 4.

- "Merrill Lynch is the nationally recognized leader in both institutional and retail distribution to municipal bond investors. No other bank or securities firm has the ability to effectively balance the local and retail participation goals of issuers with the strong institutional presence necessary to provide the lowest cost of funds." *See* page 5 (emphasis omitted).

- MLPFS led LSED to believe that MLPFS was highly committed to the municipal bond market, and referred to an article in the March 17, 2004 issue of *The Bond Buyer*, which, according to MLPFS, "should provide further reassurance" of such commitment. *See* page 7. The article quoted Merrill Lynch & Co.'s Chairman and CEO, Stan O'Neal, as saying "Being the leader in municipals strategically supports both our institutional and retail franchises. Our institutional and retail clients are active investors in the municipal market. We need to have more new-issue product available for these clients." It reported that O'Neal "wants Merrill Lynch & Co. to be the number-one brokerage firm in the municipal industry."

- "…Merrill Lynch has had a strong history in underwriting municipal bonds of all types. This is due in part to the fact that our firm is ready and willing to commit capital to financings for the interest of our issuer clients." *See* page 8.

- After advising that "Merrill Lynch has consistently ranked as the most highly capitalized investment banking firm on Wall Street," MLPFS represented that it could offer LSED "the strongest underwriting commitment, superior pricing, and solid secondary market support." *See* page 11 (emphasis omitted).

- MLPFS provided short resumes of its representatives who would be primarily responsible for LSED's bond transaction. Particularly, MLPFS noted that Claiborn, as Managing Director and Senior Banker, would "provide leadership and manage Merrill Lynch's overall relationship with [LSED]" and that Moffett, as Vice President and Day-to-Day Transactional Banker, would be "[r]esponsible for all aspects of transaction execution." MLPFS further advised that Mr. Moffett's "duties span all aspects of transaction execution including structuring, analysis, marketing execution, and cash-flow modeling within the Public Finance Group." *See* page 16.

- "In today's markets, retail and institutional investors continue to have a huge appetite for insured bonds. As a result, the yield spread between insured and uninsured fixed-rate bonds makes bond insurance extremely economical…we recommend [LSED] pursue bond insurance which will broaden the potential investor base for the transaction as well as provide [LSED] with a lower cost of funds." *See* page 20.

33.

These representations were consistent with other oral representations by and actions of MLPFS's representatives, Claiborn, Moffett, Sober, and Stephens, who acted as LSED's trusted advisors in connection with planning the structure of and implementing LSED's financing plans.

34.

In the Solicitation, LSED specifically asked applicants to:

- "Give a brief but complete description of any criminal proceeding, criminal investigation, or other oversight entity's investigation of alleged securities laws violations involving your firm (all areas of the firm) or any professionals in your firm who would be involved in this financing. Please cover the period January 1, 2002 through the present. NO PAGE LIMIT. UNLIMITED."

In response to this request, MLPFS disclosed numerous regulatory problems, but failed to disclose that MLPFS was a target of an investigation by the Securities & Exchange Commission ("SEC") that began in 2004 regarding MLPFS's (and other investment banks') practices and procedures in the ARS market. This investigation resulted in the SEC's issuance of a negotiated Cease and Desist Order on May 31, 2006, which is discussed in more detail below.

35.

Unbeknownst to LSED at the time, but based on recent press reports and the conclusions of state and federal regulators, MLPFS, since at least January 2003, had actively supported the auction market by placing blanket support bids for all of the bonds in the auctions for bonds on which MLPFS was the sole or "lead" underwriter/broker-dealer.  During the thirty-month period from January 3, 2006 to May 27, 2008, 5,892 auctions would have failed but for MLPFS's support bids.  There was nothing in MLPFS's Proposal that could have put Plaintiffs on notice of MLPFS's support bids in the ARS market or of the market's fragility if MLPFS ceased making the bids.

36.

The Solicitation also specifically asked MLPFS to "disclose any conflicts of interest or potential conflicts of interest that may arise as a result of your firm's being hired for this engagement…."  MLPFS failed to disclose various conflicts of interest that would later come to be known to the Plaintiffs in the wake of the auction failures.  Instead, MLPFS replied:  "To the best of our knowledge, there are no existing or potential conflicts of interest that may arise as a result of our firm's being hired for this engagement."  At the time, MLPFS knew that it would be supporting the auctions for LSED's bonds as it routinely did and that its interests and LSED's interests were different.

37.

Relying on, among other things, the representations of MLPFS outlined above, Plaintiffs ultimately accepted MLPFS's Proposal on May 19, 2005, creating a contract between the parties. As all parties understood and as evidenced by various writings and by the conduct of the parties, MLPFS obligated itself to work as a partner with Plaintiffs and to provide advice and recommendations to Plaintiffs on the most economically beneficial structure to achieve

293820v.7

Plaintiffs' financing goals, as well as to provide continuing reporting advice to Plaintiffs following the issuance.  In return, Plaintiffs allowed MLPFS to serve as lead underwriter and broker-dealer, and allowed MLPFS's affiliate, Merrill Lynch Capital Services, Inc. ("MLCS"), to serve as swap counter-party, as part of the transaction that MLPFS designed, earning significant fees for MLPFS and Merrill Lynch & Co. in the process.  These particular component transactions are reflected in ancillary component agreements that were included among the closing documents.

38.

Pursuant to the contract described above, MLPFS ultimately advised Plaintiffs on the structure; bought the bonds from LSED and resold them; sold interest rate swaps to LSED that supposedly supported the structure; provided continuing advice related to the swaps, including how the swaps should be booked; provided monitoring and advisory services regarding the bonds and the swaps after the issuance, including whether to change the mode of the issuance; functioned as the main broker-dealer for the auctions; and performed various other tasks as Plaintiffs' advisor, partner and fiduciary during the structuring process, at the time of issuance, and during the course of the auctions.

**C.    Hurricane Katrina Struck the City of New Orleans**

39.

On August 29, 2005, Hurricane Katrina struck the City of New Orleans, inflicting severe damage to the Superdome, as well as many hotels within the New Orleans area.  In the Hurricane's aftermath, given the extensive damage to hotels and other facilities, tourism in New Orleans slumped, and revenue from the Hotel Occupancy Tax (LSED's main source of revenue)

was severely reduced.[1]  At that time, it appeared that it would take at least several years for the New Orleans tourism market, and revenues from the Hotel Occupancy Tax, to return to their pre-Katrina levels.

<div align="center">40.</div>

Following Hurricane Katrina, Plaintiffs made clear to MLPFS, primarily through conversations starting in early December 2005 between LSED's representative, Doug Thornton, and MLPFS's representatives, Claiborn and Moffett, that they urgently needed to develop a plan, based on then-current revenue estimates, that (i) refinanced LSED's existing debt in a more cost-effective way; (ii) raised additional funding to repair damage to the Superdome and to make the renovations to the Superdome that LSED was contractually obligated to make in time for the 2006 NFL season; and (iii) reduced LSED's debt service payments.  It was essential to LSED that these goals be met under a new structure where LSED's debt service payments conformed to LSED's estimated revenue stream.  Plaintiffs communicated to MLPFS at various times, including conferences with Jerry Leblanc and other representatives of the Louisiana Governor's office and Louisiana State Treasurer John Kennedy on January 4, 2006, January 13, 2006, and February 21, 2006 and the March 6, 2006 meeting before the Louisiana State Bond Commission, that the State was unwilling to be a direct obligor or direct guarantor of the bonds, and, therefore, it was clearly communicated to MLPFS that an objective of the transaction was that the State not be called upon to directly support the bonds.  This was important because the State had a total debt ceiling.  At the time, State officials believed that additional State-supported debt might contribute to a decrease in the State's credit rating and an increase in the State's overall cost and availability of borrowing.

---

[1] Through the Hotel Occupancy Tax, LSED collects 4% of the rent or fee charged for occupancy by any hotels located within the Parishes of Orleans and Jefferson.

41.

Claiborn and Moffett gave a presentation on December 7, 2005 in which they summarized LSED's objectives, noting: "LSED intends to finance a portion ($50 million) of the reconstruction costs for the Superdome," "financing must be in place by February 2006 in order to meet the NFL schedule," and "near term financial projections currently yield approximately $4 million of annual deficits in FY 2006 through FY 2011."

**D.    MLPFS's Advice And Recommendations to LSED on which LSED Relied (Including Advice about ARS and Swap Agreements)**

42.

In the course of the extensive work necessary to structure the subject bond financing from November 2005 to March 2006, LSED representatives, including Doug Thornton, Tim Coulon, David Weidler, Jimmy Dupuis, Brent Bourgeois, Larry Roedel, Sarah Roberts, Dan Barrett, Craig Saporito, and Meredith Hathorn (the "LSED Restructuring Group"), had regular telephone conferences and in-person meetings with Claiborn, Moffett, Sober, and Stephens.  During a period early in 2006, telephone and email contacts among these individuals were generally made on a daily basis.  During these five months, MLPFS's representatives (including Claiborn, Moffett, Sober, and Stephens) were continually advising and making recommendations to the LSED Restructuring Group about how the borrowings should be structured.

43.

Claiborn, Moffett, Sober, and Stephens discussed various structures that MLPFS could offer, including both fixed and variable rate bonds, but they ultimately recommended that LSED issue ARS using a "synthetic fixed rate structure" as the best alternative considering LSED's stated objectives.  This recommended structure, which was supposed to convert LSED's floating rate payment obligations set by the auctions into a predictable, fixed obligation, included the use

of certain interest rate swap agreements (the "Swap Agreements") and credit enhancement in the form of bond insurance. Pursuant to the Swap Agreements, LSED would pay a MLPFS affiliate, MLCS, a fixed payment in exchange for a floating rate payment, which MLPFS advised LSED would be an accurate proxy for the rate that the auctions would generate. To show how the synthetic fixed rate structure would work, MLPFS supplied numerous debt service schedules that showed LSED's payments in all years of the proposed financing. LSED relied on these debt service schedules to plan for its own cash needs in future years and to determine whether to enter into the various component transactions that MLPFS proposed. MLPFS knew that it was critical for the structure adopted by LSED to yield the debt service outlined in the schedules provided by MLPFS, and MLPFS knew that LSED was relying on the structure to do so.

44.

MLPFS provided cash flow schedules to the LSED Restructuring Group in formal presentations on December 7, 2005, January 13, 2006, February 21, 2006, February 27, 2006, and March 6, 2006. In addition, MLPFS emailed numerous schedules to the LSED Restructuring Group as the project evolved, ultimately emailing at least 30 different versions that changed and evolved slightly based on changing market conditions and additional information.

45.

Claiborn and Moffett presented the "Louisiana Stadium & Exposition District Restructuring and Financing Plan" to the LSED Restructuring Group on January 13, 2006. During the course of this presentation, Claiborn and Moffett made the following representations about MLPFS's recommended "synthetic fixed rate structure":

- "This restructuring yields positive net present value savings and provides nearly $55 million in debt service relief in the pressure years." *See* page 17.

- "In addition to the ability to sculpt to resulting solution, the stepped swap provides a debt service payment stream nearly $20 million (pv) below that of a traditional cash market solution." *Id.*

The presentation outlined, in a detailed debt service schedule, what was purported to be a series of fixed payments by LSED over the life of the Bonds. These fixed payments met LSED's financing objectives. Nowhere in the presentation did MLPFS disclose that the fixed payment schedule assumed, and was therefore at the mercy of, MLPFS's continued willingness to support the auctions with blanket bids. The fixed payment schedule presumed that an efficient, robust market for ARS existed.

46.

Also on January 13, 2006, Claiborn, Moffett, and Sober presented "Louisiana Stadium & Exposition District Overview of Synthetic Fixed Rate Strategies," which was part of the main presentation, to the LSED Restructuring Group. During the course of this presentation, they represented that:

- "Merrill Lynch makes understanding the risks and rewards manageable." *See* page 3.

- "The partnership between Merrill Lynch and LSED goes far beyond executing transactions." *See* page 11.

- MLPFS's "Strategic Focus", among other things, included: "Understanding LSED's long-term goals and objectives" and "[d]escribing benefits and risks of any transaction or combination of transactions for LSED." *See* page 11.

- MLPFS's "Market Knowledge" included: "Providing the market access, liquidity, knowledge and understanding that comes with having the largest municipal derivatives book on Wall Street" and "[h]elping advise LSED as to right structure for the current market given LSED's stated risk tolerance." *See* page 11.

- MLPFS would provide "Ongoing Support" and that MLPFS's "Ongoing Support" included: "Producing timely market valuations and analytics" and "[p]roviding periodic reports outlining market movements, insights, research and projections." *See* page 11.

- MLPFS's "[c]apital markets and municipal finance bankers work together as a team in structuring and executing our clients' finance plans." *See* page 12.

- "Merrill Lynch was the first firm to assemble a group of professionals dedicated exclusively to the structuring and execution of risk management products solely for tax-exempt clients." *See* page 12.

- MLPFS has a "[s]pecial focus on customized solutions and new product development…" *See* page 12.

- "Merrill Lynch Capital Services, Inc. is Merrill Lynch's primary swap counterparty. All of its swap obligations are guaranteed by the parent company, Merrill Lynch & Co., Inc. ..." *See* page 16.

Thus, MLPFS promised to provide LSED with continuing advice and recommendations regarding financing options to achieve LSED's goals. These representations and related course of conduct that MLPFS undertook define the scope of the contract that was created by the Proposal and its acceptance. In connection with MLPFS's promises, MLPFS assumed a duty to provide LSED with full and complete information necessary to evaluate MLPFS's advice and recommendations.

47.

MLPFS's presentation on January 13, 2006, represented that the Swap Agreements under consideration would convert LSED's, unknown, or floating-rate, interest payment obligation set by the auctions, to a predictable, fixed-rate obligation. As promised by MLPFS, the interest-rate swap would enable LSED to "[b]alanc[e] variable rate/fixed rate exposure" and "*[l]ock in interest rates* for future borrowing" (emphasis added).

48.

Claiborn and Moffett, in MLPFS's presentations, including the January 13, 2006 presentation, showed LSED paying a fixed rate of 2.26 percent for an initial 2 year period and 4.32 percent after the initial period. The presentation slides showed the auction rates generated by the auction as equaling the BMA Index rate. Neither Claiborn nor Moffett ever said that the underlying assumption that the rates set by the auction would equal the BMA Index was directly

21

dependent on MLPFS's willingness to submit support bids in every auction over the 30-year term of the Bonds.  Although well known to them, Claiborn and Moffett also failed to disclose at this time that the proposed structure would function as described to the LSED Restructuring Group if, and only if, MLPFS supported the auctions for LSED's Bonds.  They never disclosed that they knew, based upon MLPFS's extensive experience with such auctions, that absent continuing MLPFS bidding, the ARS market itself would not generally produce auction results at the BMA Index Rate.  Based on available research reports, from 2003 through 2007 alone, MLPFS served as sole or lead underwriter/broker-dealer in at least 130 ARS issuances involving at least 78 different issuers.

49.

In the January 13, 2006, presentation, MLPFS outlined how the synthetic fixed rate structure was going to work.  Specifically, MLPFS wrote:  "The two variable cash flows offset each other resulting in a fixed cost of funds."  The variable rates that supposedly "offset" were the rate set by the auctions (the rate that LSED would pay bondholders) and the 70 percent of the London Interbank Offered Rate ("LIBOR") (the rate that MLCS would pay to LSED under the Swap Agreements).  Claiborn, Moffett, Sober and Stephens did not disclose that the offset would not create a fixed cost of funds if MLPFS ceased its practice of submitting blanket bids at any time prior to the 30-year anticipated maturity of the Bonds.  This risk was the most significant one that LSED faced in this transaction, yet MLPFS failed to disclose it, either before the issuance or during the many in-person meetings that occurred during the almost two years that followed.

50.

On January 17, 2006, the LSED Restructuring Group, with substantial assistance from Claiborn and Moffett, presented LSED's "Debt Restructuring Plan" to the rating agencies in an

effort to ensure that the proposed bond structure would be given a favorable bond rating. In fact, Claiborn and Moffett supplied all information set forth in the "Debt Restructuring Plan" section of the presentation. In that presentation, MLPFS advised that the "proposed solution," a "Synthetic Fixed Rate Structure Using Stepped Fixed Payor Swap," would result in a cost of funds of approximately 2.26% until July 1, 2009, increasing to approximately 4.67% (for 2 of the 3 series of bonds) or 4.72% (for the third series) until the maturity of the Bonds on July 1, 2036. Detailed spreadsheets outlining the cash flows for the 30 years of the issuance were provided by MLPFS. Just as it had done in its January 13, 2006 presentation, MLPFS represented:

- "This restructuring yields positive net present value savings and provides nearly $55 million in debt service relief in the pressure years."

- "In addition to the ability to sculpt to resulting solution, the stepped swap provides a debt service payment stream nearly $20 million (pv) below that of a traditional cash market solution."

MLPFS again did not discuss that the spreadsheets were based upon the assumption of MLPFS's continued support of the auctions and that the market itself, without continued MLPFS support, would not produce the budgeted payment schedules.

51.

Claiborn and Moffett made additional formal presentations to LSED, each entitled "Louisiana Stadium & Exposition District Restructuring/Recovery Financing Plan" on February 21, 2006 and February 27, 2006. On page 1 of the February 21, 2006 presentation in the "Executive Summary" section, MLPFS advised:

Our baseline plan essentially provides $100 million of capital: $40 million tax exempt (All-In TIC [total interest cost] of 4.50%) for new capital, $33 million in restructuring debt service relief, and $25 million taxable (All-In TIC of 6.50%) for working capital. This is possible due to the restructuring which allows the new money on parity and bond insurance which allows savings through synthetic fixed rates. Any other approach (without state guarantees) would inherently be

much more expensive since the new capital would be subordinate as a result of current covenants - maybe double the interest rates.

On pages 4-6, MLPFS outlined various financing options for LSED and presented the ARS interest-rate, swap-based structure as the most advantageous to LSED and the best means of realizing LSED's objectives. The reference to "TIC of 4.5 percent" means that LSED's total interest cost would be less than 4.5 percent for new capital.

<div align="center">52.</div>

Claiborn and Moffett also stated in the presentations: "The bulk of the transaction is tax exempt and has an all-in cost including insurance of less than 4.50% (annualized cost of the insurance premium is 43 bps)." This statement evidences LSED's assumption (and MLPFS's understanding as well) that the insurance premium (43 basis points spread over the life of the issue) would result in interest rate savings for all 30 years of the issue. However, this statement omitted the crucial information that this supposed "all-in" cost of 4.5 percent per year depended on MLPFS's continued ability and willingness to place blanket support bids in its auctions for the full 30-year term of the Bonds and that if MLPFS stopped doing so, the transaction would not generate the scheduled cash flows.

<div align="center">53.</div>

Claiborn and Moffett also noted, in the "Executive Summary" section of their February 21, 2006 and February 27, 2006, presentations, that the proposed structure was possible due in part to "bond insurance which allows savings through synthetic fixed rates." Furthermore, in the "Proposed Transaction Highlights" section of the same presentation, MLPFS advised that "the transaction could be structured on a non-insured basis but we believe the rate would be at least 100 basis points higher than the insured option and would not offer the cash flow relief in the next several years."

<div align="right">24</div>

54.

The February 27, 2006 presentation was substantially the same as the February 21, 2006 one. It again focused on how the proposed structure would fix LSED's interest costs over the life of the bonds and would provide a lower cost of funds than other possible structures, including fixed rate bonds.

55.

Claiborn and Moffett also prepared major portions of a summary of LSED's "Post-Katrina Recovery Plan and Debt Restructuring," which was presented to the Commission on March 6, 2006. On page 6, MLPFS advised that its recommended structure "allows LSED to accomplish financing objectives on a stand alone basis at an approximate 'all in' rate under 5%." This presentation was also designed to convey that the proposed structure would create a synthetic fixed interest rate and that LSED would be paying a fixed amount in each upcoming year according to the detailed debt service schedule provided. Neither Claiborn nor Moffett disclosed that these payment schedules would be different and much more onerous to LSED if MLPFS decided at any time over the life of the Bonds not to continue its undisclosed practice of bidding on all of the bonds sold at the auctions because without MLPFS's support bids, the ARS market would not generate the necessary interest rates. The reference to "stand alone basis" conveys that the State will not be called upon to be an obligor or guarantor on the Bonds.

56.

This presentation also provided a chart with annual cash flows that analyzed LSED's current debt service and the savings offered by the new structure through 2037 under the heading "Proposed Solution: Synthetic Fixed Rate Structure Using Stepped Fixed Payer Swap." The presentation summarized:

- "The tax-exempt restructuring component yields basically break-even present value cash flow and provides nearly $35 million in debt service relief in the pressure years FY 2007-FY2012."

- "In addition to the ability to sculpt the resulting solution, the stepped swap provides a debt service payment stream nearly $20 million (pv) below that of a traditional cash market solution."

57.

The closing documents (particularly, the Tax and No Arbitrage Certificate and certification letters) demonstrate that MLPFS knew that the Swap Agreement was intended to provide a synthetic fixed interest rate, because MLPFS knew that the swap was intended to be a "qualified hedge" pursuant to the applicable Treasury Regulations.  As is evidenced by these documents, the Swap Agreement was represented by all parties to be a qualified hedge under the Treasury Regulations, such that the effect of the hedge transaction would be to make LSED's bonds "substantially similar to fixed rate bonds;" *i.e.*, LSED's bonds would have a synthetic fixed interest rate.

58.

With the expectation that LSED could borrow the needed funds at the "'all in' rate [of] under 5%" according to the payment schedules based on the analyses, recommendations, and advice of MLPFS, the Commission approved MLPFS's proposed structure at its March 6, 2006 meeting.  Discussions at this meeting demonstrate that MLPFS was clearly told that an objective of the transaction was that the State not be an obligor on the Bonds in order to preserve the State's borrowing capacity and stay within the State's debt ceiling.

59.

Through the acceptance of its Proposal as outlined above and the promises made in subsequent presentations to LSED and the Commission discussed herein, as well as through the actions and representations of Claiborn, Moffett, Stephens, and Sober, MLPFS undertook,

contractually assumed and, therefore, owed a duty to provide LSED with full and complete information regarding the structure that MLPFS recommended to LSED. This duty included the obligation to provide all information that LSED would have found to be material in deciding whether to act on MLPFS's advice. Indeed, without full and complete information, LSED could not make an informed decision regarding MLPFS's advice and recommendations on the structure of this transaction.

<div align="center">60.</div>

Given the assurances by MLPFS's representatives regarding their expertise and experience and given MLPFS's leadership position in the municipal ARS industry, LSED relied heavily on the advice and recommendations of MLPFS. LSED reasonably assumed that MLPFS was providing LSED with full and complete information necessary for it to make an informed decision on the structure advocated by MLPFS.

<div align="center">61.</div>

LSED's January 12, 2006 Resolution authorizing the issuance of the Bonds reflected that "The Bonds do not constitute an indebtedness, general or special, or a liability of the State…." In addition, as a result of MLPFS's representations, Louisiana Governor Kathleen Babineaux Blanco issued Executive Order No. KBB 2006-11 on March 6, 2006, authorizing the issuance of the Bonds. In the recitals of the Executive Order, Governor Blanco noted that "the refunding of [LSED's] Prior Debt will result in present value interest cost savings to [LSED] and will enable [LSED] to have cash flow savings over the next few years, which is essential to the recovery of [LSED's] finances as a result of Hurricane Katrina" and that "as stated in the General Bond Resolution issuing the Series 2006 Bonds, the Series 2006 Bonds will not constitute an indebtedness, general or special, or a liability of the State…."

### E.     LSED Issued the Bonds.

62.

On March 23, 2006, Claiborn and Moffett presided over the closing of LSED's issuance of auction rate bonds with a total par value of $238,475,000 pursuant to the ARS structure and the Swap Agreements that MLPFS and its representatives had designed and recommended as creating a "synthetic fixed rate." The Bonds were issued in three series:  Series 2006A, 2006B, and 2006C.

63.

The Series 2006A bonds were issued in an aggregate principal amount of $84,675,000 with an initial interest rate of 3.10%, and an initial auction period starting April 4, 2006.

64.

The Series 2006B bonds were issued in an aggregate principal amount of $84,650,000 with an initial interest rate of 3.10%, and an initial auction period starting April 5, 2006.

65.

The Series 2006C bonds were issued in an aggregate principal amount of $69,150,000 with an initial interest rate of 4.70%, and an initial auction period starting April 17, 2006.  (The Series 2006A bonds, the Series 2006B bonds and the 2006C bonds are collectively referred to herein as the "Bonds").  The Series 2006C bonds were initially taxable, but they converted to tax exempt bonds within a couple of months as planned and then converted to a seven day auction schedule like the A and B series.

66.

Under the LSED bond resolutions governing the terms of the Bonds, LSED had the option of converting the Bonds from auction-rate mode to either fixed-rate or variable-rate mode. The Official Statement outlines the various options for future conversions.  At various times,

MLPFS provided advice on the desirability of exercising such conversion options. This advice was part of what MLPFS obligated itself to do in its Proposal and the MLPFS's January 13, 2006 presentation. Moffett scheduled routine meetings and calls with LSED representatives to provide such advice and to project near-term cash flows. At no time prior to the auction failures did Moffett advise LSED to convert from auction rate mode.

<div align="center">67.</div>

LSED also issued $55,850,000 of taxable bonds as Series 2006D. These taxable bonds were not issued as ARS. They bear interest at rates indexed to the LIBOR rate.

<div align="center">68.</div>

Under the terms of the Swap Agreements arranged by MLPFS, MLCS agreed to make floating rate payments to LSED equivalent to interest at a rate equal to 70% of the one-month LIBOR rate on the Bonds in exchange for fixed-rate payments by LSED of approximately 2.00% through July 1, 2009 and approximately 4.414% (for the Series 2006A and Series 2006B Bonds) and 4.463% (for the Series 2006C Bonds) thereafter until the maturity of the Bonds in 2036.[2] As developed by MLPFS, the Swap Agreements contained a "step-up" feature (*i.e.,* an increase in the fixed payments payable by LSED to MLPFS) that was supposed to reduce the cash outlays of LSED in the early years of the deal until the Hotel Occupancy Tax recovered. As represented many times by Claiborn, Moffett, Sober, and Stephens to the LSED Restructuring Group, the floating-rate paid by MLCS would be a closely correlating proxy of the rates that investors would set by their bids at auction so the structure would create a synthetic fixed rate.

---

[2] Adding fees, including those payable to broker-dealers handling orders at auctions for the Bonds, the effective funding cost of LSED was approximately 2.26% through July 1, 2009, and 4.67% (for the Series 2006A and 2006B bonds) and 4.72% (for the Series 2006C bonds) thereafter until the maturity of the Bonds in 2036.

69.

The Bonds' Official Statement describes that the purpose of the Swap Agreements "is generally to convert the [LSED's] floating rate obligations with respect to the Series 2006 Bonds to fixed rate obligations." This statement demonstrates LSED's reliance on MLPFS's representations that the structure would work to create a synthetic fixed rate.

**F.    MLPFS's Underwriting and Broker-Dealer Compensation**

70.

MLPFS earned substantial fees as a result of its relationship with LSED. Under the terms of the Contract of Purchase between LSED and MLPFS and the other underwriters named therein, the underwriters, including MLPFS, agreed to purchase the Bonds and the Series 2006D bonds at a price discounted from their par value, the amount of which represented their sales commission, and profit, when they subsequently sold the Bonds and the Series 2006D bonds into the market. The underwriters purchased the Bonds at an aggregate discount of $837,047.25, and the Series 2006D bonds at a discount of $196,033.50, for a total underwriting discount of $1,033,080.75. As Representative and Senior Manager under the Agreement Among Underwriters, MLPFS received 60 percent of such discounts.

71.

Similarly, under the terms of the Broker-Dealer Agreement between MLPFS and LSED, following each auction period, MLPFS earned a fee equal to (i) 0.25% of the principal amount of Bonds either held or purchased pursuant to orders submitted to it for a particular auction, or (ii) if no auction took place on a particular auction date, 0.25% of the principal amount of Bonds held by holders through MLPFS, prorated to reflect the number of days in the applicable auction period as a fraction of 360. As a result of its position as lead broker-dealer, MLPFS stood to gain a large percentage of the fees approximating $597,000 paid by LSED to broker-dealers each

year in connection with auctions for the Bonds. Based on LSED's internal review of the auction results, this arrangement provided for fees of approximately $644,000 paid to MLPFS from the time that the Bonds were issued until the auction failures of February 2008.

72.

According to emails from MLPFS representatives, MLPFS also earned a spread of 10.5 basis points on the Swap Agreements. This created income to MLPFS of approximately $240,000 annually.

73.

Based on press reports and the opinions of those familiar with the ARS market, MLPFS's arrangements with LSED were typical of arrangements with ARS issuers generally. That is why internal emails refer to MLPFS's ARS business as "very profitable."

G.     FGIC's Credit Enhancement

74.

LSED paid FGIC more than $13 million for credit enhancement in the form of a Municipal Bond New Insurance Policy (the "Bond Insurance Policy") and separate Municipal Bond Debt Service Reserve Fund Policies for each of the three series of bonds (collectively, the "Reserve Fund Policies").

75.

The premium charged by FGIC to LSED was one of the largest premiums, percentage-wise, ever paid by any municipal issuer. The amount of the premium is all the more remarkable in the light of the fact that at the time of LSED's March 2006 issuance FGIC was already insuring LSED's pre-existing bonds and FGIC, therefore, already bore the same risk. Even though FGIC would be relieved of its obligations under its pre-existing policy with LSED when

LSED's new ARS were issued, FGIC still demanded the up-front premium of more than $13 million for the credit enhancement.

<center>76.</center>

The continued creditworthiness of FGIC and ability to insure LSED's obligations over the life of the Bonds was critical to the value of FGIC's credit enhancement, without which the Bonds would have had a much lower credit rating, and LSED would have had to pay higher interest amounts.

<center>77.</center>

Regarding its decision to purchase credit enhancement, LSED understood that its future interest payment savings would be substantially greater than the amount of the premium paid to FGIC.

<center>78.</center>

MLPFS and FGIC both fully understood that LSED was only paying the large up-front premium of approximately $13 million because LSED intended to save itself considerably more than that in interest payments over the life of the Bonds. If FGIC's credit rating fell below triple-A at any time after the Bonds were issued, LSED – not investors holding the Bonds – would bear the cost in the form of higher interest rates.

<center>79.</center>

FGIC's knew that its policies were intended to provide credit enhancement because FGIC knew that its policies were intended to be a "qualified guarantees" pursuant to the applicable Treasury Regulations. This is further confirmed by FGIC's certification letter that was part of the closing documents.

80.

Further, as is evident from FGIC's promotional materials and various news reports, FGIC marketed itself so that the public and the credit markets knew that FGIC was providing credit enhancement through the sale of its insurance products.

81.

When FGIC was purchased by The PMI Group, Inc., Blackstone Group, and Cypress in 2003, PMI's press release described FGIC's business as follows:  "As a leading insurer of municipal bonds, FGIC provides credit enhancement solutions that enable state and local issuers **to reduce their borrowing costs and enhance their access to capital markets** by guaranteeing payment when due of the principal and interest on their guaranteed obligation" (emphasis added).  This is what LSED understood FGIC would do for LSED over the life of the Bonds in exchange for the premium of approximately $13 million.

82.

FGIC's business was described as follows in the State of New York Insurance Department Examination Report dated November 10, 2005:  "For public finance obligations, FGIC provides credit enhancement solutions that enable state and local issuers to reduce their borrowing costs and enhance their access to the capital markets…FGIC's financial guaranty enables issuers to reduce their financing costs, helps investment bankers to structure and execute transactions more efficiently and effectively, and provides added liquidity to investors."

83.

In its 2005 and 2006 Annual Reviews, FGIC stated that it "provides credit enhancement for public finance and structured finance obligations."

84.

In its 2005 Annual Review, FGIC touted FGIC's ratings and performance:

33

Established in 1983, FGIC is one of the four leading monoline financial guarantors. FGIC typically guarantees the scheduled payments of principal and interest on an issuer's obligation. FGIC's financial strength is rated triple-A by Moody's Investors Service, Standard & Poor's and Fitch Ratings.

\*        \*        \*        \*        \*

FGIC is now recognized by clients, investors, rating agencies and competitors as a major force in the global financial guaranty market. We have established ourselves as leaders in execution and innovation. As evidence, FGIC guaranteed three of the five *Bond Buyer* "Regional Deals of the Year" in 2005, including the winning "2005 Deal of the Year Award" for the San Jose Redevelopment Agency transaction. And in an awards ceremony last spring, *Securitization News* recognized FGIC as "Financial Guarantor of the Year" for 2004.

85.

FGIC also routinely reminded the market that FGIC was supposedly only insuring

obligations based on a "remote-loss standard":

Financial strength is part of FGIC's DNA and will never be compromised. To this end, we will continue to underwrite to a remote-loss standard. In this way we will maintain our market position as the triple-A insurer with the safest book of insured business. We will also be highly selective about the market opportunities we choose to participate in, and we will actively manage concentrations of risk, single risk and correlations of risk. The trading value of the FGIC name remains very strong, and we will always seek to maintain this value by focusing on the long-term impact of the risks we assume and the strategic business decisions we make.

\*        \*        \*        \*        \*

We like to say that FGIC has one of the lowest risk insured books of business in our industry. Eighty-one percent of our insured portfolio is rated 'A' or better, with only 0.5% rated below investment grade. Because of this, and because there is less FGIC paper in the market than that of our larger competitors, there is very high demand for the FGIC name. Our long-term goal is to continue to maintain a low risk book while achieving acceptable returns for the company.

*See* FGIC's 2005 Annual Review.

<div align="center">86.</div>

In FGIC's 2006 Annual Review, FGIC stated that "The FGIC triple-A guaranty affords issuers more cost-effective access to both domestic and cross-border capital by attracting a broader class of investors and creating liquidity for their paper in the market."  This is exactly why LSED paid FGIC approximately $13 million—credit enhancement for the 30 year life of the Bonds.  FGIC also declared in its 2006 Annual Review that "FGIC focused on continuing to be the best at providing credit enhancement solutions to issuers and investors" and advertised that "FGIC emerged in 2006 as an indisputable leader in the financial guaranty industry, a first line provider of credit enhancement specializing in complex and non-commodity type products." FGIC routinely marketed itself based upon its "triple-A guaranty," and similar formulations in promotional materials and print ads prior to LSED's issuance.

<div align="center">87.</div>

During 2007, FGIC stated on its website that "FGIC is one of the four leading monoline financial guarantors" and that "FGIC's financial strength is rated triple-A by Moody's Investors Service, Standard & Poor's and Fitch Ratings."

<div align="center">88.</div>

In its Proposal to LSED, under a section labeled "Credit Enhancement Discussion," MLPFS advised the following:  "In today's markets, retail and institutional investors continue to have a huge appetite for insured bonds.  As a result, the yield spread between insured and uninsured fixed-rate bonds makes bond insurance extremely economical…we recommend [LSED] pursue bond insurance which will broaden the potential investor base for the transaction as well as provide [LSED] with a lower cost of funds."  When dealing with Standard and Poor's

on LSED's behalf, MLPFS's representative, Moffett, stated in an email dated March 9, 2006, that LSED was "requesting their AAA rating based on insurance from FGIC…."

89.

The market correctly perceived the benefit of LSED's purchase of FGIC's credit enhancement. News reports providing an overview of the issuance of the LSED Bonds discussed the "AAA enhancement" and referred to the bond insurance policy as a "wrap" where LSED "essentially [bought] the rights to use the insurer's top flight credit rating." Press reports discussed the fact that even after the payment of the unprecedented 300 basis point up-front premium, the policy would "save the issuer money" over the life of the Bonds.

90.

In the First Supplemental Resolution of LSED dated March 17, 2006, the purpose of the bond insurance was summarized as follows: "The [LSED] finds and determines that economic benefits, including reducing the Debt Service due on the Series 2006 Bonds by hedging against potential fluctuations in interest, reduced economic borrowing costs, maximizing flexibility and enhancing the marketability of the Series 2006 Bonds will result from the obtaining of the Bond Insurance Policy, the Reserve Fund Insurance Policy, and the execution and delivery of the Interest Rate Hedge…." Further, the minutes of LSED's Board of Commissioner's meeting on January 12, 2006 reflect that "[t]his insurance will enable the bonds to be sold at the highest Triple A rating."

**H.     MLPFS's Support Bids from April of 2006 through February of 2008 and Their Effect of Preventing Auction Failures**

91.

Based on LSED's review of the summary of the bids received in the auctions for the Bonds (the "Bid Summaries") that were received by LSED in response to the request of litigation

293820v.7

counsel, it is now known that from the very first auctions for the Bonds in April of 2006 until February of 2008, MLPFS placed a bid for 100% of LSED's Bonds in 100% of LSED's auctions.  It is also now known that MLPFS's blanket bid set the clearing rate for nearly every one of the auctions during this time. The Bid Summaries were not supplied to LSED contemporaneously with the auctions; rather, they were obtained by undersigned counsel well after the auction failures.  MLPFS's practice of placing its support bids prevented the auctions for the Bonds from failing and prevented LSED and investors from learning that the market for the Bonds was not self-sufficient.  LSED did not learn this until after the auctions failed.

92.

MLPFS's blanket bids on the Bonds were merely a continuation of its general policy of placing blanket support bids for all of the bonds in the auctions for which MLPFS was the sole or lead underwriter/broker-dealer.  LSED did not know about MLPFS's blanket bid policy, and MLPFS never disclosed this policy to LSED.

93.

With respect to the Series 2006A bonds, MLPFS placed buy bids at or below 5.5 percent for all of the outstanding bonds in every auction from April 4, 2006 (the first auction) to February 12, 2008.  There were 98 auctions during that period.  In all but 5 of those auctions, MLPFS's blanket support bid set the clearing rate.  Further, 76 of those auctions, including the very first auction on April 4, 2006, would have failed without MLPFS's blanket support bids.

94.

With respect to the Series 2006B bonds, MLPFS placed buy bids at or below 5 percent for all of the outstanding bonds in every auction from April 5, 2006 (the first auction) to February 6, 2008.  There were 97 auctions during that period.  In all but 5 of those auctions,

MLPFS's blanket support bid set the clearing rate.  Further, 72 of those auctions, including the very first one on April 5, 2006, would have failed without MLPFS's blanket support bids.

95.

With respect to the Series 2006C bonds, MLPFS placed buy bids at or below 5.25 percent for all of the outstanding bonds in every auction from April 17, 2006 (the first auction) to February 8, 2008.  There were 86 auctions during that period.  In all but 16 of those auctions, MLPFS's blanket support bid set the clearing rate.  Further, 46 of those auctions, beginning with the June 12, 2006 auction, would have failed without MLPFS's blanket support bids.

96.

MLPFS's manipulative policy of placing blanket bids in every auction for which it was the sole or lead underwriter/broker-dealer created a false impression of liquidity in the ARS market and of the rarity of auction failures.  The Massachusetts Securities Division found that 5,892 auctions would have failed between January 3, 2006 and May 27, 2008 but for MLPFS's support bids.  And based on the above statistics, 69 percent of the auctions for the LSED's bonds would have failed absent MLPFS's support bids.

97.

It is well known that, all things being equal, an investor will demand a higher interest rate for a long-term investment than for a short-term investment that provides weekly liquidity. Absent a consistent track record of a very low risk of auction failures, investors would have treated ARS as investments with significant liquidity risk, which they were, and required higher interest rates to take that risk.  Further, issuers would have recognized the risk of auction failure and weighed that risk in choosing whether to issue a long-term debt obligation that carried a significant risk of failure and the attendant risk of very high costs of borrowing during any period of failure.

293820v.7

98.

Ultimately, LSED believed there was a robust market for ARS bonds that would continue to produce a lower, short-term cost of borrowing.  Issuers, like LSED, were not told and were unaware that the markets would only produce that low-rate result as long as the underwriters continued to bid in every auction.  The implication of this is that instead of being able to rely on the integrity of the market to generate the anticipated short-term rates, these short-term rates were actually entirely dependent on MLPFS, an absolutely critical fact to know to determine whether to issue bonds in this structure.

99.

MLPFS's manipulative blanket bid policy as to this and other ARS issues had the effect of sending a false signal to the market that the risk of auction failure was very remote and that the ARS market had consistent inherent liquidity.  The concealment of the real risk of lack of liquidity of the ARS market caused investors to treat ARS as viable alternatives to money market funds rather than as long-term investments, and thus induced investors to buy ARS at lower short-term interest rates.  This in turn allowed MLPFS to pitch ARS to issuers as a long-term debt financing at a short-term rate.  And MLPFS's manipulative blanket bid policy ultimately caused issuers to issue ARS based on the expectation that the ARS structure would provide short-term interest rates for a long-term debt financing.

I.    **The SEC's Investigation and MLPFS's Misleading Notice of its ARS Practices**

100.

On May 31, 2006, the Securities and Exchange Commission ("SEC") issued an "Order Instituting Administrative and Cease-and-Desist Proceedings, Making Findings, and Imposing

Remedial Sanctions and a Cease-and-Desist Order Pursuant to Section 8A of the Securities Act of 1933 and Section 15(b) of the Securities Exchange Act of 1934," naming 14 investment banks, including MLPFS.  In its May 31, 2006 Order, the SEC found that "[f]rom at least January 1, 2003 through June 30, 2004," the investment banks "engaged in one or more practices" in violation of Section 17(a)(2) of the Securities Act.  In its Proposal, MLPFS did not disclose this investigation to LSED although the Solicitation to which MLPFS was responding asked for a listing of ongoing investigations into MLPFS's conduct related to its municipal business and although MLPFS listed many other ongoing investigations.

101.

Among other things, the SEC noted in its May 31, 2006 Order that various investment banks "intervened in auctions by bidding for their proprietary accounts" in one of the following ways:  bidding to prevent auctions from failing; bidding to affect the auctions' clearing rates; or bidding to prevent all-hold auctions.  The SEC found that this conduct violated the prohibition on material misstatements and omissions in the offer and sale of securities.

102.

As a result of the SEC's findings, MLPFS entered into an agreement with the SEC pursuant to which it agreed (i) to be censured, (ii) to pay a civil penalty of $1.5 million, and (iii) to "[n]ot later than 6 months after the entry of this Order…provide all of…the issuers of such securities … with a written description of [its] material auction practices and procedures" and to post its "then-current material auction practices and procedures" on its website.

103.

Following the Consent Order, upon information and belief, based on pleadings filed in other ARS cases involving MLPFS, MLPFS posted a document entitled "Description of Merrill Lynch's Auction Rate Securities Practices and Procedures" on its website at

http://www.ml.com/media /70501.pdf in or around August 2006.  Despite the fact that MLPFS

intervened and placed support bids in *every* auction where it served as lead or sole broker-dealer

including every LSED auction, MLPFS stated only that it "*may* routinely place one or more bids

in an auction for its own account to acquire auction rate securities for its inventory, to prevent an

auction failure or an auction from clearing at a rate that Merrill Lynch believes does not reflect

the market for the securities…Merrill Lynch also *may* routinely encourage bidding by others in

auctions, including to prevent an auction failure or an auction from clearing at a rate that Merrill

Lynch believes does not reflect the market for auction rate securities."  *Id.* at 16 (emphasis

added).  These disclosures—which were made after LSED issued its Bonds—were false and

substantially misleading.

<div align="center">104.</div>

In April 2007, the Securities Industry and Financial Markets Association ("SIFMA"), an

industry organization representing underwriters and broker-dealers (including MLPFS) issued

"SIFMA's Best Practices for Broker-Dealers of Auction Rate Securities."   SIFMA's Best

Practices require broker dealers that routinely place auction support bids to disclose that they do

so, not that they *may* do so, as MLPFS deceptively worded its disclosure.  The Best Practices

provide, in pertinent part that a broker-dealer should disclose, if true, that:

> (a) it routinely places one or more Orders in auctions generally for its own
> account, even after obtaining knowledge of some or all of the other
> Orders, and it may do so in any particular Auction;
>
> (b) it routinely places one or more Bids in Auctions generally to prevent a
> Failed Auction or a Clearing Rate the Broker-Dealer believes is not a
> market Rate at the time it makes its Bid, even after obtaining knowledge
> of some or all of the other Orders, but is not obligated to continue to place
> such Bids or to bid in any particular Auction;
>
> (c) it routinely encourages bidding by others in Auctions generally,
> including to prevent a Failed Auction or a Clearing Rate it believes is not a

market Rate even after obtaining knowledge of some or all of the other Orders, and it may do so in any particular Auction…

105.

On March 14, 2008, the SEC issued a no-action letter concerning ARS, in which the SEC made clear that broker-dealers bidding for proprietary accounts could avoid liability for violating the federal securities laws only by disclosing "detailed information regarding bidding in the immediately preceding auction," including such material facts "as the amount of securities for sale in the auction; the number and aggregate dollar amount of bids made; the number of bidders other than the participating dealers, . . . the number, interest rate(s) and amount of bids, if any, made by the participating dealers." Such information would necessarily include the extent of the broker-dealers support bids, and the extent to which those support bids were responsible for clearing each auction.

106.

Based on the findings of the state and federal regulators, press reports, and LSED's own experience with MLPFS, MLPFS failed to abide by these guidelines or best practices. Despite placing support bids in every auction in which it served as sole or lead broker-dealer to prevent market failure, MLPFS never disclosed the true nature or extent of its market manipulation. Rather, MLPFS characterized its practices in website disclosures in terms that MLPFS knew omitted the most critical information and was false and misleading as stated. In the regular face-to-face meetings with LSED representatives, MLPFS never disclosed or discussed with LSED its ubiquitous support-bid practice, that it always bid for all of the bonds in every LSED auction, and that these bids prevented the auctions from failing and routinely set the interest rates.

**J.    February 2008 Auction Failures**

107.

On February 13, 2008, what was essentially a house of cards began to collapse.

108.

On February 13, 2008, MLPFS ceased its manipulative practice of placing blanket bids for the Bonds and the auctions for the Bonds immediately failed.  Once MLPFS ceased placing blanket bids, the risk of failed auctions immediately materialized, and LSED was forced to pay the auction failure rate of 12 percent.  This risk was precisely the risk concealed by MLPFS's manipulative blanket bidding, which created the impression of liquidity and of a remote risk of auction failure.  It was also the risk that was omitted from discussions about the proposed bond structure.  In fact, the risk of auction failure was significant and highly material throughout the term of the Bonds, as demonstrated by the fact that 69 percent of LSED's auctions would have failed absent MLPFS's support bids and that LSED's auctions failed immediately upon MLPFS ceasing to place support bids.

109.

As is now known following a review of the Bid Summaries that were obtained after the auction failures, at the February 13, 2008 auction for the Series 2006B bonds, MLPFS did not place a support bid.  As a result, the auction for the Series 2006B bonds failed, and LSED was forced to pay the punitive 12 percent interest rate.  In the auctions for the Series 2006B bonds after February 13, 2008, MLPFS did place bids, but the bids were at or around the failed auction rate of 12 percent.  That is, MLPFS actually set the clearing rate at or around 12 percent in auctions after February 13, which caused LSED to pay 12 percent (or nearly 12 percent) on all of the outstanding Series 2006B bonds, including the bonds that MLPFS was holding for its own

account.[3]  Through its blanket bids, MLPFS obtained the following amounts of Series 2006B bonds at the following auctions after February 13, 2008:  $30.5 million at the February 20, 2008 auction; $24.65 million at the February 27, 2008 auction; $27.025 million at the March 5, 2008 auction; $6.025 million at the March 12, 2008 auction; $10.925 million at the March 19, 2008 auction; $6.925 million at the March 26, 2008 auction; $3.125 million at the April 2, 2008 auction; and $.675 million at the April 9, 2008 auction.

110.

At the February 15, 2008 auction for the Series 2006C bonds, MLPFS did not place a support bid.  As was the case with the Series 2006B bonds, the auction for the Series 2006C bonds failed on that date, and LSED was forced to pay the punitive 12 percent interest rate.  In the auctions for the Series 2006C bonds after February 15, 2008, MLPFS bid at or around the failed auction rate of 12 percent, forcing LSED to pay 12 percent (or nearly 12 percent) on all of the outstanding Series 2006C bonds, including the bonds that MLPFS was holding for its own account.[4]  Through its blanket bids, MLPFS obtained the following amounts of Series 2006C bonds at the following auctions after February 15, 2008:  $20.975 million at the February 22, 2008 auction; $17.1 million at the February 29, 2008 auction; $17.275 million at the March 7, 2008 auction; $6.625 million at the March 14, 2008 auction; $2.45 million at the March 20, 2008 auction; and $16.05 million at the April 4, 2008 auction.

---

[3] At the February 20, 2008, March 5, 2008, March 12, 2008, March 19, 2008, March 26, 2008, April 2, 2008, and April 9, 2008 auctions for the Series 2006B bonds, Merrill set the clearing rate at 12 percent.  At the February 27, 2008 auction, Merrill set the clearing rate at 11.5 percent; and at the April 16, 2008 auction, Merrill set the clearing rate at 11 percent.

[4] At the February 22, 2008, February 29, 2008, March 7, 2008, March 14, 2008, March 20, 2008, and April 4, 2008 auctions for the Series 2006C bonds, Merrill set the clearing rate at 12 percent.  At the March 28, 2008 auction, Merrill set the clearing rate at 10.5 percent; at the April 11, 2008 auction, Merrill set the clearing rate at 11 percent; and at the April 18, 2008 auction, Merrill set the clearing rate at 10 percent.

293820v.7

111.

At the February 19, 2008 auction for the Series 2006A bonds, MLPFS bid the failed auction rate of 12 percent and set the clearing rate at the punitive 12 percent rate.  In the auctions for the Series 2006A bonds after February 19, 2008, MLPFS bid at or around the failed auction rate of 12 percent, forcing LSED to pay 12 percent (or nearly 12 percent) on all of the outstanding Series 2006A bonds, including the bonds that MLPFS was holding for its own account.[5]  Through its blanket bids, MLPFS obtained the following amounts of Series 2006A bonds at the following auctions after February 19, 2008:  $22.65 million at the February 19, 2008 auction; $2.575 million at the March 4, 2008 auction; $3.85 million at the March 11, 2008 auction; $3.85 million at the March 18, 2008 auction; and $2.775 million at the April 15, 2008 auction.

112.

MLPFS's actions in obtaining millions of dollars worth of LSED's Bonds at or around the 12 percent penalty rate, which occurred between February 2008 through April 2008, constituted a continuing part of MLPFS's wrongdoing.

113.

One of the services that MLPFS was purportedly providing was the provision of advice regarding whether LSED should change the Bonds' mode, which, under the bond documents, was possible and under the circumstances could have averted a significant portion of the damages.  Prior to the auction failures, MLPFS's representatives, including Moffett and Claiborn, did not recommend any change in mode, such as a change to fixed rate mode, that would have mitigated the problems.  Based on MLPFS's contract, its written representations, its

---

[5] At the March 4, 2008, March 11, 2008, March 18, 2008, March 25, 2008, and April 15, 2008 auctions for the Series 2006A bonds, Merrill set the clearing rate at 12 percent.  At the February 26, 2008 auction, Merrill set the clearing rate at 11 percent; at the April 8, 2008 auction, Merrill set the clearing rate at 11.77 percent; and at the April 22, 2008 auction, Merrill set the clearing rate at 10 percent.

45

actual practice in dealing with LSED and making such recommendations to LSED and other customers and custom and practice in the industry, MLPFS owed a contractual and fiduciary duty to supply correct information to LSED in order for LSED to be able to make appropriate decisions regarding what actions to take after the issuance with respect to the Bonds and the interest rate swaps.  As discussed herein, MLPFS failed to do so.

114.

As a regular part of the services that MLPFS provided to LSED, Moffett (and sometimes Claiborn) would confer with David Weidler and other LSED representatives to review the state of the ARS market, whether a mode change was advisable, the status of the interest rate swaps, the prospective cash flows and to value the swaps for purposes of valuing them on LSED's financial statements.  At these conferences, which occurred at least quarterly after the issuance from 2006 on, neither Moffett nor Claiborn ever disclosed that LSED's auctions would have failed without MLPFS's support or that MLPFS's inventory of ARS was growing alarmingly and exceeding its internal limits.

115.

In conversations with LSED representatives in February 2008 through April 2008, Claiborn and Moffett affirmatively misrepresented the cause of the auction failures and the high rates as being the product of a "market disruption" when they knew the truth about MLPFS's integral role in the failures.

116.

MLPFS failed to disclose to LSED the true cause of the auction failures and the fact that MLPFS was setting 12 percent (and near 12 percent) clearing rates through its continued practice of placing support bids, even though MLPFS continued to advise LSED and made formal presentations to LSED on February 7, 2008, February 13, 2008, March 17, 2008, March 20,

46

2008, and April 2, 2008.  In its presentations to LSED's representatives on February 7, 2008, February 13, 2008, and April 2, 2008, MLPFS blamed the problems in the ARS market (and the resulting high interest rates) on a "market disruption."  In these presentations, MLPFS further stated, "Extremely volatile market conditions have impacted both the fixed and variable markets" and "Disruptions in the sub-prime mortgage and collateralized debt obligations ("CDO") markets have led to a global contraction in liquidity and volatile market conditions for the last several months."  MLPFS did not provide the truth to LSED — that the real reason LSED was now paying interest at or around the 12 percent failed auction rate was that MLPFS had stopped submitting support bids at low rates and was now setting the high rates by bidding at or around the failed auction rate of 12 percent.

K.    **Following the Auction Failures, State and Federal Regulators Have Identified MLPFS's Wrongful Conduct, and MLPFS Has Accepted Censure and Paid Penalties**

117.

On August 22, 2008, the SEC announced that it had reached a preliminary settlement with MLPFS on the SEC's charges that MLPFS misrepresented that ARS "were safe, highly liquid investments equivalent to money market instruments and cash;" that "Merrill Lynch did not make adequate disclosures that the liquidity of these securities was based on Merrill Lynch supporting the auctions it managed when there was not enough demand;" and that "Merrill Lynch continued to tout the purported liquidity of ARS to customers despite its awareness of the escalating liquidity risks in the weeks and months preceding the collapse of the ARS market." The settlement provided for those who purchased ARS through MLPFS to receive up to $7 billion to restore their losses and liquidity. The SEC also indicated that MLPFS would face "the prospect of a financial penalty to the SEC after it has completed its obligations under the settlement agreement."

118.

Following the SEC's May 31, 2006 Cease and Desist Order and the SEC's August 22, 2008 Preliminary Settlement with MLPFS, on April 9, 2009, MLPFS entered into a Consent Order with the Massachusetts Securities Division ("MA Consent Order") in which MLPFS agreed to "pay fines and/or penalties totaling $125 million (the 'Total Penalty') to the Commonwealth of Massachusetts and the other states which shall be allocated at the Commonwealth of Massachusetts and other states' discretion, to resolve all underlying conduct relating to the sale of auction rate securities."

119.

The Massachusetts Securities Division made the following findings, among others:

- "Until August of 2007 Merrill Lynch had a policy of placing support bids into every auction for which it was sole or lead broker." *See* ¶ 129 of the MA Consent Order.

- "When placing a support bid, Merrill Lynch would bid for the entire notional value of the issue being auctioned, regardless of the size or volume of buy, sell or hold orders Merrill Lynch had received." *Id.* at ¶ 131.

- "By placing support bids for the entire notional value of the issue being auctioned Merrill Lynch ensured that no auctions in its ARS program would fail." *Id.* at ¶ 134.

- "For the period of January 3, 2006 through May 27, 2008, 5892 auctions for which Merrill Lynch was the sole lead dealer would have failed but for Merrill Lynch's support bid." *Id.* at ¶ 136.

120.

MLPFS's own internal documents, which were identified by the Massachusetts Securities Division, demonstrate the lengths to which MLPFS was willing to go to conceal the problems with the ARS market and to protect its share of the $330 billion ARS market by propping up the market through undisclosed market manipulation beginning by at least January 2003.

121.

Numerous emails show that MLPFS misled investors by manipulating and withholding information to paint a more favorable picture of the ARS market.  Juxtaposing what MLPFS was saying internally with what it was telling customers and issuers evidences the contrast between internal gloom and external confidence and demonstrates that MLPFS knew that the statements it was making to the market were false, misleading and grossly incomplete.  MLPFS's fraud on its investors and its fraud on the issuers were two sides of the same coin.  MLPFS had to convince investors to buy ARS in order to protect its balance sheet and retain its capacity to act to prevent the auctions failures that would alert issuers and potential issuers to the real danger of financing through an ARS structure.

122.

For example, on August 21, 2007, Martin Mauro and Phil Fisher of MLPFS's Research Department, issued a report titled "Liquidity features of short term municipal securities" that called into question the true liquidity of ARS.  On August 22, 2007, Frances Constable, MLPFS's Managing Director in charge of the auction desk, internally demanded a retraction of the report.  In addition to placing several phone calls to demand a retraction, she wrote the following in an email:

> I HAD NOT SEEN THIS PIECE UNTIL JUST NOW AND IT MAY SINGLE HANDEDLY UNDERMINE THE AUCTION MARKET…I HAVE ASKED FOR AN IMMEDIATE CLARIFICATION TO BE PUBLISHED AND A RETRACTION OF THIS.

The research report was later revised to Constable's liking.

123.

On November 30, 2007, Constable emailed Mauro as follows:

> Any renewed research focusing on the high quality of closed end
> fund preferreds of ALL tax status, auction municipal bonds and
> student loan backed bonds, wrapped around the value added
> proposition with today's rates would be extremely helpful.

124.

On December 3, 2007, in the *Fixed Income Digest*, contrary to what MLPFS knew about

the shakiness of the ARS market, but in line with its concerted effort to conceal the truth,

MLPFS advised:

> Are auction market securities safe?
> We are comfortable with the safety of auction market securities,
> and view the present backup in rates as a buying opportunity for
> investors looking for short-term instruments. Since August, our
> top recommendations have been the auction securities of the closed
> end funds and municipal issues insured by one of the primary
> mono-line financial guarantors.

125.

On February 8, 2008, just days before MLPFS stopped placing blanket support bids, in

the *Fixed Income Digest*, when discussing the ramifications of a "few failed auctions," MLPFS

said:

> There is one lesson for investors to take away from this [the failed
> auctions]: know the broker dealer with whom they are doing
> business. No broker dealer is going to guarantee that it will always
> be making markets in auction securities no matter what the
> environment looks like.
>
> *        *        *        *        *
>
> Many investors are wondering what these potential exits says
> about the future of the auction market, and is it a sign of something
> more ominous to come. We think not.
>
> *        *        *        *        *
>
> The reports of the imminent demise of the auction market seem to
> be greatly exaggerated, again.

These statements were clearly intended to give the false impression that the ARS market was still viable and that MLPFS was still committed to "making markets" in ARS, when MLPFS's contemporaneous internal records demonstrate that MLPFS knew that it would not be supporting the auctions for much longer.

<div align="center">126.</div>

The MA Consent Order states that MLPFS's internal records "illustrate perfectly the repressive conditions under which research reports that touched upon issues facing the Auction Market were crafted.  Simply stated, objectivity had to be tempered and shaped to understate negative market events and known risks affecting ARS in order to minimize the potential adverse consequences to Merrill Lynch's marketing and sales of ARS."  *See* MA Consent Order at ¶ 269.

<div align="center">127.</div>

When it became clear to MLPFS that the ARS market was on the verge of collapse, in complete disregard for the interests of its clients (including LSED), MLPFS continued to conceal the problems with the ARS market and continued to push ARS on its retail customers.

<div align="center">128.</div>

On November 19, 2007, John Price, Constable's supervisor, stated the following in a personal email:

> Thanks...Will call later.  Market is collapsing.  No more $2k dinners at CRU!!  The Financials are being invicerated! (sic)  More firings over at Citi...Inventory flooding the street.  Going to be great '08 trading environment.  All we have to do is live!!

<div align="center">129.</div>

On November 19, 2007, Constable emailed Price with the following:

> AMS desk barraged by issuers asking why their rates are climbing as well as investors expressing concern about muni [guaranteed] by monolines. Negative tone prevails.  Inventory up by 100MM.  We are offering

discounts as well as 25 and 50 bp credit specials in an effort to move inventory.

130.

On November 26, 2007, Constable emailed Price in response to his question or whether it was possible to "cheapen the levels close to the fail rates to clear more product":

> That would be too scary, as the fail rates are generally 12%. we are working it higher to at least be consistent with where we have T.E. closed end funds. The gloves are off and we are not concerned about issuer perception of [MLPFS's] abilities and the competition. Gotta Move these microwave ovens.!!

This email in its use of the term "working it higher" is referring to MLPFS's blanket bidding to set the interest rates in the auctions slightly higher, evidencing that MLPFS was well aware, as it had to be, that MLPFS was routinely setting the auction clearing rates in all of its issues, not just LSED's.

131.

On November 28, 2007, Edward Malmstrom, Managing Director and Co-Head Public Finance, stated in an email to several representatives of MLPFS, including Constable:

> …[W]ord is out that we are not supporting our auction programs. We have to be competitive or we will lose our best clients and put at risk a very profitable health care franchise.

This email demonstrates that MLPFS was motivated to continue to manipulate the ARS auctions to try to preserve the various income streams that its fixed income business and its ARS specially generated. MLPFS knew that once the market for ARS failed, it would be difficult to resuscitate it and that there would be many angry issuers whose financings did not work to generate low interest rates as planned and investors whose bonds were illiquid, who would no longer be eager to do business with MLPFS.

132.

On January 9, 2008, Jim Brewer wrote the following email to many of MLPFS's senior

personnel, including Frances Constable:

> The attached file contains the lead managed XL & FGIC Insured
> issues we currently trade on the auction desk.   It seems
> increasingly likely that these two monoline insurers are going to be
> downgraded.   We anticipate that if that happens there will be a
> wave of selling in these issues that we will be unable to support
> causing the auctions to fail.   If any of these issues fail, one can
> make the assumption that it will spread to the other sectors of our
> market regardless of the insurer or ratings.   Is anyone working on a
> contingency plan in the event that these issues are downgraded?

This email demonstrates that MLPFS knew internally at least a month before the failures that if

FGIC was downgraded by the ratings agencies that MLPFS would not be willing or able to

continue to place blanket support bids and buy the necessary number of bonds at auction to keep

LSED's issuance, among others, from failing.   MLPFS knew, therefore, that if and when this

happened, LSED's cost of borrowing would be 12 percent (plus the fixed payment on the swap).

Nonetheless, up to and after January 2008, Moffett and Claiborn did not disclose these concerns

to David Weidler of LSED during the periodic meetings and calls to provide "market updates"

and "analytics."

133.

The records obtained by the Massachusetts Securities Division further demonstrate that

MLPFS was well aware of the problems with the ARS market because MLPFS was tracking via

a "Daily Lead Managed Summary" the amount of ARS held in its own inventory, and it could

tell that its inventories were growing to unsustainable levels and that it would no longer be

supporting the auctions.

134.

In fact, as early as August 21, 2007, Constable expressed MLPFS's concern about "inventory creep":

> we have had a more robust round of selling across the entire spectrum of product........To attempt to combat inventory creep and to encourage greater retail participation and the attraction of new buyers in our market, I have meetings planned with Mark Berry and the institutional sales force tomorrow at 7:15 to push the closed end funds and student loans.....We have scheduled a meeting with GPC [Global Private Client] National Sales for next Wednesday to discuss the cash alternatives that investors should consider to be the gold standard versus T-Bills.  We simply need to buy time to get new buyers encouraged.

135.

Historically, MLPFS had kept no more than approximately $200 to $300 million of municipal ARS in inventory at any one time, and an internal November 26, 2007, MLPFS email reveals that MLPFS had an internal risk limit of $1 billion for municipal ARS.

136.

After Constable's August 21, 2007 email, MLPFS's inventory continued to grow. MLPFS's Daily Lead Managed Summaries reveal that:

- On August 22, 2007, MLPFS had approximately $538 million worth of municipal ARS in its inventory.

- On September 27, 2007, MLPFS had approximately $611 worth of municipal ARS in its inventory.

- On November 19, 2007, MLPFS had approximately $898 worth of municipal ARS in its inventory.

- On November 21, 2007, MLPFS had just over $1 billion worth of municipal ARS in its inventory.

- On November 26, 2007, MLPFS had approximately $1.1 billion worth of municipal ARS in its inventory.

- On December 11, 2007, MLPFS had approximately $1.2 billion worth of municipal ARS in its inventory.

- On December 19, 2007, MLPFS had approximately $1.3 billion worth of municipal ARS in its inventory.

137.

Despite MLPFS's promise to provide market updates to LSED, MLPFS did not disclose these increasing inventory levels to LSED or describe the additional level of risk that this created.  MLPFS's internal communications reveal that its increasing inventory levels were of great concern to MLPFS.

138.

On December 4, 2007, Price emailed MLPFS's trading desk to advise that MLPFS's inventory had to be reduced by year end:

> TRADING - WE NEED TO REDUCE BALANCE SHEET INTO YEAR END.  THE DESK IS OVER IT'S (sic) TARGET BY $3BLN AND WE NEED TO GET DOWN.  PLEASE EXAMINE CRFF AS IT HAS BECOME TOO LARGE.

139.

And on January 18, 2008 Constable emailed MLPFS's sales group to stress the need to sell MLPFS's ARS inventory:

> Mike and team:  It's a double day and we have to also buy back many of the securities from the MLI account early this morning, not to mention we are about to get shellacked from terrified investors and we HAVE TO SELL INVENTORY!!"

140.

MLPFS's concerns about the weakness of the ARS market and its inability to continue supporting the auctions were never brought to the attention of LSED despite MLPFS's express promise and undertaking to continue to advise LSED with "market updates" and "analytics."  Despite regular in-person meetings and conference calls with LSED representatives, including

55

David Weidler after the issuance of the Bonds, MLPFS did not give LSED any advance notice of the problems with the ARS market or that MLPFS could see that it would likely cease supporting the auctions. As a result, once LSED's Bonds lost their investment-grade rating and the auctions failed, LSED's options to fix the problem through some kind of transaction restructuring—for example, converting the Bonds' auction-rate mode to a fixed-rate or variable-rate mode—were significantly limited by the market. One of the duties that MLPFS undertook was to advise LSED regarding whether to switch to a different mode under the bond transaction documents. During the period that the Bonds were triple-A rated, LSED could have changed to a fixed rate or variable rate mode and mitigated its exposure to the failed auction rate. But once the auctions failed, these were no longer practical options. As a result of this conduct, LSED has suffered damages equal to the difference between what the interest and other costs are to LSED to restructure the Bonds after the auction failures versus what LSED could have done had it been advised to change modes in a timely fashion.

<div align="center">141.</div>

Because of the wrongful conduct identified by the Massachusetts Securities Division and the SEC, MLPFS quickly began to enter settlements with several states' regulators.

<div align="center">142.</div>

In the April 9, 2009 Consent Order with the Massachusetts Securities Division, MLPFS agreed, among other things, to: (i) buyback ARS from a number of investors; (ii) arbitrate investors' consequential damages claims under the auspices of the Financial Industry Regulatory Authority; (iii) refund refinancing fees to municipal auction rate issuers that issued ARS between August 1, 2007 and February 13, 2008; and (iv) pay a total penalty of $125 million to all states to resolve MLPFS's conduct relating to the sale of ARS.

143.

Following MLPFS's settlement with Massachusetts, MLPFS has settled with many other state regulatory agencies, including at least the following: Montana (June 2, 2009); Arizona (June 11, 2009); Colorado (June 17, 2009); Indiana (June 18, 2009); Michigan (June 25, 2009); California (June 26, 2009); New York (July 2, 2009); Washington (July 14, 2009); Kansas (July 16, 2009); Missouri (July 30, 2009); Florida (September 1, 2009); and Texas (September 14, 2009). Each of these states' regulators made findings substantially similar to those made by the Massachusetts Securities Division.

144.

Thus far, based on the published settlements with the states' regulators, MLPFS has agreed to pay state securities regulators penalties in the amount of $125 million and to buy back over $26 billion in ARS from its customers as a result of both its failure to disclose the extent of its involvement in the market for ARS and its misrepresentations about the vibrancy, efficiency, and viability of the ARS market. In its Form 10-K for the period ending December 26, 2008 and filed on February 24, 2009, Merrill Lynch & Co. reported that it had reached a "global agreement with the New York Attorney General, the Securities and Exchange Commission, the Massachusetts Securities Division and other state securities regulators relating to sales of Auction Rate Securities ("ARS")." Merrill Lynch & Co. further reported that "[i]n connection with this agreement, during 2008 we recorded a charge of $0.5 billion, which includes a fine of $125 million."

**L.    MLPFS did not Disclose a Number of Material Facts, Including its Support Bid Policy and Practice or that it Was Under Investigation by the SEC.**

145.

Based on a review of the Bid Summaries, until the auction failures in February 2008, MLPFS routinely placed bids at each of the LSED's auctions to buy all the Bonds at an interest rate MLPFS chose that was typically about 70 percent of the one-month LIBOR rate.  Upon information and belief, based on reports and findings of the SEC and various state regulators, MLPFS routinely managed the auctions of its other issuer clients in similar fashion.  In most auctions, and in nearly all of LSED's auctions, without MLPFS's blanket bids, the auctions would have failed, and in many other auctions, MLPFS's blanket bids set the interest rate. MLPFS's blanket bids typically set the interest rate of the bonds for each auction.  MLPFS concealed these material facts from LSED during the structuring of the Bonds, at the time of issuance, and even after the auctions for the Bonds failed.

146.

MLPFS's support bids created the outward appearance that the market for the Bonds functioned naturally and efficiently based on robust supply and demand forces generated by many interested bidders.  MLPFS's support bids concealed from the Plaintiffs and the investing public that the market for the Bonds, and therefore the efficacy of the synthetic fixed rate financing arrangement, depended entirely on the MLPFS's blanket support bids.  As MLPFS knew well but did not disclose, without such bids, the auctions would fail, and LSED would be forced to pay a penalty rate of 12 percent.

147.

MLPFS also knew prior to and at the time of issuance, but did not disclose to LSED, that the Swap Agreements that it recommended to LSED would not serve the intended function of

fixing LSED's interest payments absent MLPFS's manipulative blanket bidding.  When MLPFS stopped providing blanket support bids, the auctions failed.  The payments to LSED by MLPFS under the Swap Agreements of 70 percent of LIBOR no longer matched the interest rates generated at the auctions that were now the 12 percent interest rates resulting from the failed auctions.  This 12 percent rate more than doubled the 5 percent rate set at the auction immediately prior to MLPFS's decision not to make a support bid and was far less than the swap payment made to LSED.  The result to LSED was an interest cost in excess of 14 percent, the opposite of the "synthetic fixed rate" that MLPFS had promised

148.

Contrary to MLPFS's representations, LSED did not fix its costs by "[l]ock[ing] in interest rates" or "[b]alance [its] variable rate/fixed rate exposure."  And MLPFS did not advise or warn LSED that the purported correlation between 70 percent of LIBOR (or BMA/SIFMA) and the rates generated at auction was purely an artificial by-product of the blanket bids.  The reality was that for the Swap Agreements to work as planned, MLPFS had to continue its manipulative practice of bidding at an interest rate of approximating 70 percent of LIBOR.  This risk was never disclosed to LSED.  This was the most significant and material risk that LSED faced in this transaction.

149.

As described in paragraphs Sections IV(B) and (D) above, and elsewhere herein, in their numerous meetings, presentations, and telephone conferences with the LSED Restructuring Group, Claiborn, Moffett, Sober, and Stephens repeatedly made the following representations: (i) that the proposed transaction was the best alternative available to LSED to meet LSED's objective of a fixed payment schedule that conformed to LSED's expected revenue stream; (ii) that the proposed structure would create a fixed, predictable payment obligation, a "synthetic

fixed rate" borrowing; (iii) that auctions for municipal ARS like LSED's proposed issuance tracked 70 percent of LIBOR such that if LSED paid rates generated by auction and received 70 percent of LIBOR those payment streams would effectively offset each other with only minimal long term variance; (iv) the specific amounts of the future payments by year to be made by LSED under the structure that MLPFS proposed; (v) that LSED's "all-in" interest cost would be less than 5 percent; and (vi) that the structure would save LSED money in interest payments in the early years of the issuance.

<div align="center">150.</div>

Because of MLPFS's contractual undertakings based on its accepted Proposal and its promises made in meetings, presentations, and personal conferences, all as described above, MLPFS undertook a duty to provide the material information necessary for LSED to make an informed decision whether to undertake the recommended structure and the individual component transactions.  LSED reasonably assumed that MLPFS was providing such material information to LSED.  Indeed, given the nature of the undertaking and the assurances of Claiborn, Moffett, Stephens, and Sober regarding their experience and expertise, LSED had no reason to believe that MLPFS was withholding any material information from LSED.  The fact that LSED was relying on MLPFS (not a viable, robust market) to set the interest rates was a material fact required to be disclosed to  allow informed decision-making.

<div align="center">151.</div>

At the same time that MLPFS made the misrepresentations above, it failed to disclose, among other things, the following:  (i) that MLPFS was a target of an SEC investigation that was launched in 2004 with respect to market manipulation and improper business practices in the ARS area; (ii) that at the time of the issuance of the Bonds through the time that the auctions actually failed, MLPFS routinely submitted blanket bids on the entire outstanding amount of

ARS in every bond auction in which it acted as lead underwriter and that MLPFS knew that it would have to submit blanket bids in LSED's auctions in order for its proposed structure to function; (iii) that absent such blanket bids, many auctions would fail and issuers like LSED would be stuck paying the failed auction interest rate, which in LSED's case was 12 percent; (iv) that there was no satisfactory market for ARS if MLPFS stopped its practice of submitting such blanket bids, so LSED was effectively at the mercy of MLPFS's willingness to continue to make blanket bids; (v) that the only reason that the auctions historically set an interest price that was roughly equivalent to 70 percent of LIBOR was because such blanket bids set the price in this range and that without those bids, the rate would be far in excess of 70 percent of LIBOR; and (vi) that LSED's future debt service would only match the debt service schedules that MLPFS provided to LSED and provide a "synthetic fixed rate" at an "all-in" cost of less than 5 percent if MLPFS continued to participate at the auctions via its manipulative blanket bidding.

152.

MLPFS also failed to disclose the many conflicts of interest that it knew would exist between MLPFS and LSED. Because of its status as LSED's fiduciary, MLPFS owed duties of complete candor and loyalty to LSED. The duty of candor required MLPFS to disclose fully and truthfully all material facts regarding MLPFS's proposed structure for the bond issuance, including the extent and importance of MLPFS's involvement in the ARS market. The duty of loyalty required MLPFS to refrain from self-dealing, to avoid conflicts of interest, and to treat LSED fairly. MLPFS breached each of these duties.

153.

Although MLPFS represented in its Proposal that it had no conflicts of interest, MLPFS's interests were often opposed to those of LSED. MLPFS often acted in its own self-interest and without the required candor. Some of the important conflicts were as follows: (i) it was in

61

MLPFS's interest for LSED to believe the ARS market was efficient and robust and that the market existed and functioned separate and apart from MLPFS's involvement, whereas it was in LSED's interest to know and understand that it was, in reality, entirely dependent on MLPFS's support bids to prevent failed auctions; (ii) it was in MLPFS's interest to keep the market for ARS alive even when there was insufficient investor activity to ensure market efficiency so that MLPFS could continue to earn underwriting compensation, broker-dealer fees, swap fees and other commissions and compensation by continuing to create new ARS debt, whereas it was in LSED's interest for this activity to be restricted to a supply that realistically matched demand; (iii) it was in MLPFS's interest to complete the LSED deal so MLPFS could earn its upfront fees and continuing annual fees, whereas it was in LSED's interest that the deal go forward only if it could accomplish LSED's stated objectives and particularly fix LSED's interest rate; (iv) it was in MLPFS's interest for LSED to refinance its existing debt into MLPFS-underwritten ARS, whereas LSED would have been better served by implementing a different structure to meet its financing objectives; (v) once MLPFS's inventory positions in ARS exceeded MLPFS's internal limits and MLPFS decided that it no longer wanted a substantial inventory position in ARS, it was in MLPFS's interest to stop supporting ARS auctions as it had formerly done, knowing they would fail and that the cost to issuers would be enormous, whereas it clearly was not in LSED's interest for MLPFS to stop supporting the auctions; (vi) it was in MLPFS's interest to mislead investors to purchase ARS based on false and incomplete information regarding the risk of illiquidity to remove as much of the ARS from its balance sheet as possible, whereas it was clearly not in LSED's interest that MLPFS use this strategy to sell ARS as, once the truth about the ARS products became known, it would inevitably destroy issuer and investor confidence in this structure; (vii) it was in MLPFS's interest to delay disclosure of its concerns about the

viability of the ARS market overall and about the solvency of the bond insurers, including FGIC, as long as possible to continue to be able to underwrite municipal issues, hope that market conditions became more favorable, and avoid a widespread market disruption, whereas it was in LSED's interest to have full and complete information about this at the earliest possible time so that it could change the mode of bonds or otherwise restructure; and (viii) once MLPFS decided to stop supporting the auctions at a rate of approximately 70 percent of LIBOR, it was in MLPFS's interest to set the rates high so that it received more income on the inventory that it held, whereas it was not in LSED's interests for MLPFS to do so.

154.

As noted by many state regulators, on March 15, 2006, MLPFS ended its practice of sending ARS purchasers a "Master Purchaser's Letter."  The Master Purchaser's Letter supposedly provided certain disclosures regarding MLPFS's ARS practices.  LSED does not have any record of receiving the Master Purchaser's Letter at any time either before or after the issuance of the Bonds.

155.

While MLPFS was outwardly optimistic about FGIC's ability to maintain its triple-A rating and about the credit worthiness of ARS of municipal issuers insured by monoline insurers (*see, e.g.*, the recommendation of the December 3, 2007 *Fixed Income Digest*), MLPFS knew internally that FGIC's triple-A rating was in jeopardy yet did not disclose its real internal views on FGIC's continued viability or the likely result of FGIC's downgrade to LSED in time for LSED to mitigate its damages by, for example, taking action to convert the Bonds' auction-rate mode to a fixed-rate or variable-rate mode before FGIC rating-down grade and the Bonds' loss of their investment-grade rating.  Likewise, MLPFS did not disclose its increasing inventory

levels of ARS or its internal concerns about the viability of continued blanket bidding to support the market.

<div align="center">156.</div>

By withholding critically important information and misrepresenting material facts, MLPFS induced LSED to issue the Bonds in the structure that MLPFS recommended. LSED would not have issued the Bonds and structured its obligations in this way absent MLPFS's advice to do so. After the issuance, MLPFS continued to misrepresent its views and failed to state critical information or describe the increasing risk of auction failures in a timely fashion, which prevented LSED from understanding the situation that it faced in time to take steps to mitigate its damages.

### M.    FGIC Failed to Disclose its Overcommitted Balance Sheet

<div align="center">157.</div>

Upon information and belief, based on FGIC's presentations at its Fixed Income Conference in 2006, its October 9, 2007 presentation to investors, its press releases, and the reports of the ratings agencies, before and after FGIC accepted LSED's premium of more than $13 million, FGIC was insuring, and otherwise subjecting itself to the hazards of, increasingly risky obligations and investments. FGIC's actions were unknown to LSED when it obtained the credit enhancement, and were contrary to FGIC's supposed "remote loss" underwriting practices and FGIC's representation that it had the best book of insured risks in the business.

<div align="center">158.</div>

Upon information and belief, based on FGIC's 2007 presentations to analysts, in 2006 and 2007, FGIC entered into a series of credit default swaps and other guarantees of asset-backed securities of collateralized debt obligations consisting of subprime mortgages serviced by, among others, Litton Loan Servicing, Countrywide, Wells Fargo, and others. FGIC's exposure to these

credits was greatly increased after the issuance of the Bonds. It was the deterioration of these and other risky credits that led to FGIC's inability to maintain its "triple-A guaranty" on the "wraps" that FGIC was providing.

159.

On January 30 and 31, 2008, as a result of FGIC's concealed decline in its underwriting standards, two ratings services (Fitch and Standard & Poor's respectively,) downgraded FGIC's AAA rating, which FGIC had maintained since at least 1991. Specifically, Fitch cut FGIC's rating two notches to AA on January 30, 2008, and Standard & Poor's cut FGIC's rating two notches to AA on January 31, 2008.

160.

And on February 14, 2008, Moody's Investors Service declared that FGIC was in worse financial shape than its larger competitors, MBIA, Inc. and Ambac Financial Group, Inc., and cut FGIC's rating six levels to A3.

161.

In its first quarterly report of 2008, FGIC Corp. disclosed further deterioration of its creditworthiness and its impact:

> The deterioration in the U.S. housing and mortgage markets and the global credit markets, which accelerated in the fourth quarter of 2007 and continued during the first quarter of 2008, has adversely affected the Company's business, results of operations and financial condition. During the first quarter of 2008, the Company's financial strength and credit ratings were downgraded by various rating agencies. As of June 13, 2008, the financial strength of FGIC and FGIC UK Ltd. was rated BBB by Fitch Ratings Inc. (rating outlook negative), Baa3 by Moody's Investor Services Inc. (on review for possible downgrade) and BB by Standard & Poor's Rating Services (Credit Watch with negative implications). The financial strength ratings downgrades have adversely impacted the Company's ability to generate new business and, unless restored, will impact the Company's future business, operations and financial results. During the first quarter

of 2008, the Company increased reserves established for the Company's exposure to certain collateralized debt obligations of asset-backed securities ("ABS CDOs"), which are backed primarily by subprime residential mortgage-backed securities, and to certain residential mortgage-backed securities ("RMBS"), primarily backed by second-lien mortgages.

As a result of these developments, the Company ceased writing new business during the first quarter of 2008 for a period of time to preserve capital and is considering various alternatives to enhance its capital, restructure its operations and mitigate losses. However, no assurance can be given that any action taken by the Company will improve its current ratings, that further rating downgrades will not occur, or that the Company will be able to recommence writing new business in the near term or at all. FGIC has proposed a significant restructuring of its insurance operations to the New York State Insurance Department (the "NYSID"), including the organization of a new financial guaranty insurer to be domiciled in New York to provide support for global public finance and infrastructure obligations previously insured by FGIC and to write new business to serve those markets. Any restructuring will require approval from the NYSID, among other requirements, and significant new capital investment. No assurance can be given that such restructuring or investment will be completed.

162.

FGIC is no longer rated by the major ratings agencies. On March 24, 2009, Moody's Investor Service announced that it had downgraded the rating of FGIC to "Caa3" and that it would "withdraw the ratings of FGIC for business reasons." Moody's noted that the rating action was the "result of FGIC's substantial exposure to subprime mortgages…" and estimated that "the expected loss from FGIC's insured portfolio now exceeds claims paying resources."

163.

And on April 22, 2009, Standard & Poor's lowered its counterparty credit, financial strength, and finance enhancement ratings of FGIC to "CC" and subsequently withdrew its ratings because of its "expectation that timely and comprehensive financial information will not be available." S&P also noted that "[r]ecently released GAAP financial statements for both

FGIC and FGIC Corp. contain a statement from the independent auditor that there is substantial doubt regarding the company's ability to continue as a going concern."

164.

In a November 24, 2009, Press Release, FGIC announced that the New York Insurance Department had issued an order pursuant to Section 1310 of the New York Insurance Law requiring FGIC to suspend paying any and all claims.  FGIC further announced that it "will immediately suspend all claims payments."

165.

In the November 24, 2009 Press Release FGIC explained its predicament as follows:

On November 20, 2009, FGIC filed with the NYID its Quarterly Statement for the period ending September 30, 2009, in which FGIC reported a surplus to policyholders deficit at September 30, 2009 of $865,834,577 and an impairment of its required minimum surplus to policyholders of $932,234,577. The Superintendent of Insurance (the "Superintendent") has directed FGIC to submit a plan to eliminate such impairment of FGIC's surplus to policyholders.

FGIC is currently formulating a comprehensive restructuring plan contemplating FGIC's commencement of a tender offer for the acquisition or exchange of certain residential mortgage backed securities ("RMBS") guaranteed by FGIC in the primary market; FGIC's continued pursuit of commutations with the holders of FGIC-insured collateralized debt obligations of asset-backed securities ("ABS CDOs"); and the commutation, termination or restructuring of FGIC's exposure in respect of certain other obligations for which it has established statutory loss reserves; all with a view to remediate its RMBS, ABS CDO and other exposures, remove its capital impairment and return it to compliance with the applicable minimum surplus to policyholders requirement (the "Surplus Restoration Plan").

The NYID Order requires FGIC to provide the Superintendent a detailed and final plan of the proposed Surplus Restoration Plan (the "Final Plan") no later than January 5, 2010.  In the event that FGIC fails to provide the Superintendent with the Final Plan by such date, the NYID Order provides that the Superintendent shall seek an order of rehabilitation or liquidation of FGIC forthwith.

The NYID Order further requires FGIC to take such steps as may be necessary to remove the impairment of its capital and to return to compliance with its minimum surplus to policyholders' requirement by not later than March 25, 2010, or such subsequent date as the Superintendent deems appropriate, without limiting in any way the Superintendent's ability to seek rehabilitation or liquidation of

FGIC prior to such date. Until FGIC achieves compliance with such requirement, the NYID Order prohibits FGIC from writing any new policies and requires FGIC, as of November 24, 2009, to suspend paying any and all claims and to otherwise operate only in the ordinary course and as necessary to effectuate the Surplus Restoration Plan.

The Board of Directors of FGIC will continue to monitor the situation and, in the absence of a successful restructuring, may, in the exercise of its fiduciary duties, request that the NYID seek court appointment of a rehabilitator or liquidator for FGIC. There can be no assurance that the NYID or other regulators will not take regulatory action at any time with respect to FGIC.

166.

As of December 9, 2009, on its website under "Ratings," FGIC advises that "Financial Guaranty Insurance Company (FGIC) is not rated by Moody's Investors Service or Standard & Poor's (S&P) or Fitch Investors Service."

167.

In sum, FGIC's credit enhancement for which LSED paid more than $13 million has been rendered worthless because its credit rating is worse than LSED's and because it has stopped paying claims. As such, LSED is entitled to have the premiums that it paid refunded.

**N.    MLPFS was reckless and had fraudulent motives**

168.

At all times relevant to these transactions, MLPFS was well aware that its manipulative blanket bidding practice misrepresented the liquidity risks inherent in the ARS market, as well as the risk of auction failures. Similarly, at all times relevant to these transactions, MLPFS was aware that its statements to LSED about the likely outcome of the transaction and the liquidity of the ARS market were not complete and were, therefore, not accurate, because of the undisclosed blanket bidding practice and its implications.

169.

Since at least 2003, MLPFS had a routine practice of submitting blanket bids in every auction for which it was the lead or sole underwriter/broker-dealer. Based on available research reports, MLPFS served as lead or sole underwriter/broker-dealer in at least 130 different ARS issues by the following issuers: Akron & Bath & Copley Joint Township Hospital District; Alachua County Health Facilities Authority; Alaska Housing Finance Corporation; Atlanta City Georgia; Bay Area Toll Authority; California Housing Finance Agency; California Infrastructure & Economic Development Bank; California Statewide Communities Development Authority; Carroll County Kentucky; Clackamas County Hospital Facilities Authority; Clarksville City Tennessee; Colorado Health Facilities Authority; Coral Gables Health Facilities Authority; East Alabama Health Care Authority; East Bay MUD; Educational Funding of the South; Elkhart County Hospital Authority; Florida Higher Education Facilities Finance Authority; Florida Municipal Power Agency; Grand Forks City-North Dakota; Grand Traverse County Hospital Finance Authority; Hanover County Economic Development Authority; Harrisonburg Industrial Development Authority; Hillsborough County Industrial Development Authority; Illinois Finance Authority; Illinois Health Facilities Authority; Indiana Health & Education Facility Finance Authority; Irvine Ranch Water District; Jacksonville Economic Development Commission; Johnson City Health & Education Facilities Board; Kansas Department of Transportation; Kentucky Economic Development Finance Authority; Lehigh County General Purpose Authority; Long Island Power Authority; Los Angeles County Metropolitan Transportation Authority; Los Angeles Department of Water & Power; Louisiana Public Facilities Authority (LPFA); Louisiana Stadium & Exposition District; Maine Health & Higher Education Facilities Authority; Massachusetts Health & Education Facilities Authority; Medford Hospital Facilities Authority; Miami Health Facilities Authority; Miami-Dade County Florida;

Miami-Dade County School Board; Michigan Municipal Bond Authority; Middletown City Ohio; Montgomery County Ohio; New Hampshire; New Hanover County North Carolina; New Jersey Educational Facilities Authority; New York City-New York; Norfolk City Economic Development Authority; North Carolina Medical Care Commission; NYC Housing Development Corporation; NYC Industrial Development Agency; NYS Dormitory Authority; NYS Energy Research & Development Authority; NYS Thruway Authority; Ohio Air Quality Development Authority; Pennsylvania Higher Education Assistance Agency; Port of Portland-Oregon; Providence Health System Obstetric Group; Providence Health System Obstetric Group; Regents of the University of California; Reno City Nevada; Rhode Island Health & Education Building Corporation; South Carolina Jobs Economic Development Authority; South Dakota Health & Education Facilities Authority; South Fork Municipal Authority; Southeast Pennsylvania Transportation Authority; Tarrant County Cultural Education Facility Finance Corporation; Vermont Education & Health Buildings Finance Agency; Washington Health Care Facilities Authority; Washoe County Nevada; Westchester Co Industrial Development Agency; Wisconsin Health and Educational Facilities Authority; Yonkers Industrial Development Agency; Yuma Industrial Development Authority.

170.

This practice had the effect of preventing auction failures and of inducing investors to treat ARS as cash-equivalents or short-term investments, despite their long-term maturities. Despite MLPFS's knowledge of its own blanket bidding practice, MLPFS never disclosed this practice or its effect of concealing the risk of lack of liquidity in the ARS market to LSED at any time prior to or after the issuance.

293820v.7

171.

At the time when LSED was negotiating and structuring the transaction, MLPFS was under investigation by the SEC into the very practice that caused LSED's damages, namely, that MLPFS "intervened in auctions by bidding for their proprietary accounts … to prevent auctions from failing." The SEC ultimately determined that MLPFS's practices violated the prohibition on material misstatements and omissions in the offer and sale of securities. As a result of the investigation, MLPFS agreed to be censured for its conduct and to pay a civil penalty. MLPFS was obviously aware of the existence of this investigation and its subject matter, as the investigation had been ongoing for nearly two years at the time of the LSED's issuance and would conclude less than three months after the issuance. Notwithstanding that this SEC investigation was ongoing during the negotiation and issuance of the LSED bonds, MLPFS never disclosed the existence of this investigation or its blanket bidding practice, which was the subject of this investigation, to LSED.

172.

Throughout the period of LSED's auctions, MLPFS continued to follow its routine practice and submitted blanket bids in every auction for LSED's bonds up until February 13, 2008, after which the auctions for LSED's bonds promptly failed. Without MLPFS's bids, 69% of the auctions for LSED's bonds (including the very first auction) would have failed. Further, the Massachusetts Securities Division found that 5,892 auctions would have failed between January 3, 2006 through May 27, 2008 but for MLPFS's support bids. MLPFS was clearly aware of its own bidding practices, yet MLPFS never disclosed its blanket bidding practice, the significance of the practice, or the effect of its changing or ceasing this practice to LSED, even including after MLPFS had stopped the practice and the auctions had failed.

173.

In its Solicitation, LSED specifically asked MLPFS to disclose "any … oversight entity's investigation of alleged securities laws violations involving your firm (all areas of the firm) or any professional in your firm who would be involved in this financing."  MLPFS disclosed numerous other investigations.  Nonetheless, MLPFS failed to disclose the existence of the SEC investigation or MLPFS's manipulative blanket bidding practice, which was the subject of this investigation, to LSED, despite the fact that this investigation touched on the type of bonds recommended by MLPFS to LSED.

174.

The risk of auction failures if MLPFS stopped bidding in the auctions for LSED's bonds was one of the most material risks involved in the entire transaction.  Arguably, this was the most important risk to understand because the true facts were that instead of the interest rates being set by a market, the interest rates were in essence set by MLPFS, and MLPFS's continued willingness to set rates by bidding was crucial to the success of the ARS structure.  MLPFS knew that, following Hurricane Katrina and the fall off of the Hotel Occupancy Tax revenues, a low interest rate on the Bonds was necessary for "LSED to accomplish [its] financing objectives." As MLPFS knew well, in the event of auction failures, the Swap Agreements would cease to establish a synthetic fixed interest rate for LSED, and LSED would face interest rates in excess of 12 percent, nearly three times the interest rates projected by MLPFS's presentations. Nonetheless, MLPFS made numerous presentations to LSED representing a low synthetic fixed interest rate without disclosing that this interest rate was entirely dependent on MLPFS's willingness to continue its manipulative blanket bidding practice.  There is a big difference between the risk of reliance on an established robust market including an excess of required

participants and the risk of reliance on one entity to set the interest rates. Effectively, in the market for LSED's bonds, MLPFS, not the market itself, generally set the interest rate.

## 175.

MLPFS's manipulative conduct and misstatements and omissions concealed the risk of lack of liquidity in the ARS market and of auction failures in the auctions for LSED's bonds. The concealment of these risks had the effect of making ARS appear to be a more attractive debt instrument than several other possible debt instruments, including variable-rate demand obligations (VRDOs) and fixed-rate bonds. It was in MLPFS's interest to push issuers towards an ARS structure because of the additional fees that MLPFS would gain under this structure.

## 176.

ARS were a substantially more profitable product for MLPFS than VRDOs or fixed rate bonds because ARS provided for MLPFS to receive broker-dealer fees of up to 25 basis points annually over the life of the bonds. Over the course of the full 30-year term of the bonds, these broker-dealer fees dwarf the underwriting discount typically earned upon the issuance of bonds. Further, since MLPFS had the ability to set the interest rate at which the auctions would clear through its blanket bids, MLPFS could ensure that it would always receive a sufficient return on any bonds that it held through the blanket bids, in addition to the ongoing broker-dealer fees. Not surprisingly, MLPFS's ARS business was referred to in internal emails as "very profitable."

## 177.

Several internal emails uncovered by the Massachusetts Division of Securities demonstrate the remarkable profitability of MLPFS's ARS business. On January 30, 2008, then-MLPFS employee Francis Constable described the economics of MLPFS's ARS business as

follows:

> Providing some economics around this data is very compelling, as we earned both an upfront fee of 1% on the value of the shares that we initially underwrote, as well as an ongoing remarketing fee paid to us for management of the auction process and marketing of these securities. The 25bp per annum remarketing fee equates to roughly $34.75MM -- $2.5MM per each $1Bn we keep outstanding ANNUALLY. Since 2001, the auction market desk has underwritten approximately $13Bn of preferred shares of closed end funds, earning $130MM of underwriting fees.

On January 11, 2008, then-MLPFS employee John Price responded to an internal memorandum, which warned about the increasing amount of auction rate securities that MLPFS was taking onto its balance sheet ("B/S"), by pointing out the remarkable historical performance of MLPFS's auction rate securities business:

> The title "Historical Inventory Level" and "Risky Preferred Only" are both curious descriptions. History does not just go back to Aug of 2008 [sic], When the carnage began. The AMPS business has historically had a quarter end B/S of only a few $100mm – which made it on [sic] of the highest ROA/ROE businesses on the floor. This incomplete "History" distorts the "historical" contribution of this Desk. Look back to June '07 at least - $300mm in B/S.

> "Risky Preferred Only" – same story – let's not forget how much $$$ this business contributed to the Firm in '04, '05, '06 and who got paid from it – SSG.

<div align="center">178.</div>

The additional fees generated by ARS as opposed to comparable debt instruments gave MLPFS an incentive to push issuers towards the ARS structure and away from alternative structures, such as VRDOs and fixed-rate bonds, which did not present the same liquidity risks as ARS due to the purchase of liquidity insurance (typical for VRDOs) or the lack of a default interest rate. And it was in the interest of MLPFS to conceal the risks of lack of liquidity in the ARS market and of auction failures in order to make ARS appear more attractive in comparison to the alternative products that were less lucrative to MLPFS. The substitution of ARS for

VRDOs or fixed rate bonds was plainly in MLPFS's interest, but was not in the interest of issuers like LSED particularly given the significant risks of auction failure and the payment of a penalty interest rate that were concealed by MLPFS's blanket bid policy and its misstatements and omissions in its dealings with LSED.

179.

Based on academic research, until mid-2007, ARS generated lower costs of borrowing than VRDOs, and ARS in general produced lower interest rates than VRDOs. As VRDOs have a "put" feature that ARS does not to ensure investor liquidity, this was anomalous, strongly suggesting that the manipulative bidding practices were artificially lowering ARS rates, which was helpful in selling this structure to issuers. The manipulative bidding practices allowed MLPFS to continue expanding its position in the municipal bond market and generating "new-issue product available for [its] clients"

180.

The remarkable growth of MLPFS's ARS business from 2000 to 2006 demonstrates MLPFS's efforts to convince issuers to issue ARS rather than other debt instruments. Upon information and belief, based on available market data, from 2000 through 2006, MLPFS grew its share of the auction-rate municipal bond market (as lead underwriter) from 6 bond issues totaling approximately $281 million par amount to 32 bond issues totaling approximately $3.4 billion par amount, a growth of 1200%. By comparison, during this same period MLPFS grew its share of the total municipal bond market from $17.6 billion to $36.4 billion, the fixed rate municipal bond market from $14.9 billion to $27.9 billion, and the non-auction rate variable rate municipal bond market from $2.45 billion to $5.06 billion, all increases of around 200%. Thus from 2000 to 2006, MLPFS's municipal ARS business grew six times as fast as the rest of

75

MLPFS's municipal bond businesses.  MLPFS also increased its market share in comparison to its competitors.  From 2000 to 2006, MLPFS's share of the total U.S. auction-rate municipal bond underwriting market grew from 2.9% to 10.7%.

### 181.

During the time of LSED's issuance, LSED had no way to know the true facts regarding MLPFS's blanket bid practice.  Although an SEC investigation had been commenced, its results would not be published for several months, and MLPFS did not disclose the investigation, despite being specifically asked about ongoing investigations.  Further, the bidding in the ARS market was not subject to ready analysis, and LSED had no way of knowing the extent of MLPFS's blanket bidding practices, which federal and state regulators later found were inadequately disclosed to the markets.

### 182.

Having the role of broker-dealer in auctions gave MLPFS the opportunity to control the auction process, to view the submitted bids before the auction closed, and to ensure that it could bid to prevent the auction from failing.  Thus, MLPFS had ample opportunity to conceal the lack of liquidity of the ARS market through its policy of submitting blanket bids, and based on the findings of the federal and state regulators, this is exactly what MLPFS did to LSED's detriment.

### O.    MLPFS owed duties to the State

### 183.

The Commission administers all bond issues by the State and its political subdivisions. The Commission's power derives by virtue of Article VII, Section 8 of the Louisiana Constitution, which provides that "No bonds or other obligations shall be issued or sold by the

State directly or through any State board, agency, or commission, or by any political subdivision of the State, unless prior written approval of the Commission is obtained."

<div align="center">184.</div>

The Commission acts as the representative of the State's fiscal interest as a whole. The purpose of its centralized administration of debt is to protect the State's fiscal integrity. In this capacity, it was the Commission that requested proposals, reviewed the proposals, and accepted MLPFS's Proposal, both as a representative of the State and of LSED.

<div align="center">185.</div>

The Commission assisted in reconciling the interests of its constituents, the State and LSED, in the fashion outlined herein.

<div align="center">186.</div>

During the structuring of the Bonds, MLPFS provided direct representations and advice to the State and its representatives, specifically including Jerry Leblanc (Governor Blanco's Commissioner of Administration), Jimmy Clarke (Governor Blanco's chief of staff), John Kennedy (the State Treasurer), Whit Kling (Executive Director of the Louisiana State Bond Commission), and Jim Napper (Executive Counsel of the State Treasury Department) and others.

<div align="center">187.</div>

Internal emails and documents show that MLPFS communicated with these individuals on at least January 4, 2006, January 13, 2006, and February 21, 2006 as well as at the March 6, 2006 Louisiana State Bond Commission. Persons involved with the issuance, including LSED's bond counsel, recall that there were numerous other conversations between Claiborn and Moffett and representatives of the State, including particularly Jimmy Clarke and Jerry Leblanc.

188.

Based on MLPFS's previous experience with Louisiana municipal bond issues (according to MLPFS's own Proposal, MLPFS accounted for more than 20% of all primary and secondary municipal securities sold in the State), MLPFS knew that the Commission serves as the State's agent regarding proposed bond issues in coordinating and reviewing bond issues by municipal entities in Louisiana. MLPFS's Proposal was submitted to the Commission as well as LSED, and the Commission was tasked with determining whether the proposed issuance was in the interest of the State. MLPFS provided advice to the State about how to structure this financing to accomplish the State's objectives as set forth below.

189.

One of the issues discussed extensively during the planning stages of the issue was whether the State would formally guarantee the Bonds in some fashion. Various scenarios involving some form of direct State obligation were discussed. The representatives of the State communicated to MLPFS that the State did not want to be a formal obligor or guarantor of the Bonds. This decision is reflected in various documents provided by MLPFS and was one of the principal objectives of the transaction.

190.

MLPFS demonstrated its understanding of the Plaintiffs' desire to structure the Bonds without State involvement in various of its presentations. For example, one of the proposed transaction highlights noted in MLPFS's February 21, 2006 and February 27, 2006 presentations is that "This [MLPFS's proposed structure for the Bonds] is a long term workable solution *without state aid* and should be an important first step in the rebuilding of the City of New Orleans." (emphasis added). Further, in the Summary section of the March 6, 2006 presentation

for the Commission, MLPFS noted that "This recommended restructuring/recovery plan provides a workable solution *without further State assistance*." (emphasis added).

191.

LSED's January 12, 2006 Resolution authorizing the issuance of the Bonds specifically stated that "The Bonds do not constitute an indebtedness, general or special, or a liability of the State…." Further, in the recitals of her Executive Order No. KBB 2006-11 dated March 6, 2006, Governor Blanco noted that "as stated in the General Bond Resolution issuing the Series 2006 Bonds, the Series 2006 Bonds will not constitute an indebtedness, general or special, or a liability of the State…."

192.

As a result of the foregoing, the parties were aware from the outset of the structuring process that the State was an intended recipient of MLPFS's advice or, at a minimum, was a third party beneficiary of the integrated contracts between LSED and MLPFS whereby MLPFS advised LSED on an appropriate structure, it being intended that the structure recommended by MLPFS would fulfill the objectives of both LSED and the State as discussed above.

193.

MLPFS was also aware, as a result of its knowledge of LSED's finances, that any increases in the MLPFS-projected interest payments on the Bonds, as a practical matter, would very likely be a financial burden on the State in the form of an increased annual appropriation by the State in favor of LSED.

194.

Claiborn, Moffett, and MLPFS are well aware, based, among other things, on their participation in presentations made to the ratings agencies and their familiarity with LSED's finances as part of their duties in structuring the transactions, that LSED expenses are paid from

three sources: (1) self-generated operating revenues (consisting mostly of revenues received from grants of the right to use the Superdome and from sales of goods and services in the Superdome); (2) proceeds of the Hotel Occupancy Tax remaining after payment of debt service; and (3) appropriations by the State. MLPFS was familiar with the fact that the State was a direct obligor to Louisiana's two major sports teams, the Saints and the Hornets, and that these payments were made through LSED. This was discussed at the rating agency presentations and in many discussions that preceded those presentations. MLPFS's knowledge is reflected in its April 24, 2008 presentation in which MLPFS outlined the then-current situation as being "pledged taxes with State behind team contracts." As a result, MLPFS knew that to the extent LSED's expenses exceeded its self-generated funds, the State would be called upon to fund that deficit and based on historical practice would likely do so. With this knowledge, and with knowledge of the historical and projected amounts of LSED's self-generated revenues and Hotel Occupancy Tax revenues, MLPFS was aware that any increase in interest rates payable on the Bonds would cause a dollar for dollar increase in the State appropriation required to fund LSED's deficit.

195.

That the Bonds not be part of the "net state supported debt" was discussed with Claiborn and Moffett numerous times, including in conversations on January 4, 2006, January 13, 2006, February 21, 2006, and March 6, 2006, but also many other times in the frequent conference calls. After Hurricane Katrina, without clear knowledge of what the extent of the total potential State debt arising from the storm would be, Jimmy Clarke, Jerry Leblanc, and ultimately Governor Blanco believed that obligating the State would be imprudent and that was clearly communicated to MLPFS.

196.

MLPFS proposed that LSED issue the Bonds as ARS without a formal State guaranty or direct obligation so that the State could keep the Bonds off of its balance sheet and could preserve the State's debt capacity as the Bonds would not be part of the "net state supported debt," while at the time, MLPFS knew that these benefits to the State were dependent on MLPFS's manipulative blanket bidding.  MLPFS failed to disclose this to LSED or the State at any time.

197.

Almost immediately after the auction failures, MLPFS began to advise that the State should cover the increased debt service on LSED's Bonds.  In its April 24, 2008 presentation, for example, MLPFS specifically advised LSED to "[h]ave the State pay debt service on current LSED bonds."

**P.    Plaintiffs' Damages and Effort to Mitigate Damages**

198.

When the auctions for the Bonds failed, Plaintiffs suffered millions of dollars of damages.

199.

LSED has suffered and will continue to suffer damages in the form of increased interest rate payments.  For example, in MLPFS's April 10, 2008 presentation, MLPFS estimated that LSED had already suffered approximately $5.5 million in increased auction rate bond interest expense in the period of time between February 13, 2008 and April 10, 2008.

200.

Since that time, LSED has continued to incur additional unanticipated increases in its debt service payments totaling in the millions of dollars.

201.

In an effort to mitigate the State's and LSED's exposure to the 12 percent interest rate payment on the Bonds, and given the State's unwillingness to allow a State entity to become insolvent and given the State's direct obligation on incentive payments to the New Orleans Saints and New Orleans Hornets, which formed part of LSED's budget, and meant that the State was directly impacted by the increase in LSED's cost of borrowing, the State took corrective action at the 2008 Second Extraordinary Session of the Louisiana Legislature.  After the passage of special legislation, the State began to purchase the Bonds at auction based upon an initial bid of 2.9 percent.  The purpose of this action was to lower LSED's cost of funds and thereby minimize the operating deficit that the State was obligated to fund as outlined above.

202.

Once the auctions failed and LSED started to incur the 12 percent failed auction rates as well as the other fixed charges, it became clear that LSED, given its projected revenues, would not be able to fund all of its obligations, particularly including its obligations to the major sports teams as to which the State was also obligated.

203.

If LSED and the State had failed to make their payments to the major sports teams, that would have resulted in draconian consequences under the contracts with the teams, further impacting the State's financial situation, potentially causing the teams to move elsewhere and causing other damages, including damages to the State's economy as a whole.

204.

In the Fiscal Note circulated to the Louisiana Legislature during the 2008 Second Extraordinary Session, the Legislative Fiscal Office noted that "The LSED is currently expending approximately $60,000/day more than anticipated due to higher than expected interest

rates…This could ultimately result in almost $2 million of additional interest payments per month." The Legislative Fiscal Office further noted that "the state will lose between 50 and 100 basis points per dollar invested in LSED bonds. In order to purchase these bonds, the state must forego other more profitable investments, resulting in a loss of revenue."

<div align="center">205.</div>

The ability of the State to purchase LSED's Bonds was only made possible by an exception created by the Internal Revenue Service ("IRS") following the failures of the auctions for LSED's bonds. Under the current exception, the State may only hold the bonds through December 31, 2009. After that, unless a further extension from the IRS can be obtained, on which LSED is currently working, the Bonds will lose their tax exempt status, resulting in LSED having to pay even higher interest rates to the holders.

<div align="center">206.</div>

Had the Defendants not engaged in manipulative conduct to prop up the ARS market or not made the aforementioned misrepresentations and omissions to the Plaintiffs causing LSED to issue the Bonds as ARS, the State would not have had to purchase the Bonds. The State would not have purchased LSED Bonds at par at a 2.9 percent yield absent the failure of LSED's auctions and LSED's exposure to the 12 percent failed auction interest rate. The State could have earned this percentage yield in a much higher-rated investment or could have obtained a much higher yield in a similarly rated investment. Further, the State's investment is not liquid at this point, and the rate being paid to the State is not reflective of the illiquidity of the Bonds. As a result, the State may incur a loss when the Bonds are sold.

207.

There have been discussions between the State and LSED that there will need to be an adjustment in the terms of the State's ownership of the Bonds if the State continues to hold them beyond January 1, 2010 to reflect the costs to the State and the benefits to LSED.

208.

Plaintiffs will prove tens of millions of dollars of damages that have arisen as a direct result of the Defendants' acts and omissions and their failure to receive the benefit of the proposed bargain. The Plaintiffs are entitled to recover all such damages. The damages include additional interest costs over the synthetic fixed rate before the State's intervention to buy the bonds, the additional interest costs after the State's intervention, the State's damages, including the costs of mitigation outlined above, including reasonable interest on the monies invested commensurate with the risk assumed, all costs incurred in the purchase of the Bonds, damages to be incurred in the future as a result of future efforts to mitigate the effects of the auction failures and any other appropriate damages.

209.

At some time in the near future, LSED will have to change the mode of the Bonds or re-finance them or otherwise restructure them. When LSED does so, the additional costs and interest payments that will result will cause additional damages to Plaintiffs in the many tens of millions of dollars. Had MLPFS forthrightly outlined the problems with the ARS market after the issuance, but prior to the auction failures, Plaintiffs could have effected a restructure on considerably better terms. Plaintiffs are entitled to damages as a result.

## V.    Causes of Action

### First
### Breach of Fiduciary Duty
### (Plaintiffs Against MLPFS)

210.

Plaintiffs adopt and incorporate by reference herein the allegations set forth in paragraphs 1 through 209 above.

211.

In connection with the transactions described above, MLPFS provided a broad array of services to Plaintiffs, especially including services as an advisor with purported superior knowledge of possible deal structures and market risks and opportunities, and in connection with those services, MLPFS owed Plaintiffs fiduciary duties.

212.

MLPFS had superior knowledge about the structure and specific transactions that MLPFS recommended. Plaintiffs placed their trust and confidence in MLPFS, and relied on MLPFS's superior knowledge about what options were available, what possible structures existed, how the various transactions fit together, how the involved markets worked, and what the important risks were. At all material times, until Plaintiffs discovered the truth about why the transaction did not work (after the auction failures), MLPFS exerted substantial influence over Plaintiffs.

213.

At all times that MLPFS was providing advice and recommendations to Plaintiffs, MLPFS actively encouraged Plaintiffs to place trust and confidence in MLPFS, including in Claiborn, Moffett, Stephens and Sober, and these MLPFS representatives were aware that Plaintiffs were placing their trust and confidence in their superior knowledge and expertise regarding the structure and transactions proposed.

214.

Given MLPFS's superior knowledge and expertise, the extent of MLPFS's involvement in Plaintiffs' decision to undertake the recommended transactions, the nature of its multi-faceted relationship with Plaintiffs, MLPFS's various advisory roles outlined herein and MLPFS's representations about the integration of its services into one coherent strategy, MLPFS owed to the Plaintiffs fiduciary duties of good faith, trust, candor, and loyalty under Louisiana law.

215.

As a fiduciary and based on its express promises and practical undertakings to provide information and advice, MLPFS was obligated to disclose to Plaintiffs all relevant and material information about the ARS market and the recommended transactions that combined to create the "synthetic fixed rate" financing. In addition, MLPFS was obligated to act solely in Plaintiffs' best interests without regard to its own interest and to disclose all conflicts of interest fully and candidly.

216.

For the reasons set forth above in Sections IV(B), (D), and (L) and elsewhere herein, MLPFS breached its fiduciary duties by misrepresenting material facts and omitting material facts necessary to provide Plaintiffs with the complete information needed to evaluate the proposed transactions to make an informed decision about them.

217.

MLPFS had material conflicts of interest as discussed above in paragraphs 152 and 153 and elsewhere herein. These conflicts were not disclosed to Plaintiffs. By failing to disclose the conflicts and by placing its own interests over those of Plaintiffs, MLPFS breached its fiduciary obligations, especially those of loyalty, trust, and candor. In particular, by placing its own interests ahead of LSED's interests, MLPFS breached the duty of loyalty.

293820v.7

218.

MLPFS's fiduciary obligations continued up to and after the failure of the auctions, and its failure to disclose its involvement in the auctions or the reason for the auction failures was a continuing breach of its fiduciary obligations. Its bidding and receiving the 12 percent failed auction interest was also a breach of its fiduciary duties, including its duty of loyalty.

219.

As a result of MLPFS's breach of its fiduciary duties, Plaintiffs have suffered damages, including the failure of its bargain and the corresponding additional interest and expenses above those outlined by MLPFS in its various schedules and statements. In addition, MLPFS is responsible for the increased expense of a restructuring transaction, which could have been accomplished more economically had MLPFS not breached its duties. As of December 10, 2009, these damages amount to no less than $10 million.

## Second
### Intentional and Negligent Misrepresentation
### (Plaintiffs Against MLPFS)

220.

Plaintiffs adopt and incorporate by reference herein the allegations set forth in paragraphs 1 through 219 above.

221.

Given its relationship with Plaintiffs, its involvement in the issuance of the Bonds, and the fact that it was continuously providing information as a result of its promises to do so and its practical undertakings, MLPFS owed duties under Louisiana law to provide Plaintiffs with correct, complete, and non-misleading information. These duties also stemmed from MLPFS's Proposal, its acceptance and resulting contract, MLPFS's subsequent promises, presentations,

87

and personal communications with LSED and its voluntary undertaking to provide such information.

<p style="text-align:center">222.</p>

As discussed above in Sections IV(B), (D), and (L) and elsewhere herein, MLPFS provided Plaintiffs with false or misleading information and failed to disclose material facts about the true nature of the ARS market, the extent of MLPFS's involvement in the ARS market, and the material risks involved in the proposed structure of the recommended transaction. These misrepresentations and omissions continued up through at least April 2008. Accordingly, MLPFS committed the tort of intentional misrepresentation.

<p style="text-align:center">223.</p>

At an absolute minimum, as outlined above in detail in paragraphs 151 through 153 and elsewhere herein, MLPFS negligently misrepresented and/or negligently omitted material facts about the true nature of the ARS market, the extent of MLPFS's involvement in the ARS market, and the material risks in the transactions that it recommended. Accordingly, MLPFS committed the tort of negligent misrepresentation.

<p style="text-align:center">224.</p>

Plaintiffs reasonably relied on MLPFS's misrepresentations, and they have suffered damage as a result. Therefore, MLPFS is liable to Plaintiffs for damages under Louisiana Civil Code article 2315. As of December 10, 2009, these damages amount to no less than $10 million.

<div style="text-align:center">

**Third**
**Fraud**
**(Plaintiffs Against MLPFS)**

</div>

<p style="text-align:center">225.</p>

Plaintiffs adopt and incorporate by reference herein the allegations set forth in paragraphs 1 through 224 above.

293820v.7

226.

MLPFS's misrepresentations and omissions as outlined above in Sections IV(B), (D), and (L) and elsewhere herein give rise to a claim for fraud under Louisiana law.

227.

Given its relationship with Plaintiffs and its involvement in the issuance of the Bonds, MLPFS owed duties to disclose the material facts regarding the structure and transaction proposed to Plaintiffs, MLPFS's involvement in the ARS market, and the risks that Plaintiffs faced in undertaking the transaction that MLPFS recommended.

228.

As noted throughout this Complaint, MLPFS made numerous misrepresentations of and failed to disclose to Plaintiffs many material facts and continued to do so up until at least April 2008. These misrepresentations and omissions were made with the intention of deceiving Plaintiffs to obtain an unjust advantage over them.

229.

The misrepresentations and omissions made by MLPFS, upon which Plaintiffs justifiably relied, actually induced Plaintiffs to enter into the recommended component transactions using the structure proposed by MLPFS. The continuing supply of incomplete and misleading information after the issuance of the bonds about the state of the market and MLPFS's continued involvement in it caused additional damage and prevented Plaintiffs from taking action to address the problems that MLPFS created in time to avoid calamitous losses.

230.

MLPFS's fraudulent actions have caused damage to Plaintiffs, and as a result, Plaintiffs are entitled to damages and attorneys' fees from MLPFS under Louisiana Civil Code articles 1953 and 1958.  As of December 10, 2009, these damages amount to no less than $10 million.

**Fourth**
**Breach of Contract**
**(Plaintiffs Against MLPFS)**

231.

Plaintiffs adopt and incorporate by reference herein the allegations set forth in paragraphs 1 through 230 above.

232.

As a result of MLPFS's submission of its Proposal and Plaintiffs' acceptance of that Proposal, MLPFS undertook a contractual obligation to provide its best advice to Plaintiffs regarding the optimal structure for the transaction based upon Plaintiffs' stated objectives.  This contractual obligation is further evidenced by the subsequent presentations that MLPFS made to Plaintiffs and numerous conversations between MLPFS and Plaintiffs from May 2005 through April 2008.  Specifically, MLPFS undertook an obligation to provide all information necessary for Plaintiffs to select a suitable financing structure, and MLPFS also undertook an obligation to provide continuing reporting and advice regarding the transactions following the issuance, including providing ongoing valuation of the swaps, ongoing cash flow projections, ongoing reporting on the state of the ARS market and ongoing advice on whether any changes to the structure of LSED's financings were necessary or would be advantageous.  These contractual obligations included the duty to provide Plaintiffs with full and complete information regarding the transaction recommended and administered by MLPFS. MLPFS's contractual obligation to

provide information and advice began once Plaintiffs accepted MLPFS's Proposal and continued during the structuring process and beyond the auction failures.

<div align="center">233.</div>

There were several ancillary agreements entered between MLPFS and LSED that were component parts of MLPFS's larger obligation to provide advice and recommendations (during the structuring process and beyond) to Plaintiffs. These subsequent, component agreements were necessary to carry out specific elements of the "synthetic fixed rate" structure designed and implemented by MLPFS. The provisions set forth in the component agreements pertain only to the specific obligations of the parties set forth in the component agreements. They do not in any way minimize, eliminate, or otherwise affect, MLPFS's original and ongoing contractual obligation to provide advice and recommendations to LSED.

<div align="center">234.</div>

In fact, the component agreements served as MLPFS's consideration for its larger, overarching contract with Plaintiffs. That is, in exchange for MLPFS's advice and recommendations, LSED allowed MLPFS to become the lead underwriter and broker-dealer for LSED's Bonds, earning significant commissions, fees, and other compensation in the process.

<div align="center">235.</div>

MLPFS owed a contractual duty of good faith and to perform in a workmanlike manner in connection with its contract with Plaintiffs. These duties included good-faith performance of its structuring function, advisory function, underwriting function, broker-dealer function, and swap provider function, all of which were supposedly combined to accomplish Plaintiffs' objectives.

236.

As discussed above in detail in Sections IV(B), (D), and (L) and elsewhere herein, during the course of providing advice and recommendations, which continued through April 2008, MLPFS failed to provide, fully and accurately, the benefit of its knowledge and opinions to Plaintiffs. Instead, MLPFS misled Plaintiffs about the nature of, and failed to disclose many material facts about, the ARS market. While MLPFS advised Plaintiffs to issue the Bonds as ARS, MLPFS specifically failed to disclose that the success of the ARS market and therefore the promised "synthetic fixed rate" structure was entirely dependent upon MLPFS's blanket bids and that those blanket bids could be withdrawn at any time at MLPFS's sole discretion and if they were withdrawn the market would not create the promised "synthetic fixed rate." As a result of MLPFS's actions, it breached its contractual obligations with Plaintiffs.

237.

Because MLPFS knowingly, intentionally, and to further its own interests made false and/or fraudulent representations and omitted and concealed obviously important, material facts concerning the proposed structure, the vibrancy, efficiency, and viability of the ARS market, and the extent of MLPFS's support of that market, MLPFS was in bad faith when it breached its contract with Plaintiffs.

238.

As a result of MLPFS's bad faith breach of contract, MLPFS is liable to Plaintiffs not only for all damages that are foreseeable under Louisiana Civil Code article 1996, but also for all consequential damages under Louisiana Civil Code article 1997. As of December 10, 2009, these damages amount to no less than $10 million.

**Fifth**
**Violation of §10(b) of the Exchange Act and Rule 10b-5**
**(LSED Against MLPFS)**

239.

LSED adopts and incorporates by reference herein the allegations set forth in paragraphs 1 through 238 above.

240.

In advising LSED that LSED should issue, and in taking to market, LSED's auction-rate Bonds, MLPFS failed to disclose to LSED an obviously material fact: that, but for MLPFS's support bids, there was no market to sustain the auctions and to prevent the Bonds' interest rate from soaring to 12 percent, a disastrous consequence from which MLPFS's interest-rate swap could not save LSED.

241.

Contrary to its undertaking to provide "ongoing support [including] timely market valuations and analytics …, periodic reports outlining market movements, insights, research and projections," MLPFS further failed to timely disclose to LSED during and after August 2007 the problems developing with the ARS auctions and MLPFS's concern over its growing ARS inventory. Instead, MLPFS acted to conceal these problems and its own internal concern. Had MLPFS disclosed these facts before the auction failures and before the Bonds' loss of their investment-grade rating, LSED could have sought to mitigate its potential losses by exercising LSED's option to convert the Bonds' auction-rate mode to a fixed-rate or variable-rate mode.

242.

MLPFS's concealment of its critical support-bid practice continued even after the February auction failures when Claiborn misleadingly and incompletely represented that the

auctions failed because there was not "enough demand," because of "market disruption" and "extremely volatile market conditions."

<p style="text-align:center">243.</p>

As set forth above in Section IV(N) and elsewhere herein, MLPFS acted recklessly and had fraudulent motives when dealing with the Plaintiffs. MLPFS's fraudulent intent to conceal its support-bid practice may be inferred from a number of facts. First is the ubiquity of the long-standing and widespread practice. As federal and state regulators reported, MLPFS's undisclosed support bids date back to at least January 1, 2003 and were placed in every auction for ARS that MLPFS underwrote, including every auction for the Bonds. In 2006, for example, the year when LSED sold its bonds to MLPFS, on information and belief, based on an August 7, 2008 report published by Thomson Reuters, MLPFS served as lead underwriter in 32 municipal ARS issues totaling $3.4 billion. MLPFS knew that its undisclosed support bids were critical to sustain the auctions. According to state regulators, over a thirty-month period, from January 3, 2006 through May 27, 2008, 5,892 auctions would have failed but for MLPFS's support bids, including 213 auctions of LSED's Bonds.

<p style="text-align:center">244.</p>

Second, the undisclosed fact that there was not a sufficient auction market to sustain an "all in" interest rate cost under 5% was so obviously material. MLPFS knew that, following Hurricane Katrina and the fall-off of the Hotel Occupancy Tax revenues, a low interest rate on the Bonds was necessary to "LSED to accomplish [its] financing objectives …."

<p style="text-align:center">245.</p>

Third, MLPFS's misconduct in concealing its support-bid practice was pervasive. Its Proposal failed to disclose the then-ongoing SEC investigation into its auction practices,

including its support bids.  MLPFS's subsequent website notice of its auction practices was misleadingly phrased in disregard of SEC and SIFMA guidelines to conceal the fact that it consistently placed auction support bids in every auction and that if it did not continue to do so the auctions would consistently fail.  While the relationship between MLPFS and LSED was based on in-person visits and telephone conferences, the true and important facts were never disclosed in those routine contacts.  Later, when MLPFS determined that ARS auctions were in jeopardy of failing, it failed to disclose this.  Indeed, MLPFS acted to conceal it, and when the auctions for the Bonds did fail, MLPFS's misleading "explanations" to LSED concealed the critical fact that the auctions failed because MLPFS withheld its support bids.

246.

Finally, MLPFS's fraudulent intent may be inferred from how it stood to gain by perpetuating the auction system.  The fees that MLPFS earned each year as the broker-dealer handling the majority of the Bonds being bought and sold at auction (and, necessarily, from the concomitant interest-rate swaps) approached the amount of its underwriting compensation for the issuance of the Bonds.  At the time the Bonds were issued, MLPFS could look forward to broker-dealer fees and swap spreads that together potentially could approximate up to $28 million, or almost 5,700 percent of its underwriting compensation for the Bonds, over the 30-year term of the Bonds.  During the nearly two years before the auction failure, MLPFS received broker-dealer fees of approximately $644,000 and, assuming a 10.5 percent spread, made approximately $655,000 on the Swap Agreements.  Combined, these fees represented 257 percent of MLPFS's underwriting compensation for the Bonds.  These fees were dependent on the issuance of ARS and on perpetuating successful auctions, which in turn promote more ARS being issued and more auctions.  As noted in Section N and elsewhere herein, the ARS structure

95

was more lucrative than other available alternative structures.  This profitable scheme, however, would be jeopardized if issuers knew that MLPFS's promise of low interest rates, and purchasers knew that MLPFS's promise of cash-like liquidity, hung vulnerably on MLPFS's own ability and willingness to prop up the auction with its own support bids.

247.

MLPFS thus deliberately concealed its support bids in advising LSED to issue its auction rate Bonds and then withdrew its support bids.  As a result, LSED has been damaged by the amount of fees and interest attributable to MLPFS's fraud for which MLPFS is liable pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. §240.10b-5, thereunder.  As of December 10, 2009, these damages amount to no less than $10 million.

**Sixth**
**Violation of §10(b) of the Exchange Act and Rule 10b-5**
**(LSED Against MLPFS)**

248.

LSED adopts and incorporates by reference herein the allegations set forth in paragraphs 1 through 247 above.

249.

MLPFS's undisclosed support bid practice manipulated the ARS market in that it created the false impression of a market demand for ARS generally and LSED's Bonds in particular for the purposes, and with the effects, of (i) keeping interest rates at a level mutually attractive to issuers and purchasers (lower than long-term borrowing rates for issuers and higher than money-market rates for purchasers) and thereby (ii) perpetuating, as described above, an auction system that generated enormous fees for MLPFS.

250.

MLPFS's manipulative support bid scheme induced LSED to issue the Bonds into what it was misled by MLPFS to falsely believe was a genuinely robust and efficient ARS market not dependent on MLPFS's support.  Had LSED been aware of the real liquidity risks posed by ARS, it would have issued its Bonds in another mode or changed the mode after issuance.

251.

When MLPFS ceased its manipulative blanket bid policy in February 2008, the liquidity risk concealed by the manipulative policy materialized, and the auctions for LSED's bonds failed.

252.

After the auctions failed, MLPFS continued to manipulate the Bonds' auctions to maintain an interest rate at or near the 12 percent failure rate to profit at LSED's expense on the Bonds it obtained and held for its own account.

253.

As discussed above in Section IV(N), Paragraphs 239 through 247 and elsewhere herein, MLPFS acted recklessly and had fraudulent motives in applying its manipulative practices.

254.

As a result of LSED having been induced by MLPFS to issue the auction rate Bonds based on MLPFS's manipulative practices that concealed the liquidity risks of the auction rate market, LSED suffered significant damages, including but not limited to increased interest and fees, for which MLPFS is liable pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. §240.10b-5, thereunder.  As of December 10, 2009, these damages amount to no less than $10 million.

97

**Seventh**
**Violation of § 20(a) of the Exchange Act**
**(LSED Against Merrill Lynch & Co.)**

255.

LSED adopts and incorporates by reference herein the allegations set forth in paragraphs 1 through 254 above.

256.

Merrill Lynch & Co. acted as a control person of MLPFS with respect to all of the acts described in this Complaint. Because it is the parent company of MLPFS, it shares offices with MLPFS, it guarantees MLPFS's obligations, and it exercises supervisory authority over all aspects of the business of MLPFS, Merrill Lynch & Co. directed, participated in, and/or had knowledge of: (i) MLPFS's device, scheme, and artifice to defraud; (ii) MLPFS's untrue statements of material fact and/or its failure to state material facts necessary in order to make the statements made not misleading; and/or (iii) MLPFS's engagement in acts, practices, or courses of business that operated as a fraud and deceit upon LSED in connection with the sale and purchase of the Bonds and the manipulation of the market for the Bonds. Merrill Lynch & Co. had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of MLPFS, including the statements and the conduct described herein.

257.

Merrill Lynch & Co. had operational control, operational management, and supervisory involvement over the day-to-day operations of MLPFS, and, therefore, had the power to and did direct and/or influence the particular statements and transactions giving rise to the securities violations alleged herein.

258.

Merrill Lynch & Co. had the authority and the ability to prevent the material misstatements and omissions alleged herein and the market manipulation alleged herein, but did not do so because those actions contributed to Merrill Lynch & Co.'s profitability as the parent of MLPFS.

259.

Merrill Lynch & Co. was driven by its own greed and desire to perpetuate the highly profitable manipulation of LSED's auctions and the entire ARS market. As MLPFS's corporate parent, Merrill Lynch & Co. profited greatly from MLPFS's underwriting and broker-dealer fees, provided that MLPFS could continue to prop up the auctions for ARS. Merrill Lynch & Co. also greatly benefitted from the ARS issuances of BlackRock, a global investment management firm that is half-owned by Merrill Lynch & Co. If Merrill Lynch & Co. would have directed MLPFS to cease its misrepresentations and fully disclose its involvement in the ARS market, it would have deprived itself of the fees and other revenues generated from BlackRock's ARS issuances.

260.

Merrill Lynch & Co. was actively monitoring MLPFS's manipulative participation in the ARS markets. It is now known that when Merrill Lynch & Co. began to be adversely impacted by its exposure to CDOs and sub-prime mortgages, Merrill Lynch & Co. pressured MLPFS to withdraw from the ARS market to limit Merrill Lynch & Co.'s own risk exposure. Under pressure from Merrill Lynch & Co. to reduce its exposure to subprime mortgages, MLPFS began to stop supporting certain ARS auctions, causing them to fail.

261.

Merrill Lynch & Co. has assumed financial responsibility for the acts and omissions of MLPFS in connection with the ARS market. In its Form 10-K for the period ending December

26, 2008 and filed on February 24, 2009, Merrill Lynch & Co. reported that it had reached a "global agreement with the New York Attorney General, the Securities and Exchange Commission, the Massachusetts Securities Division and other state securities regulators relating to sales of Auction Rate Securities ("ARS")." Merrill Lynch & Co. further reported that "[i]n connection with this agreement, during 2008 we recorded a charge of $0.5 billion, which includes a fine of $125 million."

262.

As detailed herein, MLPFS violated Section 10(b) and Rule 10b-5 by the misrepresentations, acts, omissions and market manipulation alleged throughout this Complaint. As a controlling person of MLPFS, and based on the above facts, Merrill Lynch & Co. was a culpable participant in MLPFS's wrongdoing and is liable for damages under Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a), for the securities law fraud under Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. §240.10b-5, thereunder of MLPFS to the same extent as MLPFS. As of December 10, 2009, these damages amount to no less than $10 million.

**Eighth**
**Breach of Warranties**
**(Plaintiffs Against MLPFS)**

263.

Plaintiffs adopt and incorporate by reference herein the allegations set forth in paragraphs 1 through 262 above.

264.

In connection with its advice and recommendations to Plaintiffs, MLPFS warranted under Louisiana Civil Code articles 2520 and 2524 that the various products that it sold as part of the structure that it recommended were free from redhibitory defects and/or were fit for their

intended use to create a "synthetic fixed rate" borrowing that would yield the debt service payments set forth in the debt service schedules that MLPFS created and would result in an "all-in" rate of less than 5 percent. Accordingly, MLPFS is liable for the breach of the warranty against redhibitory defects, and alternatively, MLPFS is liable for the breach of the warranty of fitness.

265.

As MLPFS was well aware, Plaintiffs bought into the structure proposed by MLPFS with the expectation that the proposed structure (*i.e.,* auction rate bonds, with Swap Agreements with MLPFS and credit enhancement) would function to fix LSED's interest payments over the life of the Bonds as per the specific schedules that MLPFS provided.

266.

The structure sold by MLPFS to Plaintiffs contained many defects that MLPFS concealed from Plaintiffs during the structuring process, at the time of issuance, and beyond the auction failures. The defects in the structure (including the inefficiency of the ARS market and the fact that the recommended structure could not function without MLPFS's support bids), which existed at the time of the sale, rendered the structure absolutely useless to Plaintiffs. At a minimum, the defects in the structure rendered the structure so inconvenient or imperfect that Plaintiffs would not have purchased it from MLPFS.

267.

Had the Plaintiffs known that the structure that MLPFS recommended would not function as promised because of the defects (particularly, that it was dependent upon MLPFS's continuing to supply weekly support bids for the Bonds at a rate of 70 percent of LIBOR), Plaintiffs would not have bought the structure from MLPFS.

268.

Plaintiffs had no way of learning of the defects in the structure proposed by MLPFS because MLPFS hid the defects from Plaintiffs by providing false and misleading information and failing to disclose material facts to Plaintiffs as set forth above in Sections IV (B), (D), and (L) and elsewhere herein.  MLPFS continued to conceal this information after the issuance and even after the auction failures.  As a result, Plaintiffs were prevented from discovering the hidden defects until after the auction failures.

269.

Because MLPFS knew of the hidden defects in the structure that it was selling to Plaintiffs, failed to disclose the defects, and continued to conceal the defects even after the auction failures, MLPFS acted in bad faith and is liable to Plaintiffs for the breach of the warranty against redhibitory defects.

270.

Alternatively, in the event that MLPFS is not liable for the breach of the warranty against redhibitory defects, MLPFS is liable for the breach of the warranty of fitness.

271.

MLPFS also knew that Plaintiffs were relying on MLPFS's skill and judgment when the Plaintiffs purchased the structure that MLPFS recommended and knew that the reason Plaintiffs purchased the structure was to create a "synthetic fixed rate" in accordance with MLPFS's schedules.

272.

Because of the many undisclosed problems with the ARS market and with MLPFS's involvement in the ARS market, the structure and products proposed and sold by MLPFS were not fit for their intended use.  Further, because the structure sold by MLPFS could not function

102

unless MLPFS placed support bids in LSED's auctions, the structure was not—and MLPFS knew that the structure was not—suitable for Plaintiffs' intended use.

273.

As a result of MLPFS's breach of the warranty against redhibitory defects, or alternatively, the breach of the warranty of fitness, MLPFS is liable for damages and attorney's fees to Plaintiffs under Louisiana Civil Code article 2545. As of December 10, 2009, these damages amount to no less than $10 million.

**Ninth**
**Detrimental Reliance**
**(Plaintiffs Against MLPFS)**

274.

Plaintiffs adopt and incorporate by reference herein the allegations set forth in paragraphs 1 through 273 above.

275.

MLPFS is also liable under the Louisiana law of detrimental reliance, which is designed to prevent injustice by barring a party from taking a position contrary to its own prior acts, admissions, representations, or silence.

276.

Plaintiffs, to their detriment, relied upon the representations and upon the completeness of the information MLPFS provided as outlined in Sections IV (B), (D), and (L) and elsewhere herein. In particular, but not intended to be all-inclusive, Plaintiffs relied on MLPFS's representations that the recommended transactions would create a "synthetic fixed rate" with debt service payments that were set forth on the schedules that MLPFS provided in line with Plaintiffs' stated objectives and that the "all-in" rate would be less than 5 percent.

277.

Plaintiffs also relied on the completeness of information provided by MLPFS.  Notably, unbeknownst to Plaintiffs, MLPFS failed to mention any problems associated with the ARS market, that the market was entirely dependent on MLPFS's support bids, or that the market for LSED's Bonds would be entirely dependent on MLPFS's support bids.  MLPFS knew, or certainly should have known, that such information was highly material to LSED.

278.

Plaintiffs were reasonable in relying on MLPFS's representations and silence.  MLPFS was serving as Plaintiffs' advisor, underwriter, broker-dealer, and investment banker, and MLPFS arranged for its affiliate, MLCS, to serve as Plaintiffs' Swap Agreement counterparty.  Further, MLPFS routinely provided advice and recommendations to Plaintiffs both before and after the issuance of the Bonds regarding the ARS and swap markets and the proposed structure of the transaction.

279.

Because of MLPFS's representations and omissions made up to and after the auction failures, Plaintiffs purchased and sold the various component products that MLPFS recommended as set forth above that formed the constituent parts of the transaction, and as a result, did not enter into alternative transactions or structures that would have been more favorable.  But, as described in detail herein, MLPFS failed to disclose numerous material facts and presented a misleading picture of the transaction and its risks.  As a result, the "synthetic fixed rate" promised by MLPFS did not materialize.

280.

As a result of Plaintiffs' justifiable reliance on MLPFS's representations and promises and as a result of MLPFS's failure to provide critical information, Plaintiffs incurred damages.

As a result, Plaintiffs are entitled to damages under Louisiana Civil Code article 1967.  As of December 10, 2009, these damages amount to no less than $10 million.

**Tenth**
**Unjust Enrichment**
**(Plaintiffs Against MLPFS)**

281.

Plaintiffs adopt and incorporate by reference herein the allegations set forth in paragraphs 1 through 280 above.

282.

Alternatively, in the event that this Court finds that Plaintiffs are not entitled to any of the remedies requested above from MLPFS, Plaintiffs are entitled to damages under Louisiana's law of unjust enrichment.

283.

MLPFS has been unjustly enriched by the millions of dollars that it has earned in fees and commissions in connection with the issuance and administration of the Bonds and the periodic auctions of those Bonds, and Plaintiffs have been impoverished by the payment of commissions, fees, and interest payments for which it did not receive what was promised and which has actually worked significantly to their detriment.  There was neither justification nor cause for Plaintiffs' impoverishment and MLPFS's corresponding enrichment.

284.

Accordingly, MLPFS is liable to Plaintiffs for the value of the unjust enrichment.  As of December 10, 2009, these damages amount to no less than $10 million.

**Eleventh**
**Failure of Cause**
**(LSED Against FGIC)**

285.

LSED adopts and incorporates by reference herein the allegations set forth in paragraphs 1 through 284 above.

286.

As noted above, in connection with the issuance of the Bonds, LSED paid $13,645,990.63 to FGIC for credit enhancement in the form of the Insurance Contract and Reserve Policy, qualified guarantees under the applicable Treasury Regulations. The principal cause of this contract was the credit enhancement that FGIC provided to raise the credit rating on the bonds to "triple-A" and by doing so lower the borrowing costs of LSED over the life of the Bonds.

287.

The essential purpose of LSED's contract with FGIC was that FGIC's credit enhancement would create a favorable environment for the sale of the Bonds at the weekly auctions and lower LSED's interest payments as set at the weekly auctions. MLPFS indicated that the resulting savings would be 100 basis points a year over the life of the Bonds, justifying the more than $13 million payment to FGIC. This savings would only occur if FGIC's wrapper of the Bonds continued to supply the "triple-A" rating.

288.

In other words, the cause of LSED's entering into the contract with FGIC was to obtain FGIC's credit rating of "triple-A" for the Bonds so the interest rates set at the auctions would remain low. LSED paid FGIC over $13 million to obtain FGIC's continuing favorable credit rating for the Bonds and, therefore, to reduce the interest rate payable on the Bonds. FGIC was

106

well aware that its credit rating would serve as the *de facto* credit rating of the Bonds. Having provided credit enhancement to many other ARS deals prior to the issuance of the Bonds, FGIC was also well aware that the market (in this case, as supported by MLPFS) would be looking to the creditworthiness of FGIC and the $13 million wrap it sold to LSED at each and every auction, and that any deterioration of its creditworthiness would raise LSED's funding costs as a result. That the $13 million premium paid by LSED for this credit enhancement was significantly higher than the premiums it typically received for providing non-ARS issuances further suggests that FGIC knew that its role as provider of credit enhancement continued beyond the issuance date, and would continue to influence, if not determine, the price of the Bonds over their 30-year term. FGIC's understanding of LSED's purchase of credit enhancement is further evidenced in the certification letters that were executed pursuant to the applicable Treasury Regulations and included in the closing documents. LSED's cause was known at all times to all parties, is demonstrated in the documents, and cannot be subject to serious dispute.

<div align="center">289.</div>

As a result of the credit downgrades of FGIC from "triple-A" to unrated and as a result of the New York Insurance Department's November 24, 2009 Order that FGIC immediately "suspend paying any and all claims," FGIC is no longer able to provide credit enhancement, and the principal cause of the contract between FGIC and LSED has failed. This failure of cause was the result of FGIC's own bad credit decisions and its zeal to expand its business to new areas, mainly credit default swaps related to sub-prime mortgage debt, to the detriment of LSED and FGIC's other clients.

290.

If FGIC did not intend that LSED was purchasing FGIC's credit enhancement for the life of the Bonds through FGIC's maintaining its "triple-A" rating and through FGIC's ability to insure LSED's obligations over the 30-year life of the Bonds, LSED was in error as to the principal cause when it purchased FGIC's credit enhancement for more than $13 million.

291.

LSED must be awarded damages to put it in the position it should have been absent the failure of cause. As of December 10, 2009, these damages amount to no less than $10 million.

**Twelfth**
**Breach of Contract**
**(LSED Against FGIC)**

292.

LSED adopts and incorporates by reference herein the allegations set forth in paragraphs 1 through 291 above.

293.

In exchange for LSED's upfront payment of more than $13 million, FGIC contracted to provide credit enhancement over the 30-year life of the Bonds. In order to fulfill its obligation to provide credit enhancement, FGIC needed to issue LSED an insurance policy (a qualified guarantee under the applicable Treasury Regulations) and maintain its "triple-A" rating over the 30-year life of the Bonds. The credit enhancement "wrapped" LSED's Bonds with FGIC's credit rating. The terms of this bargain are explained more fully above in Section IV(G) and elsewhere herein and are demonstrated in the Bond Resolution and other documents referenced herein.

294.

LSED paid more than $13 million to FGIC for its credit enhancement, and LSED was paying for FGIC's triple-A rating and ability to provide insurance to enhance the creditworthiness and marketability of its Bonds over their life.  As demonstrated above, the reason that LSED paid more than $13 million to FGIC was so that FGIC's guarantee of the Bonds would ensure their continued triple-A rating and reduce the interest payments set by the auctions over the life of the Bonds.  FGIC knew this at the time that it accepted the more than $13 million premium from LSED.  FGIC was familiar with the auction structure of the bond issue and knew that, unlike in the case of a fixed rate bond, credit enhancement was required over the life of the Bonds, not just when issued, to provide the contracted-for interest rate benefit to LSED.  Moreover, as made clear by the certification letters included in the closing documents and by the Treasury Regulations concerning "qualified guarantees," FGIC knew that LSED expected the interest payment savings to exceed the premium paid for FGIC's credit enhancement, and FGIC knew that this would not be possible unless FGIC was able to provide its credit enhancement over the 30-year terms of the Bonds.

295.

In addition, FGIC's private and public statements, promotional literature, and agents' representations, as discussed in Section IV(G) and elsewhere herein, demonstrate that FGIC held itself out to the world of municipal issuers as being in the business of selling credit enhancement in the form of a "triple-A guaranty" to lower interest costs and make the FGIC-insured issues more desirable to investors.  FGIC did not fulfill that promise.

296.

LSED relied on FGIC's agreement to provide credit enhancement in connection with the issuance of the Bonds.  FGIC knew that LSED was relying on FGIC's credit enhancement—

accomplished through FGIC's maintaining its "triple-A" rating and insuring LSED's obligations—for the life of the Bonds when LSED paid the more-than $13 million premium. LSED would not have paid the premium had it known that FGIC would only provide its credit enhancement for less than two years.

<div align="center">297.</div>

FGIC breached its obligation to provide credit enhancement to LSED in two different ways. First, in January and February of 2008, FGIC lost its "triple-A" credit rating. Second, on November 24, 2009, the New York Insurance Department ordered FGIC to "suspend paying any and all claims." Both the loss of FGIC's credit rating and the Order of the New York Insurance Department were caused by FGIC's own actions. Specifically, the breaches were brought about by FGIC's imprudently exposing itself to risks associated with the sub-prime crisis particularly by writing credit default swaps on sub-prime collateralized debt obligations in 2006 and 2007. FGIC's actions were in disregard of its supposed "remote-loss" underwriting practice. FGIC's loss of its "triple-A" rating and inability to insure LSED's obligations constitute breaches of contract.

<div align="center">298.</div>

As a result of FGIC's bad faith breach of contract, FGIC is liable to LSED not only for all damages that are foreseeable under Louisiana Civil Code article 1996, but also for all consequential damages under Louisiana Civil Code article 1997. As of December 10, 2009, these damages amount to no less than $10 million.

293820v.7

**Thirteenth**
**Detrimental Reliance**
**(LSED Against FGIC)**

299.

LSED adopts and incorporates by reference herein the allegations set forth in paragraphs 1 through 298 above.

300.

FGIC is also liable to LSED under the law of detrimental reliance, which is designed to prevent injustice by barring a party from taking a position contrary to its own prior acts, admissions, representations, or silence.

301.

LSED, to its detriment, relied upon the representations, conduct, and silence of FGIC regarding FGIC's ability to provide credit enhancement for the Bonds over their life, FGIC's creditworthiness and FGIC's strength as a guarantor, and FGIC's commitment to safeguard its "triple-A" rating and ability to provide insurance by underwriting only to the remote-loss standard. FGIC, knowing the circumstances of LSED's bond issuance, never informed LSED that FGIC was not promising to provide its credit enhancement for the life of the Bonds, but rather only at the time of issuance, nor did it inform LSED that its desire to expand its product line would eviscerate its purported "remote loss" underwriting standard. Further, FGIC, knowing that its insurance policy was a qualified guarantee under the applicable Treasury Regulations, never informed LSED that it was not reasonable for LSED to expect the interest payment savings to exceed the insurance premium since FGIC was not promising to provide credit enhancement for the life of the Bonds.

302.

LSED was reasonable in relying on FGIC's representations, conduct, and silence. FGIC's private and public statements, promotional literature, its agents' representations to LSED's agents, its familiarity with ARS structures, the applicable Treasury Regulations, and its knowledge that such structures depended on ongoing credit enhancement to be successful all led LSED to reasonably rely on the promise that FGIC would provide credit enhancement over the life of the Bonds. FGIC knew that LSED would not have paid a premium of more than $13 million if FGIC was not going to provide credit enhancement for the 30-year term of the Bonds.

303.

As a result of LSED's justifiable reliance on FGIC's representations and FGIC's failure to provide critical information, LSED incurred damages. Therefore, LSED is entitled to damages under Louisiana Civil Code article 1967. As of December 10, 2009, these damages amount to no less than $10 million.

**Fourteenth**
**Unjust Enrichment**
**(LSED Against FGIC)**

304.

LSED adopts and incorporates by reference herein the allegations set forth in paragraphs 1 through 303 above.

305.

Alternatively, in the event that this Court finds that LSED is not entitled to any of the remedies requested above from FGIC, LSED is entitled to recovery under the law of unjust enrichment. FGIC provided what it was paid more than $13 million to provide, credit enhancement, but for only two of thirty years. FGIC has therefore received compensation for its

credit enhancement for 30 years, but LSED did not receive the "triple-A guaranty" for 28 of those years.

<div align="center">306.</div>

FGIC has been unjustly enriched by the more than $13 million premium paid by LSED, and LSED has been impoverished by the payment of the premium for the credit enhancement that it was promised and by FGIC's failure to provide that credit enhancement. There was neither justification nor cause for LSED's impoverishment and FGIC's corresponding enrichment.

<div align="center">307.</div>

Accordingly, FGIC is liable to LSED for the value of the unjust enrichment. As of December 10, 2009, these damages amount to no less than $10 million.

<div align="center">**JURY DEMAND**</div>

Plaintiffs pray for trial by jury on all claims and demands asserted herein.

<div align="center">**PRAYER FOR RELIEF**</div>

**WHEREFORE**, Louisiana Stadium and Exposition District and the State of Louisiana pray that this, their Third Amended and Supplemental Complaint, be deemed good and sufficient, and that after due proceedings had, there be judgment in their favor for all monies due plus pre-judgment and post-judgment interest, penalties and attorneys' fees, if applicable, and all costs, together with all other general and equitable relief to which they are legally entitled.

293820v.7

Dated:  New Orleans, Louisiana
        December 9, 2009

                              Respectfully submitted,

                              */s/ James R. Swanson*
                              James R. Swanson (jswanson@fishmanhaygood.com)
                              Lance C. McCardle (lmccardle@fishmanhaygood.com)
                                   of
                              FISHMAN HAYGOOD PHELPS
                                 WALMSLEY WILLIS & SWANSON, L.L.P.
                              201 St. Charles Avenue, 46th Floor
                              New Orleans, Louisiana 70170
                              Telephone:  (504) 586-5252
                              Facsimile:  (504) 586-5250

                                                                    114