USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11/30/10

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -X
In re Merrill Lynch Auction Rate      :      09 MD 2030 (LAP)
Securities Litigation                 :      Opinion & Order
----------------------------------X
This document relates to              :
                                      :
         No. 09 Civ. 5404 (LAP)       :
         No. 09 Civ. 6770 (LAP)       :
- - - - - - - - - - - - - - - - - -X

LORETTA A. PRESKA, Chief United States District Judge:

In this case, Plaintiffs, Louisiana Stadium and Exposition District ("LSED") and the State of Louisiana (collectively "Plaintiffs"), allege ten causes of action against Defendants Merrill Lynch, Pierce, Fenner & Smith, Inc. ("MLPFS") and Merrill Lynch & Co., Inc., ("Merrill") (collectively "Defendants") related to Plaintiffs' auction rate securities ("ARS") issuance.  On February 8, 2010, Defendants filed a motion for judgment on the pleadings against Plaintiffs.  The motion is GRANTED in part and DENIED in part.

I.   BACKGROUND

     A.   The Parties

LSED is a subdivision of the State of Louisiana, with offices located in New Orleans, Louisiana.  (See Third Amended and Supplemental Complaint ¶ 15 ("Compl.").)  LSED owns the Louisiana Superdome, and the State is the lessee of the Superdome.  (Id. ¶¶ 15-16.)  When LSED's expenses exceed its revenues, the State "funds the . . . shortfall."  (Id. ¶ 16.)

Defendant MLPFS is a Delaware corporation with its principal place of business in New York.  MLPFS is a subsidiary of Merrill and provides, among other things, underwriting and brokerage services.  (See id. ¶ 17; see also Memorandum of Law in Support of Defendants Merrill Lynch & Co., Inc. and Merrill Lynch, Pierce Fenner & Smith Incorporated's Motion for Judgment on the Pleadings ("Defs. Mem.") at 16.)  Defendant Merrill is also a Delaware corporation with its principal place of business in New York and is the parent company of MLPFS.  (See Compl. ¶ 19.)

    B.   Auction Rate Securities

The following facts are recited as alleged in the complaint and are regarded as true in considering this motion for judgment on the pleadings.  See Hayden v. Paterson, 594 F.3d 150, 160 (2d Cir. 2010).  All reasonable inferences are drawn in favor of the plaintiff.  Id.; see Ashcroft v. Iqbal, ___ U.S. ___, ___, 129 S. Ct. 1937, 1949-50 (2009).

ARS are long-term variable-rate debt instruments that are traded at periodic Dutch auctions, which are normally held every seven, fourteen, twenty-eight, or thirty-five days.  (Compl. ¶¶ 6-7.)  At a Dutch auction, buy orders are entered at interest rates selected by the bidder.  (Id. ¶ 5.)  Orders to buy or sell ARS at an auction can only be placed through a designated broker-dealer.  (Id. ¶ 6.)  The broker-dealers collect the

orders and forward them to an auction agent who administers the
Dutch auction.  (Id.)

These auctions dictate the interest rates payable on the
ARS.  (Id. ¶ 5.)  Each bid, or buy order, is ranked by the
auction agent from lowest to highest based on the interest rate
of the bid.  (See id.)  The orders are filled beginning with the
lowest interest rate, followed by orders with progressively
higher interest rates, until all instruments available for sale
are matched up with purchase orders.  (See id.)  The lowest
interest rate at which all the ARS available at the auction are
sold becomes the "clearing rate."  (See id.)  Interest rates for
the entire ARS issuance up for auction are set to the clearing
rate following an auction.  (See id.)  If, at a particular
auction, the buy and sell orders are insufficient to purchase
all of the ARS offered for sale, the auction fails.  (Id. ¶ 7.)
In the event of an auction failure, ARS holders are unable to
sell the securities that they hold, and the interest rate on the
ARS rises to the maximum rate (or failure rate) of approximately
12% until the next auction.  (Id.)  By February 2008, the ARS
market had grown to approximately $330 billion in outstanding
securities.  (Id. ¶ 8.)

C.   The Solicitation and Agreement

In early 2005, LSED sought to restructure its existing
debt.  (See id. ¶ 28.)  Subsequently, LSED issued a

3

"Solicitation for Offers for Senior Managing Underwriter" (the
"Solicitation") seeking investment banking services.  (Id.
¶ 29.)  After receiving the Solicitation, MLPFS responded by
submitting a proposal to LSED on April 19, 2005.  (See id.
¶ 30.)  In its proposal, MLPFS stated, among other things, that
it would "provide a full spectrum of client services . . . in
order to create the most innovative and cost effective financing
program."  (Id.)  On May 19, 2005, LSED hired MLPFS to fill the
role of senior managing underwriter and charged it with the task
of designing and implementing a structure for refinancing LSED's
debt associated with the Louisiana Superdome.  (See id. ¶ 37;
Plaintiffs' Memorandum of Law in Opposition to Merrill Lynch's
Motion for Judgment on the Pleadings ("Pls. Mem.") at 1; Defs.
Mem. at 3.)

     After the parties reviewed various financing options, MLPFS
recommended the ARS structure to LSED.  (See Compl. ¶ 43.)
MLPFS proposed a "synthetic fixed rate structure" for the ARS,
which would convert LSED's variable rate payments as set by the
auctions into fixed obligations (created by interest rate swap
agreements and a credit enhancement in the form of bond
insurance).  (Id.)  According to MLPFS, the ARS structure it
recommended would allow LSED to meet its financing objectives
with a synthetic fixed interest rate of under 5%.  (Id. ¶ 55.)
To illustrate how the proposed ARS structure would work, MLPFS

                                4

supplied LSED with a number of debt service schedules that showed how LSED's payments would unfold over the refinancing period.  (See id. ¶¶ 43-56.)  LSED claims that it relied on these schedules when determining whether to follow MLPFS's recommendation to issue ARS.  (See id. ¶ 59.)  Accordingly, on March 23, 2006, based on MPLFS's recommendations, LSED issued three series of ARS bonds: Series 2006A, 2006B, and 2006C.[1]  (Id. ¶ 62.)

The bonds were issued in "auction mode," meaning that the rate of interest was set by way of the auction procedure outlined above.  (Id. ¶ 66.)  However, they could be converted to traditional fixed- or variable-rate "modes" until at least January 30, 2008.[2]  (Id. ¶¶ 66, 113.)  Plaintiffs allege that MLPFS undertook a duty to provide LSED with advice about whether

---

[1] "The Series 2006A bonds were issued in an aggregate principal amount of $84,675,000 with an initial interest rate of 3.10%, and an initial auction period starting April 4, 2006."  (Compl. ¶ 63.)  "The Series 2006B bonds were issued in an aggregate principal amount of $84,650,000 with an initial interest rate of 3.10%, and an initial auction period starting April 5, 2006." (Id. ¶ 64.)  "The Series 2006C bonds were issued in an aggregate principal amount of $69,150,000 with an initial interest rate of 4.70%, and an initial auction period starting April 17, 2006." (Id. ¶ 65.)

[2] Defendants state that LSED had this conversion option until January 30, 2008.  (Defs. Reply Mem. at 2.)  It is not clear from the record whether the option contractually expired or simply became economically unfeasible at that time.  The issue is immaterial because LSED had over a year to convert following the August Disclosure.

to convert the bonds to another "mode" by which the bonds' interest rates were set. (Id. ¶ 140.)

In addition to serving as lead underwriter, MLPFS served as the broker-dealer for the auctions pursuant to another agreement between the parties (the "Broker-Dealer Agreement"). (See id. ¶ 71; Defs. Mem. at 7-8.) Under the Broker-Dealer Agreement, MLPFS earned approximately $644,000 in addition to its other compensation earned between the issuance of the ARS and the auction failures in February 2008. (Compl. ¶ 71.)

D.   Merrill Lynch's Role as a Bidder

Plaintiffs allege that MLPFS failed to disclose its bidding practices in the ARS market. LSED's central allegation is that the operation of the recommended ARS structure entirely depended on MLFPS's placing support bids[3] at every auction for which it was the sole or lead underwriter/broker-dealer. (See id. ¶¶ 91-92, 108; see Pls. Mem. at 7, 9.) Support bids ensured that all the ARS for sale in any given auction would be purchased and thus the auction would not fail. (Compl. ¶ 91.) Absent support bids, LSED could not have obtained the low interest rates promised by MLPFS because the auctions would have otherwise failed, causing LSED to pay the failure rate of 12%. (See id. ¶ 48; Pls. Mem. at 7-8.)

---

[3] "Support bids" are bids placed to ensure that the entire issue of ARS in a given auction is purchased. (Compl. ¶ 11; see also id. at ¶¶ 91, 106.)

MLPFS's policy of placing support bids in every auction to prevent auction failures allegedly created a false impression of liquidity in the ARS market.  (See Compl. ¶¶ 96-97.)  From January 3, 2006, to May 27, 2008, 5,892 auctions throughout the ARS market would have failed but for MLPFS's support bids.  (Id. ¶ 96; Pls. Mem. at 7.)  Cumulatively, approximately 69% of the auctions for LSED's ARS would have failed but for MLPFS's support bids.  (Compl. ¶ 96.)  As it relates to LSED's ARS, Plaintiffs allege that MLPFS submitted a bid for 100% of LSED's bonds in 100% of the auctions to ensure no failures, and MLPFS's bids set the clearing rate in nearly every auction.  (Id. ¶ 91.) Specifically, Plaintiffs allege that 76 of 98 Series 2006A auctions, 72 of 97 Series 2006B auctions, and 46 of 86 Series 2006C auctions would have failed without support bids.  (Id. ¶ 93-95.)  Furthermore, MLPFS's support bids set the clearing rate in all but 5, 5, and 16 of those auctions, respectively. LSED claims it did not learn any of this until the auctions failed.  (Id. ¶ 91.)

E.   The 2006 SEC Order and Merrill Lynch's Website
     Disclosure

On May 31, 2006, following an investigation into the auction practices and procedures of numerous investment banks, including MLPFS, the Securities and Exchange Commission ("SEC") issued an "Order Instituting Administrative and Cease-and Desist

Proceedings, Making Findings, and Imposing Remedial Sanctions
and a Cease-and-Desist Order Pursuant to Section 8A of the
Securities Act of 1933 and Section 15(b) of the Securities
Exchange Act of 1934" (the "SEC Order").  (See id. ¶ 100; see
also Defs. Mem. at 10.)  The SEC Order stated that various
investment banks intervened in auctions for a variety of
reasons, such as bidding to prevent auction failures or to
affect the auctions' clearing rates, without proper disclosure.
(See Compl. ¶ 101.)  The SEC Order listed MLPFS as a respondent
and noted that each and every respondent engaged in violative
activity with respect to ARS practices.  (SEC Order at 2-3.)
The order created two tiers for penalty purposes, the first of
which received larger penalties in part because those
respondents "engaged in more types of violative practices."
(Id. at 9.)  MLPFS was placed in the first tier.  (Id.)   The
SEC determined that without proper disclosure, these types of
conduct violated the prohibition on material misstatements and
omissions in the offer and sale of securities.  (See id. at 3;
Compl. ¶ 101.)  The order did not prohibit broker-dealers from
bidding for their own accounts when properly disclosed.  (SEC
Order at 6 n.6.)  Pursuant to the SEC Order, MLPFS entered into
an agreement with the SEC in which MLPFS agreed, among other
things, to post on its website a written description of its

auction practices and procedures that would be available to all issuers of ARS.[4]   (See id. at 9-11; Compl. ¶ 103.)

In compliance with the settlement, in August 2006, MLPFS posted a twenty-three page document on its website entitled "Description of Merrill Lynch's Auction Rate Practices and Procedures" (the "August Disclosure").   (See Compl. ¶ 103.) MLPFS's website posting disclosed, among other things, that MLPFS "may routinely place one or more bids in an auction for its own account . . . to prevent an auction failure."   (Id.) The posting further stated that MLPFS "may submit a bid in an auction to keep it from failing, but it is not obligated to do so."   (August Disclosure at 18.)   Finally, the website posting warned of the risk of an auction failure, stating, "[i]f sufficient bids have not been made, auction failure results, and holders that have submitted sell orders will not be able to sell in the auction all, and may not be able to sell any, of the securities subject to such submitted sell orders."   (Id.)

Both the August Disclosure and the SEC Order are incorporated by reference in the complaint and therefore may be considered in resolving this motion.   Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002).

---

[4]   Pursuant to the agreement with the SEC, MLPFS also agreed to be censured and to pay a civil penalty of $1,500,000.   (See Compl. ¶ 102; SEC Order at 9.)

F.   The Collapse of the ARS Market

From March 2006 until February 2008, the auctions
functioned as MLPFS had predicted.   (See Compl. ¶ 108; see Pls.
Mem. at 8.)  But on February 13, 2008, a wave of auction
failures resulted in the collapse of the ARS market;
consequently, LSED's interest rate climbed to the failed auction
rate of 12%.   (See Compl. ¶ 108.)

G.   Procedural Background

LSED filed this suit in the Eastern District of Louisiana
on January 22, 2009.  See Complaint, La. Stadium & Exposition
Dist. v. Fin. Guar. Ins. Co., No. 09 Civ. 235 (E.D. La. Jan. 22,
2009).  On June 10, 2009, the United States Panel on
Multidistrict Litigation transferred this action here for
inclusion in coordinated or consolidated pretrial proceedings
pursuant to 28 U.S.C. § 1407.  LSED filed a second amended
complaint on September 30, 2009.  After the Defendants sent LSED
letters detailing perceived deficiencies in the second amended
complaint, LSED filed a third amended complaint on December 10,
2009.  On February 8, 2010, Defendants filed a motion for
judgment on the pleadings.  See Fed. R. Civ. P. 12(c).

"The standard for addressing a Rule 12(c) motion for
judgment on the pleadings is the same as that for a Rule
12(b)(6) motion to dismiss for failure to state a claim."

10

Cleveland v. Caplaw Enters., 448 F.3d 518, 521 (2d Cir. 2006).
The Court so proceeds.

II.   STATUTE OF LIMITATIONS ANALYSIS

     The Court addresses Defendants' federal, then state,
statute of limitations arguments below.

     A.   Federal Claims

          i.   Legal Standard

     A statute of limitations defense may be raised by way of a
motion to dismiss if the defense appears on the face of the
complaint.   Staehr v. Hartford Fin. Servs. Grp., Inc., 547 F.3d
406, 425 (2d Cir. 2008).   The limitations period for Plaintiffs'
claims under the federal securities laws is governed by 28
U.S.C. § 1658(b), which provides that "a private right of action
that involves a claim of fraud, deceit, manipulation, or
contrivance in contravention of a regulatory requirement
concerning the securities laws . . . may be brought not later
than the earlier of 2 years after the discovery of the facts
constituting the violation or 5 years after such violation."   28
U.S.C. § 1658(b).   The parties agree that the two-year period is
the relevant period here.   (Pls. Mem. at 46.)   That statute of
limitations "begins to run once the plaintiff did discover or a
reasonably diligent plaintiff would have 'discover[ed] the facts
constituting the violation' — whichever comes first."   Merck &
Co. v. Reynolds, ___ U.S. ___, ___, 130 S. Ct. 1784, 1798 (2010)

(quoting 28 U.S.C. § 1658(b)(1)).  Plaintiffs filed the original complaint on January 22, 2009, so their claims would be time barred only if the statute of limitations began to run before January 22, 2007.  (See Pls. Mem. at 46.)

When used in this context, the term "discovery" is often used as a term of art derived from the "discovery rule," a doctrine delaying the accrual of a cause of action until the plaintiff has or should have uncovered "a complete and present cause of action."  Merck, 130 S. Ct. at 1793; see Dodds v. Cigna Sec. Inc., 12 F.3d 346, 350 (2d. Cir. 1993).  Although the "facts constituting the violation" certainly include scienter-related facts in an action under section 10(b), the Supreme Court has said "nothing about other facts necessary to support a private § 10(b) action."  Merck, 130 S. Ct. at 1796. Nonetheless, a securities-fraud plaintiff must plead – and ultimately prove – economic loss.  See, e.g., Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 342-46 (2005); In re Omnicom Grp., Inc. Sec. Litig., 597 F.3d 501, 509-10 (2d Cir. 2010).

             ii.  Analysis

                1.  Securities Fraud Claims

Defendants argue that the SEC Order and subsequent August Disclosure, no later than August 2006, put Plaintiffs on notice of the "central allegation[s]" in the complaint: "that MLPFS 'did not disclose and, therefore LSED was also unaware [of]

12

MLPFS' policy of placing blanket bids in every auction . . . .'"
(Defs. Mem. at 16 (quoting Compl. ¶ 2) (second alteration in
original)). Be that as it may, Defendants cannot overcome a
fatal obstacle. Whether or not Plaintiffs could have discovered
the other facts constituting the alleged violation within the
relevant time period, Plaintiffs suffered no economic loss prior
to the collapse of the ARS market in February 2008 according to
the allegations in the complaint. The Plaintiffs' securities
fraud claims therefore could not have accrued before that time.
See Dura, 544 U.S. at 342-46; Omnicom, 597 F.3d at 509-10. And
it would be fundamentally unfair to run the statute of
limitations from a time prior to when "a complete and present
cause of action" can accrue. See Merck, 130 S. Ct. at 1793;
Lentell v. Merrill Lynch & Co., 396 F.3d 161, 168 (2d Cir. 2005)
("[T]he applicable statute of limitations should not precipitate
groundless or premature suits by requiring plaintiffs to file
suit before than can discover with the exercise of reasonable
diligence the necessary facts to support their claims."
(internal quotation marks omitted)). Consequently, the federal
claims filed on January 22, 2009, are timely.

Defendants' argument to the contrary is jejune. They argue
that Plaintiffs "could have brought suit seeking compensation
for the difference in the market value of their debt based on
the purportedly different risk that they faced." (Defs. Mem. at

13

11.)  While that proposition could be true in the abstract, it belies the reality here.  First of all, from an issuer perspective, any loss on the "market value" of debt is relevant primarily insofar as it relates to the pricing of the initial transaction between the issuer and underwriter – here, MLPFS.[5] An allegation of the type of loss suggested by Defendants would be essentially immaterial in light of the facts here, where LSED received the negotiated "full value" (Pls. Mem. at 50) for its bonds from MLPFS.  Secondly — and more importantly — this argument misses the point of this action.  The relevant alleged economic harm here is increased debt service payments in the wake of auction failures.  (Compl. ¶¶ 4, 199.)  The central allegation is that MLPFS submitted bids in 100% of LSED's auctions and thereby prevented otherwise inevitable auction failures.  (Id. ¶ 91.)  Therefore, according to the complaint, only when MLPFS decided to stop supporting these auctions could LSED have suffered an economic loss.[6]  That occurred in February 2008, well after January 22, 2007.  Defendants, which allegedly controlled when Plaintiffs' loss occurred, cannot suggest that

---

[5] LSED makes no allegation that it repurchased any of its debt at an artificially high price.

[6] The complaint contains no allegation that the market set increased interest rates in the wake of MLPFS's disclosures. Indeed, the complaint suggests the opposite: because of MLPFS's pervasive intervention, rates remained artificially stable.

14

Plaintiffs somehow could have obtained a fully accrued cause of action prior to Defendants' exercise of this power.

B.   State-Law Claims

    i.   Legal Standard

When, as here, a federal district court sits in diversity, state law governs the timeliness of state-law claims.  Diffley v. Allied-Signal, Inc., 921 F.2d 421, 423 (2d Cir. 1990).  In Louisiana, "[d]elictual actions are subject to a liberative prescription of one year.  This prescription commences to run from the day injury or damage is sustained."  La. Civ. Code Ann. art. 3492; Black's Law Dictionary 492 (9th ed. 2009) (defining "delict" as a "violation of the law," particularly "a wrongful act . . . giving rise to a claim for compensation," or a tort).  In the vernacular of this Court, actions sounding in tort in Louisiana are subject to a one-year statute of limitations.  Similarly, actions for "redhibition" (breach of warranty) are subject to a one-year statute of limitations.  See La. Civ. Code Ann. art. 2534(B); Black's Law Dictionary 1391 (9th ed. 2009) (defining redhibition).  As the parties agree, Plaintiffs' state law causes of action in Counts Two and Three and Eight through Ten are subject to a one-year statute of limitations.

    ii.  Analysis

In Louisiana, "[p]rescription does not begin to accrue until injury or damage is sustained."  Luckett v. Delta

15

Airlines, Inc., 171 F.3d 295, 299 (5th Cir. 1999).  Therefore, as with the federal claims, Plaintiffs' February 2008 date of injury is dispositive.  This lawsuit was filed on January 22, 2009, which is within one year of the date of the alleged injury.  The statute of limitations does not bar these claims.[7]

III. PLEADING OF FEDERAL CLAIMS

    A.  Legal Standard

    In assessing a motion to dismiss, the Court must accept all non-conclusory factual allegations as true and draw all reasonable inferences in the plaintiff's favor.  Goldstein v. Pataki, 516 F.3d 50, 56 (2d Cir. 2008) (internal quotation omitted).  To survive such a motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Iqbal, 129 S. Ct. at 1949 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do."  Twombly, 550 U.S. at 555.  "Where a complaint pleads

---

[7] However, claims of damages occurring before the August Disclosure that are predicated on an alleged conflict of interest or nondisclosure of the SEC investigation contained in these counts are time barred.  The nondisclosure of the investigation and the conflict of interest became immediately apparent when the August Disclosure was released and were actionable, as to pre-disclosure damages, at that time.  See In re Merrill Lynch ARS Litig., 704 F. Supp. 2d 378, 396 (S.D.N.Y. 2010); Intracoastal Seafood Co. v. Scott, 556 So. 2d 974, 977 (La. Ct. App. 1990).

facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"  Iqbal, 129 S. Ct. at 1949 (quoting Twombly, 550 U.S. at 557) (internal quotation marks omitted). In securities fraud cases like this one, the complaint also must meet heightened pleading requirements under Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(b).  ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007).

    B.   Analysis

    The federal claims posit liability (1) for material misstatements (Count Five), (2) for market manipulation (Count Six), and (3) under section 20 of the Exchange Act (Count Seven).  Because liability under section 20 is solely derivative of a primary securities law violation, Dodds, 12 F.3d at 350 n.2, the Court first focuses on the other claims.

    To state a misrepresentation claim under Section 10(b) and Rule 10b-5, Plaintiffs must "allege that the defendant[s] (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the Plaintiffs' reliance was the proximate cause of its injury." ATSI, 493 F.3d at 105.  To make out a market manipulation claim, the complaint must "allege (1) manipulative acts; (2) damage (3)

caused by reliance on an assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendant's use of the mails or any facility of a national securities exchange." Id. at 101; see 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5.

Because of the specific features of the transaction involved in this case, the Court's statute of limitations analysis, supra Part II, has a spillover effect. Securities fraud claims require allegations of but-for and proximate cause, called "loss causation." Omnicom, 597 F.3d at 510. Plaintiffs cannot demonstrate that the alleged misstatements and manipulative conduct were proximate causes of their losses, which occurred in February 2008. (Pls. Mem. at 50 ("Plaintiffs suffered no economic harm until February 2008.").) All the while after Defendants disclosed their bidding practices and ARS market risks in August 2006, Plaintiffs retained an option to convert their ARS to traditional fixed- or variable-rate instruments but failed to exercise it. In short, Plaintiffs controlled their own destiny. The Court explains briefly.

The Court of Appeals has refined the definition of proximate cause in this context.

> [A] misstatement or omission is the "proximate cause"
> of an investment loss if the risk that caused the loss
> was within the zone of risk concealed by the

18

>            misrepresentations and omissions alleged by a
>            disappointed investor.
>                 Thus to establish loss causation, a plaintiff
>            must allege . . . that the subject of the fraudulent
>            statement or omission was the cause of the actual loss
>            suffered . . . .

Lentell, 396 F.3d at 173 (second alteration in original)

(internal quotation marks and citations omitted).  This concept

applies with equal force in a market manipulation case,

particularly where, as here, the manipulation claim involves

nondisclosure, which "is usually essential to the success of a

manipulative scheme." Santa Fe Indus., Inc. v. Green, 430 U.S.

462, 477 (1977); see also ATSI, 493 F.3d at 101 (stating that a

manipulation claim requires allegations of damages caused by

reliance on an assumption of an efficient market).

     Plaintiffs claim the primary cause of their damages was

that MLPFS was unable or unwilling to continue placing support

bids.  (See Compl. ¶¶ 242, 245, 247.)  Yet Plaintiffs were

informed of the risks involved in the ARS market, albeit after

they issued the bonds.  See In re Merrill Lynch ARS Litig., 704

F. Supp. 2d 378, 392 (S.D.N.Y. 2010).  The August Disclosure

revealed information about ARS liquidity and Defendants' bidding

practices that was at odds with what Plaintiffs allegedly knew

prior to the disclosure.  (See August Disclosure at 15-16, 18.)

The risks, even if "concealed" prior to these disclosures, were

no longer "concealed" after them.  See Lentell, 396 F.3d at 173.

As the Court has explained in a prior opinion in this MDL,
following the SEC Order, Merrill disclosed its bidding
practices.[8]  Merrill Lynch ARS, 704 F. Supp. 2d at 392.  Those
disclosures, made in August 2006, were sufficient to "negate the
Plaintiffs' claims that Merrill Lynch misled the market into
believing that the price of the securities and the clearing
rates set by the auctions were dictated by the natural interplay
of supply and demand."  Id.; see August Disclosure at 15
(stating that MLPFS is "permitted, but not obligated, to submit
orders in auctions for its own account either as a bidder or a
seller, or both, and routinely does so in its sole discretion").
The disclosures alerted investors to potential liquidity
problems and auction failures:

> There may not always be enough bidders to prevent an
> auction from failing in the absence of Merrill Lynch
> bidding in the auction for its own account or
> encouraging others to bid.  Therefore, auction
> failures are possible, especially if the issuer's
> credit were to deteriorate, if a market disruption
> were to occur or if, for any reason, Merrill Lynch
> were unable or unwilling to bid.

(August Disclosure at 18 (emphasis added).)  The disclosures
specifically noted that "Merrill Lynch is not obligated to make
a market in the securities, and may discontinue trading the
securities in the secondary market without notice for any reason

---

[8] The fact that MLPFS could bid for its own account generally was
disclosed in the Broker-Dealer Agreement (Defs. Mem. at 20), but
such disclosures were inadequate given the allegations here.
See SEC Order at 3.

at any time." (Id.)  Moreover, the August Disclosure specified that "Merrill Lynch provides no assurance as to the outcome of any auction." (Id.)  Finally, the disclosures noted that Defendants possibly had differing interests in bidding and conducting auctions and that, when bidding for their own account, they "would likely have an advantage over other bidders." (Id. at 15.)

When these very risks were realized, causing auction failure and sending interest rates to 12%, Plaintiffs cried foul.  However, for over a year following the disclosures, LSED could have converted its bonds to a different interest rate structure.  Rather than doing so, it was content to pay a lower interest rate while the ARS market functioned as it had all along.  (Defs. Mem. at 12.)  Ultimately, the bet did not pay off, but that does not amount to securities fraud.  Plaintiffs contend that this ARS case is unique.  (Compl. ¶ 3.)  That is true: the specific features of LSED's ARS issuance inform the Court's analysis in this case.

LSED was armed with (1) disclosures about the nature of the ARS market and MLPFS's bidding practices and (2) the ability, for over a year, to avoid entirely the risk of auction failure. The interplay of these two facts is important.  When the disclosures emerged, LSED, in effect, was presented with a choice.  It could do nothing and accept the newly disclosed

risks (along with a more attractive interest rate) or chart a safer course.  LSED chose the former.  The risks that materialized were not then concealed from LSED, Omnicom, 510 F.3d at 513-14; Lentell, 396 F.3d at 173, and it chose to accept those risks knowing it could opt out.  Cf. Bastian v. Petren Res. Corp., 892 F.2d 680, 682-84 (7th Cir. 1990) (Posner, J.) (suggesting that investors cannot allege securities fraud when assuming the risk of the investment).  Thus, after the disclosures were made, LSED assumed the risks of the investment choices it made, like any other investor.[9]  See Bastian, 892 F.2d at 686; see also New Haven Inclusion Cases, 399 U.S. 392, 492 (1970) ("[I]t is a fundamental aspect of our free enterprise economy that private persons assume the risks attached to their investments." (internal quotation marks omitted)).

Plaintiffs therefore cannot assert that the alleged misstatements and market manipulation caused their losses.  See Omnicom, 597 F.3d at 509-10, 513; Lentell, 396 F.3d at 173; Citibank, N.A. v. K-H Corp., 968 F.2d 1489, 1495 (2d Cir. 1992) ("[A] plaintiff must show[] that the economic harm that it suffered occurred as a result of the alleged misrepresentations.").  To say otherwise would be akin to

---

[9] Indeed, Plaintiffs' brief acknowledges this reasoning.  They state that it was the "liquidity risk" — of which they were told by way of the disclosures, see Merrill Lynch ARS, 704 F. Supp. 2d at 392 — that "materialized" (Pls. Mem. at 32).

affirming that a sinking ship legally caused a passenger to drown even if the passenger had ready access to a seaworthy lifeboat. See Omnicom, 597 F.3d at 513 ("[R]ecovery is limited to only the foreseeable losses for which the intent of the laws is served by recovery." (internal quotation marks omitted)).

Plaintiffs' contentions to the contrary are unpersuasive. First, they say that the disclosures were inadequate to disclose the true nature of the manipulation here. (Pls. Mem. at 33.) That argument was rejected by this Court in this MDL. Merrill Lynch ARS, 704 F. Supp. 2d at 392. Second, they say there is no evidence that the disclosures were made available to them, meaning that there is no evidence that they made a conscious choice not to convert the bonds to another "mode." (Pls. Mem. at 34.) This argument is preposterous. Plaintiffs make no assertion that they were unaware of the SEC Order (see id. at 46; Compl. ¶¶ 100-102), and the August Disclosure, which the SEC Order required, was equally available to Plaintiffs. Merrill Lynch ARS, 704 F. Supp. 2d at 397 (stating that these same sources were "widely available" and "easily accessible"); see Staehr, 547 F.3d at 432. The Court rejects the suggestion that Plaintiffs were unaware of the disclosures. Merrill Lynch ARS, 704 F. Supp. 2d at 397.

The most Plaintiffs muster is two arguments about the conversion option itself. First, they assert that MLPFS's

23

failure to advise them to convert the ARS' "mode" was unlawful. (See Compl. ¶¶ 113, 140, 156.) But that is not a claim under the securities laws. See Gurary v. Winehouse, 190 F.3d 37, 46 n.9 (2d Cir. 1999); see also Marine Bank v. Weaver, 455 U.S. 551, 556 (1982) ("Congress, in enacting the securities laws, did not intend to provide a broad federal remedy for all fraud."). In any case, following the August Disclosure, it would have been unreasonable for Plaintiffs to rely on such advice. See In re Citigroup ARS Litig., 700 F. Supp. 2d 294, 307 (S.D.N.Y. 2009).

Second, they argue in their reply opposition that converting to another "mode" would have been "enormously expensive" and suggest that a loss was therefore inevitable. (Pls. Reply Mem. at 4.) The problem is that Plaintiffs do not adequately make such an allegation in the complaint. Indeed, the complaint suggests the opposite: it states that LSED will have to restructure the debt now, incurring additional costs, but had it been told of the "problems with the ARS market . . . prior to the auction failures, Plaintiffs could have effected a restructure on considerably better terms." (Compl. ¶ 209.)

And to the extent that such an argument is intimated in the complaint, it falls short of Rule 9(b)'s requirement that allegations of fraud be pleaded with particularity. There is no specific information in the complaint to determine whether restructuring, at any certain point in time, would have been

cheaper or more expensive than the status quo.  There is no
allegation that any specific statement was made to induce LSED
to retain the ARS structure.  Moreover, LSED issued the bonds
knowing full well the terms and conditions of the conversion
option, which was available to it at any time for any reason.
The complaint also contains little information about what the
market conditions would have dictated in terms of post-
restructure interest rate pricing; what it does contain suggests
that such a conversion would have been economically feasible.
(Id. ¶ 140 (stating that when the bonds were rated AAA,
conversion could have mitigated any exposure to auction failure
rates, but, post-failure, conversion was "no longer
practical").)  Given the "tangle of factors," Dura, 544 U.S. at
343, that could have affected LSED's choice not to convert, it
is difficult to see how Plaintiffs have alleged "economic losses
that misrepresentations actually cause[d]," id. at 344.  In
short, the thrust of the complaint's federal allegations is to
claim damages as a result of the failed auctions, not faulty
post-issuance restructuring advice.  This argument fails.

     To be clear, this conclusion does not mean that the Court
condones MLPFS's actions.  MLPFS very well may have acted
reprehensibly and foisted upon LSED a choice it did not want to
make.  Nevertheless, the securities laws were not designed to
prevent investment risks from materializing or to provide

investment insurance.  Omnicom, 597 F.3d at 510, 513 (citing

Dura, 544 U.S. at 345).

     That ends this aspect of the discussion.  Plaintiffs did

not adequately allege loss causation, so their misstatement and

market manipulation claims (Counts Five and Six) fail.  As this

is the third amended complaint, they are dismissed with

prejudice.  By extension, that dismissal mandates dismissal of

Count Seven because it is a section 20 claim, dependent on the

existence of a primary violation, which does not exist here.

Dodds, 12 F.3d at 350 & n.2; see ATSI, 493 F.3d at 108.

IV.  STATE-LAW CLAIMS

     Counts One through Four and Eight through Ten allege state-

law causes of action governed by Louisiana law.  Before the

Court analyzes these claims, it addresses Defendants' argument

that all the state-law claims should be dismissed because

Plaintiffs do not adequately plead loss causation.  The Court

rejects this argument.  Of course, Louisiana law generally

requires a causal nexus between the alleged unlawful conduct and

the harm, e.g., Keenan v. Donaldson, Lufkin & Jenrette, Inc.,

575 F.3d 483, 491 n.15 (5th Cir. 2009), but Louisiana law

requires no showing of "loss causation" as defined in the

federal securities laws.  Indeed, loss causation is a

specialized federal securities law concept.  See Lentell, 396

F.3d at 173-74 (stating that analogizing loss causation to the

"tort-law concept of proximate cause" is "imperfect").

Therefore, the Court's loss causation analysis is not applicable

in wholesale to these state-law claims.

A.   Count One: Breach of Fiduciary Duty

Plaintiffs contend that MLPFS owed LSED a fiduciary duty as

its "advisor, underwriter, broker-dealer, and investment banker"

to provide "advice and recommendations regarding the optimal

structure for their debt restructuring." (Pls. Mem. at 11.)

They claim that this advisory role continued beyond the

issuance. (Id. at 17; Compl. ¶¶ 113-114.)

Under Louisiana law, a breach of fiduciary duty claim

requires proof of (1) the existence of a fiduciary duty, (2) an

action taken by the fiduciary in violation of that duty, and (3)

damages as a result of that action. Omnitech Int'l Inc. v.

Clorox Co., 11 F.3d 1316, 1330 & n.20 (5th Cir. 1994). A mere

contractual relationship is ordinarily insufficient to create a

fiduciary duty. Id. at 1330. Instead, Louisiana law looks to

the actual relationship of the parties and attendant facts and

circumstances. Scheffler v. Adams & Reese, LLP, 950 So. 2d 641,

647 (La. 2007). Because the existence of a fiduciary duty is a

fact-intensive inquiry, dismissal on the pleadings is usually

inappropriate. Better Benefits, Inc. v. Prot. Life Ins. Co.,

No. 03 Civ. 2820, 2004 WL 633730, at *3 (S.D.N.Y. Mar. 30,

2004); see Scheffler, 950 So. 2d at 647.

27

Here, taking the allegations in the complaint as true,
Plaintiffs have alleged sufficient facts to demonstrate the
existence of a fiduciary duty.  The complaint alleges that MLPFS
stated in a January 13, 2006, presentation, "The partnership
between Merrill Lynch and LSED goes far beyond executing
transactions."  (Compl. ¶ 46.)  In that presentation, MLPFS
stated it would provide "Ongoing Support" in the form of "timely
market valuations and analytics" and help "advise LSED as to the
right structure for the current market" while "[d]escribing
benefits and risks of any transaction . . . for LSED."  (Id.)
The complaint alleges that MLPFS "obligated itself to work as a
partner" with LSED and "to provide advice and recommendations
. . . on the most economically beneficial structure."  (Id.
¶ 37.)  The complaint alleges that MLPFS "provided monitoring
and advisory services regarding the bonds . . . after issuance,
including whether to change the mode of issuance" and indicates
that meetings occurred "at least quarterly." (Id. ¶¶ 38, 113-
115.)  LSED alleges that it "relied heavily on the advice and
recommendations of MLPFS."  (Id. ¶ 60.)

While this relationship does not fall within the defined
categories of fiduciary relationships under the Louisiana code,
see Omnitech, 11 F.3d at 1330, the complaint alleges an advisory
relationship beyond the underwriter-issuer contractual
relationship.  Courts have considered such a relationship to be

28

a fiduciary one.[10]  See, e.g., EBC I, Inc. v. Goldman, Sachs & Co., 832 N.E.2d 26, 31 (N.Y. 2005) (stating that a breach of fiduciary duty claim may survive dismissal "where the complaining party sets forth allegations that, apart from the terms of the contract, the underwriter and issuer created a relationship of higher trust than would arise from the underwriting agreement alone"); Breakaway Solutions, Inc. v. Morgan Stanley & Co., Civ. No. 19522, 2005 WL 3488497, at *2 (Del. Ch. Dec. 8, 2005) ("To the extent that underwriters function, among other things, as expert advisors to their clients on market conditions, a fiduciary duty may exist.").

In an effort to deny that a fiduciary relationship exists, Defendants first point to a banking statute requiring a written agreement for a "financial institution" to assume a fiduciary duty.  La. Rev. Stat. Ann. § 6:1124.  Defendants overlook, however, the definition section of that statute, which provides that a "financial institution" is a "a bank, savings and loan association, savings bank[], or credit union."  Id. § 6:1121(4).  The statute does not apply here.  Defendants also point to boilerplate disclaimer language appended to the end of two presentations made by MLPFS to LSED.  (Declaration of Scott C. Musoff Ex. A, at 3 ("[MLPFS is] acting solely in the manner of

---

[10] Louisiana courts apparently have not opined on this question. (Defs. Mem. at 32.)

an arm's length counterparty and not in the capacity of your
financial advisor or fiduciary.").)  However, several later
presentations (Declaration of Lance C. McCardle Exs. 4, 6-8, 10-
14 & 16) and MLPFS's original proposal contain no such language,
and, in any event, it is the facts and circumstances of the
relationship of the parties that governs whether a duty existed.
See Scheffler, 950 So. 2d at 647.  Given the factual nature of
the question, the Court cannot say as a matter of law that
Plaintiffs have not alleged that a fiduciary relationship
existed.

     Plaintiffs also adequately allege a breach of this duty.
They say that Defendants failed to disclose MLPFS's ubiquitous
support-bidding practices during the proposal phase and failed
to provide Plaintiffs with that information after the issuance.
(Compl. ¶¶ 145, 151-153, 156.)  Finally, Plaintiffs argue that
Defendants failed to disclose their conflicts of interest prior
to the issuance.  (Id. ¶ 217.)  The gravamen of these
allegations is that Plaintiffs issued bonds thinking that
MLPFS's advice was "optimal" but only later found that what they
were told was not true.  (Id. ¶ 212; Pls. Mem. at 16.)
Defendants' argument to the contrary is absurd.  They rely on
their disclosure of their bidding practices to show that
Plaintiffs did not allege any breach, but Defendants fail to
acknowledge that, according to the complaint, any such

disclosure occurred <u>after</u> the bonds were issued.  And although
Defendants argue that the risks of MLPFS's bidding were
disclosed at the transaction's outset, the SEC Order suggests
otherwise.  <u>See</u> SEC Order at 3; <u>see also</u> Rombach v. Chang, 355
F.3d 164, 173 (2d Cir. 2004).  Indeed, allowing a post-issuance
disclosure to cure the alleged breach would, pared to its
essence, condone a "bait and switch."  That is not the province
of fiduciary duty law.

Defendants also argue that since any breach sounds in
fraud, the complaint fails to meet Rule 9(b)'s particularity
requirement.  This argument also fails.  The complaint
references specific presentations made on specific dates by
specific MLPFS employees to LSED.  (<u>E.g.</u>, Compl. ¶¶ 43-46, 51-
55.)  Those presentations form the basis for Plaintiffs' breach
allegations.

Finally, Plaintiffs allege damages in the form of increased
interest payments and increased expenses for restructuring as a
result.  (<u>Id.</u> ¶ 219.)  Taking the allegations in the complaint
as true, Plaintiffs allege a claim under Louisiana law for
breach of fiduciary duty.

C.   <u>Counts Two and Three: Intentional and Negligent</u>
<u>Misrepresentation and Fraud</u>

In Louisiana, a claim for negligent misrepresentation
requires a showing (1) of "a legal duty on the part of the

31

defendant to supply correct information; (2) . . . a breach of that duty, which can occur by omission as well as by affirmative misrepresentation; and (3) [that] the breach must have caused damages to the plaintiff based on the plaintiff's reasonable reliance on the misrepresentation." Keenan, 575 F.3d at 490 n.15. Unsurprisingly, intentional misrepresentation (or, in Louisiana, "delictual fraud") requires that a party misrepresent a material fact with the intent to deceive, causing justifiable reliance with resultant injury. Murungi v. Tx. Guaranteed, 693 F. Supp. 2d 597, 604 (E.D. La. 2010). Because "[i]ntentional misrepresentation is essentially fraud" in Louisiana, Solow v. Heard McElroy & Vestal, L.L.P., 7 So. 3d 1269, 1278 (La. Ct. App. 2009), the Court's analysis covers Count Three (fraud) here as well. Fraud is "a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other." Id. (quoting La. Civ. Code Ann. § 1953).

The Court begins with the straightforward. First, Plaintiffs have alleged misrepresentations about the nature of the ARS market itself and MLPFS's support bidding practice. See supra Part I.D. Those allegations, taken as true, are material; Defendants' assertion that the facts about MLPFS's bidding practices were properly disclosed is unfounded. See SEC Order at 3. Moreover, these facts were pleaded with particularity:

Plaintiffs cited specific facts about MLPFS's auction procedures that were undisclosed at and after issuance. See supra Part I.D.

Second, after the August Disclosure, it would have been unreasonable to rely on statements made by MLPFS in the ways advanced by LSED here. See Citigroup ARS, 700 F. Supp. 2d at 307. Therefore, any of the state-law claims in Counts Two and Three are dismissed to the extent that they are predicated on alleged fraud or misstatements that occurred after the August Disclosure. See Abbott v. Equity Grp., Inc., 2 F.3d 613, 624 (5th Cir. 1993); Sun Drilling Prods. Corp. v. Rayborn, 798 So. 2d 1141, 1152-53 (La. Ct. App. 2001).

Third, the Court's breach of fiduciary duty analysis, supra Part IV.C, applies to supply a duty to provide correct information. In addition, LSED and MLPFS had a contractual relationship, which supplies such a duty in Louisiana. See Barrie v. V.P. Exterminators, Inc., 625 So. 2d 1007, 1015 (La. 1993).

Fourth, all three of these claims require a showing of reasonable reliance. See Sun Drilling, 798 So. 2d at 1153. LSED adequately alleges reasonable reliance on pre-August Disclosure omissions by MLPFS. When omitted information is material, as here, reliance may be presumed. See Black v. Finantra Capital, Inc., 418 F.3d 203, 209 (2d Cir. 2005); cf.

Falcon v. Bigelow-Liptak Corp., 356 So. 2d 507, 510 (La. Ct. App. 1977) (res ipsa loquitur).  To counter that presumption, MLPFS offers only that the facts Plaintiffs claim were omitted were in fact disclosed at the outset.  That argument was rejected by the SEC, see SEC Order at 3, and the Court draws the same conclusion.  Although the issuing documents indicated that MLPFS could bid (Defs. Mem. at 20), those disclosures were inadequate in light of allegations of (1) a pervasive support bidding practice (2) necessary to keep the ARS market afloat. SEC Order at 3.

These four propositions tacked down, the Court concludes, accounting for Plaintiffs' damages allegations, that Plaintiffs alleged a claim for negligent misrepresentation.

The final question relevant to the remaining two claims here is whether Plaintiffs adequately alleged intent. Allegations of an "intent to obtain an unjust advantage or to cause damage or inconvenience to another" suffice.  Fenner v. DeSalvo, 826 So. 2d 39, 44 (La. Ct. App. 2002).  Plaintiffs allege that MLPFS had a long-standing support bid practice that predated the LSED issuance and was concealed from LSED, and that MLPFS stood to gain additional profit from selling ARS products over traditional bond products.  (Pls. Mem. at 25; Compl. ¶¶ 70-72, 174-182.)  LSED argues that because the facts about the nature of MLPFS's bidding in the ARS market were solely in the

34

possession of MLPFS, there is no way it could have discovered the truth ex ante. <u>Cf.</u> La. Civ. Code. Ann. art. 1954 ("Fraud does not vitiate consent when the party against whom the fraud was directed could have ascertained the truth without difficulty, inconvenience, or special skill."). Knowingly selling an unwitting client an allegedly more profitable but flawed financial product raises an inference of an intent to obtain an unjust advantage. <u>See, e.g.</u>, <u>Shelton v. Standard/700 Assocs.</u>, 798 So. 2d 60, 65-66 (La. 2001). Indeed, Plaintiffs allege that MLPFS's compensation arising from the LSED ARS was up to 5700% higher (over the life of the issuance) than an underwriting transaction for a conventional bond. (Compl. ¶ 246.) Although Defendants correctly argue that a motive to make a profit alone is insufficient to allege fraud (Defs. Mem. at 22), that is not the allegation here. Instead, Plaintiffs allege that Defendants had an intent to sell ARS because MLPFS would earn greater, different fees than in a traditional transaction, all the while knowing the ARS market was a sham. (Pls. Mem. at 28-30.) That is enough to allege an intent to defraud. <u>See</u> <u>Abu Dhabi Comm'l Bank v. Morgan Stanley & Co.</u>, 651 F. Supp. 2d 155, 179-80 (S.D.N.Y. 2009); <u>In re Global Crossing, Ltd. Sec. Litig.</u>, 322 F. Supp. 2d 319, 345-46 (S.D.N.Y. 2004).

Given that Plaintiffs allege that these alleged misrepresentations caused them damages, the above analysis

35

indicates that Plaintiffs have alleged a claim for fraud and intentional misrepresentation arising from pre-August Disclosure misstatements or omissions.

     D.   Count Four: Breach of Contract

     Plaintiffs' breach of contract claim is that MLPFS's April 19, 2005, "Response to Solicitation for Offers for Senior Managing Underwriter" ("Proposal") was accepted as a contract governing MLPFS's alleged advisory role, separate and apart from the later-signed written contracts.  (See Compl. ¶¶ 30, 37, 232; Pls. Mem. at 22.)  Plaintiffs claim that the Proposal was effectuated by "several ancillary agreements entered between MLPFS and LSED that were component parts of MLPFS's larger obligation."  (Compl. ¶ 233.)

     In order for a contract to be formed under Louisiana law, "an acceptance must be in all things conformable to the offer. An offer must be accepted as made to constitute a contract.  A modification in the acceptance of an offer constitutes a new offer which must be accepted in order to become a binding contract."  LaSalle v. Cannata Corp., 878 So. 2d 622, 624 (La. Ct. App. 2004).  Moreover, if "a proposal [is] to qualify as an offer, it must reflect the intent of the author to give to the other party the right of concluding the contract by assent." Delta Testing & Inspection, Inc. v. Ernest N. Morial New Orleans Exhibition Hall Auth., 699 So. 2d 122, 124 (La. Ct. App. 1997).

36

Without this intent to make an offer acceptable by the offeree as made, a proposal is "only an invitation to negotiate or an expression of willingness to receive offers from others." Id.

The Proposal was not meant to be accepted as a contract. In response to LSED's Solicitation, MLPFS's Proposal provided both a primary proposal (see Defs. Mem. at 20-24, Ex. D), as well as a number of alternative options (see id. at 25-26). MLPFS's Proposal could not have been and, indeed, was not "accepted as made." LaSalle, 878 So. 2d at 624. That LSED and MLPFS spent over five months negotiating written agreements ultimately signed signals that MLPFS's Proposal was not an offer to be accepted by LSED. (See, e.g., Compl. ¶ 42 ("During these five months [November 2005 to March 2006], MLPFS's representatives . . . were continually advising and making recommendations to the LSED Restructuring Group about how the borrowings should be structured.").) Plaintiffs also contend that the various presentations made by MLPFS supported the creation of a separate contract or created the contract in and of themselves. (See id. ¶ 59; Pls. Mem. at 22.) For the same reasons that the Proposal on its own could not form a separate contract, the presentations on their own or in conjunction with the Proposal likewise could not form such a contract. See LaSalle, 878 So. 2d at 624. The presentations do not provide

37

details sufficient to constitute an offer acceptable by assent. See id.

In short, MLPFS's Proposal was not an offer as it could not have been, and was not, assented to in full.  See id. Ultimately, three related but independent written contracts were consummated between the various parties.  (See Defs. Mem., Exs. E, F, G.)  Plaintiffs point to no provision of any of the written agreements MLPFS breached.  Those agreements each contained explicit integration clauses and represented the full agreement of the parties after almost a year of negotiations between the parties.  To the extent Plaintiffs are asserting the Proposal and presentations modified the final agreements rather than formed a separate one, the Plaintiffs fail to point to specific provisions of the final agreements that are ambiguous. The parol evidence rule thus bars consideration of such evidence.  Condrey v. SunTrust Bank of Ga., 429 F.3d 556, 566 (5th Cir. 2005).  Therefore, Plaintiffs' breach of contract claim is dismissed.

     E.   Count Eight: Breach of Warranty

Plaintiffs claim that MPLFS warranted that "the various products that [MLPFS] sold as part of the structure that it recommended were free from redhibitory defects and/or were fit for their intended use to create a 'synthetic fixed rate' borrowing."  (Compl. ¶ 264 (citing La. Civ. Code Ann. art. 2520

(warranty against redhibitory defects); id. art. 2524 (thing fit for ordinary use).)

To maintain a cause of action for breach of warranty (called redhibition in Louisiana), the Plaintiff must show that:

> (1) the seller sold the thing to him and that it is either absolutely useless for its intended purpose or its use so inconvenient or imperfect that had he known of the defect he would never have purchased it; (2) the thing contained a non-apparent redhibitory defect at the time of sale; and (3) the seller was given an opportunity to repair the defect.

Vincent v. Hyundai Corp., 633 So. 2d 240, 243 (La. Ct. App. 1993).

Louisiana does not apply the law of warranties against redhibitory defects to intangible "things" such as the financial structure at issue here. Guenin v. R.M. Homes, Inc., 424 So. 2d 485, 487 (La. Ct. App. 1982) ("The articles on redhibition . . . refer only to 'things' ('things sold' and 'inanimate things') and 'animals.'"). This understanding of the "things" to be warranted is further informed by what constitutes a defect. Harper v. Coleman Chrysler-Plymouth-Dodge, Inc., 510 So. 2d 1366, 1369 (La. Ct. App. 1987) ("The term 'defect' . . . means a physical imperfection or deformity; or a lacking of necessary components or level of quality."). The discussion of "physical imperfection" or a lack of "components" supports MLPFS's position that the law warranting against redhibitory defects applies to tangible items. See id. Plaintiffs assert that

39

their claim arises because the financial structure was "lacking of necessary components or level of quality." (Pls. Mem. at 40.) Yet Plaintiffs cite no authority for the proposition that the warranty against redhibitory defects applies to intangible "things." Absent any Louisiana authority, the Court is reluctant to expand Louisiana law by applying a warranty against redhibitory defect to intangible products like those involved here.

Additionally, the financial products here worked for almost two years between the date of the bonds' issuance and the failure of the ARS market. Plaintiffs were aware of the alleged "defects" and had the power to avoid these "defects" by conversion to another "mode." See supra Part III.B. Faced with this choice, LSED opted to absorb additional risk and reap the rewards of a lower interest rate by way of functioning swap agreements and credit enhancement. The swap agreements and the credit enhancement, at the time of the sale, were not "absolutely useless for its intended purpose" or "so inconvenient or imperfect." Vincent, 633 So. 2d at 243. The breach of warranty claim is dismissed.

F.   Count Nine: Detrimental Reliance

Detrimental reliance is defined by statute in Louisiana. "A party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely

40

on it to his detriment and the other party was reasonable in so relying." La. Civ. Code Ann. art. 1967; Omnitech, 11 F.3d at 1329. The Court is loath to apply detrimental reliance in light of its equitable nature and the Court's holding with respect to the fiduciary duty, misrepresentation, and fraud claims. "Detrimental reliance is not favored in [Louisiana] law and is sparingly applied as it bars the normal assertion of rights otherwise present." Hibernia Nat'l Bank v. Antonini, 862 So. 2d 331, 336 (La. Ct. App. 2003). Because the fiduciary duty, misrepresentation, and fraud claims remain, Plaintiffs are able otherwise to assert their rights. Id. Moreover, "[d]etrimental reliance is [an] equitable remedy." Hospitality Consultants, LLC v. Angeron, 41 So. 3d 1236, 1242 (La. Ct. App. 2010). As discussed supra in Part III.B, Plaintiffs had a hand in their own demise when LSED refused to convert to a different "mode." Because detrimental reliance is an equitable remedy, the Court concludes that the Plaintiffs' actions weigh against allowing this claim to remain. The cause of action for detrimental reliance is dismissed.

G.   Count Ten: Unjust Enrichment

To plead unjust enrichment in Louisiana, "there must be no other remedy at law available to plaintiff." Conerly Corp. v. Regions Bank, No. 08 Civ. 813, 2008 WL 4975080, at *9 (E.D. La. Nov. 20, 2008). Plaintiffs have multiple surviving causes of

action, including the fiduciary duty, misrepresentation, and fraud claims, and therefore have other remedies available. Moreover, it is not material whether the other claims are successful, but rather that they exist.  Id.  Plaintiffs assert that they are pleading their unjust enrichment claim in the alternative, and, therefore, that it should be allowed to proceed.  (See Pls. Mem. at 41-42.)  This argument has been flatly rejected in similar circumstances.  Conerly Corp., 2008 WL 4975080, at *9.  Therefore, unjust enrichment is inappropriate.

Finally, similar to the detrimental reliance claim, the Court is disinclined to employ an unjust enrichment remedy. Louisiana courts hold that unjust enrichment is an "equitable remedy."  Hospitality Consultants, 41 So. 3d at 1242.  The Court therefore concludes that Plaintiffs' actions weigh against allowing an unjust enrichment claim to go forward.  The cause of action for unjust enrichment is dismissed.

V.   CONCLUSION

For the reasons elucidated above, Defendants' motion for judgment on the pleadings [dkt. no. 35 in No. 09 Civ. 5404; dkt. no. 28 in No. 09 Civ. 6770] as to Counts Four through Ten is GRANTED; those counts are dismissed with prejudice as the pleadings are closed.  The motion is DENIED as to Counts One through Three, although those claims may not be predicated on

42

post-August Disclosure alleged misstatement or omissions for the reasons stated in Part IV.C., supra.  In keeping with the Court's state-law statute of limitations analysis, see supra note 6, any state-law claims predicated on the nondisclosure of the SEC investigation or the alleged conflicts of interest that caused pre-August Disclosure damages are time barred.


SO ORDERED.

Dated:     November 30, 2010
           New York, New York

                                   _____
                                   LORETTA A.  PRESKA
                                   Chief U.S. District Judge

43