UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -X
In re Merrill Lynch Auction Rate    :    09 MD 2030 (LAP)
Securities Litigation               :    <u>Amended Opinion & Order</u>
----------------------------------X
This document relates to            :
                                    :
          No. 09 Civ. 5404 (LAP)    :
          No. 09 Civ. 6770 (LAP)    :
- - - - - - - - - - - - - - - - - -X

LORETTA A. PRESKA, Chief United States District Judge:

    In this case, Plaintiffs, Louisiana Stadium and Exposition

District ("LSED") and the State of Louisiana (collectively

"Plaintiffs"), allege ten causes of action against Defendants

Merrill Lynch, Pierce, Fenner & Smith, Inc. ("MLPFS") and

Merrill Lynch & Co., Inc., ("Merrill") (collectively

"Defendants") related to Plaintiffs' auction rate securities

("ARS") issuance.  On February 8, 2010, Defendants filed a

motion for judgment on the pleadings against Plaintiffs.  The

motion is GRANTED in part and DENIED in part.

I.   BACKGROUND

     A.   <u>The Parties</u>

    LSED is a subdivision of the State of Louisiana, with

offices located in New Orleans, Louisiana.  (<u>See</u> Third Amended

and Supplemental Complaint ¶ 15 ("Compl.").)  LSED owns the

Louisiana Superdome, and the State is the lessee of the

Superdome.  (<u>Id.</u> ¶¶ 15-16.)  When LSED's expenses exceed its

revenues, the State "funds the . . . shortfall." (<u>Id.</u> ¶ 16.)

Defendant MLPFS is a Delaware corporation with its principal place of business in New York.  MLPFS is a subsidiary of Merrill and provides, among other things, underwriting and brokerage services.  (See id. ¶ 17; see also Memorandum of Law in Support of Defendants Merrill Lynch & Co., Inc. and Merrill Lynch, Pierce Fenner & Smith Incorporated's Motion for Judgment on the Pleadings ("Defs. Mem.") at 16.)  Defendant Merrill is also a Delaware corporation with its principal place of business in New York and is the parent company of MLPFS.  (See Compl. ¶ 19.)

B.   Auction Rate Securities

The following facts are recited as alleged in the complaint and are regarded as true in considering this motion for judgment on the pleadings.  See Hayden v. Paterson, 594 F.3d 150, 160 (2d Cir. 2010).  All reasonable inferences are drawn in favor of the plaintiff.  Id.; see Ashcroft v. Iqbal, ___ U.S. ___, ___, 129 S. Ct. 1937, 1949-50 (2009).

ARS are long-term variable-rate debt instruments that are traded at periodic Dutch auctions, which are normally held every seven, fourteen, twenty-eight, or thirty-five days.  (Compl. ¶¶ 6-7.)  At a Dutch auction, buy orders are entered at interest rates selected by the bidder.  (Id. ¶ 5.)  Orders to buy or sell ARS at an auction can only be placed through a designated broker-dealer.  (Id. ¶ 6.)  The broker-dealers collect the

2

orders and forward them to an auction agent who administers the Dutch auction. (Id.)

These auctions dictate the interest rates payable on the ARS. (Id. ¶ 5.) Each bid, or buy order, is ranked by the auction agent from lowest to highest based on the interest rate of the bid. (See id.) The orders are filled beginning with the lowest interest rate, followed by orders with progressively higher interest rates, until all instruments available for sale are matched up with purchase orders. (See id.) The lowest interest rate at which all the ARS available at the auction are sold becomes the "clearing rate." (See id.) Interest rates for the entire ARS issuance up for auction are set to the clearing rate following an auction. (See id.) If, at a particular auction, the buy and sell orders are insufficient to purchase all of the ARS offered for sale, the auction fails. (Id. ¶ 7.) In the event of an auction failure, ARS holders are unable to sell the securities that they hold, and the interest rate on the ARS rises to the maximum rate (or failure rate) of approximately 12% until the next auction. (Id.) By February 2008, the ARS market had grown to approximately $330 billion in outstanding securities. (Id. ¶ 8.)

C.   The Solicitation and Agreement

In early 2005, LSED sought to restructure its existing debt. (See id. ¶ 28.) Subsequently, LSED issued a

3

"Solicitation for Offers for Senior Managing Underwriter" (the "Solicitation") seeking investment banking services.  (Id. ¶ 29.)  After receiving the Solicitation, MLPFS responded by submitting a proposal to LSED on April 19, 2005.  (See id. ¶ 30.)  In its proposal, MLPFS stated, among other things, that it would "provide a full spectrum of client services . . . in order to create the most innovative and cost effective financing program."  (Id.)  On May 19, 2005, LSED hired MLPFS to fill the role of senior managing underwriter and charged it with the task of designing and implementing a structure for refinancing LSED's debt associated with the Louisiana Superdome.  (See id. ¶ 37; Plaintiffs' Memorandum of Law in Opposition to Merrill Lynch's Motion for Judgment on the Pleadings ("Pls. Mem.") at 1; Defs. Mem. at 3.)

After the parties reviewed various financing options, MLPFS recommended the ARS structure to LSED.  (See Compl. ¶ 43.) MLPFS proposed a "synthetic fixed rate structure" for the ARS, which would convert LSED's variable rate payments as set by the auctions into fixed obligations (created by interest rate swap agreements and a credit enhancement in the form of bond insurance).  (Id.)  According to MLPFS, the ARS structure it recommended would allow LSED to meet its financing objectives with a synthetic fixed interest rate of under 5%.  (Id. ¶ 55.) To illustrate how the proposed ARS structure would work, MLPFS

supplied LSED with a number of debt service schedules that showed how LSED's payments would unfold over the refinancing period.  (See id. ¶¶ 43-56.)  LSED claims that it relied on these schedules when determining whether to follow MLPFS's recommendation to issue ARS.  (See id. ¶ 59.)  Accordingly, on March 23, 2006, based on MPLFS's recommendations, LSED issued three series of ARS bonds: Series 2006A, 2006B, and 2006C.[1]  (Id. ¶ 62.)

The bonds were issued in "auction mode," meaning that the rate of interest was set by way of the auction procedure outlined above.  (Id. ¶ 66.)  However, they could be converted to traditional fixed- or variable-rate "modes" until at least January 30, 2008.[2]  (Id. ¶¶ 66, 113.)  Plaintiffs allege that MLPFS undertook a duty to provide LSED with advice about whether

---

[1]  "The Series 2006A bonds were issued in an aggregate principal amount of $84,675,000 with an initial interest rate of 3.10%, and an initial auction period starting April 4, 2006."  (Compl. ¶ 63.)  "The Series 2006B bonds were issued in an aggregate principal amount of $84,650,000 with an initial interest rate of 3.10%, and an initial auction period starting April 5, 2006."  (Id. ¶ 64.)  "The Series 2006C bonds were issued in an aggregate principal amount of $69,150,000 with an initial interest rate of 4.70%, and an initial auction period starting April 17, 2006."  (Id. ¶ 65.)

[2] Defendants state that LSED had this conversion option until January 30, 2008.  (Defs. Reply Mem. at 2.)  It is not clear from the record whether the option contractually expired or simply became economically unfeasible at that time.  The issue is immaterial because LSED had over a year to convert following the August Disclosure.

to convert the bonds to another "mode" by which the bonds'
interest rates were set.  (<u>Id.</u> ¶ 140.)

In addition to serving as lead underwriter, MLPFS served as
the broker-dealer for the auctions pursuant to another agreement
between the parties (the "Broker-Dealer Agreement").  (<u>See id.</u>
¶ 71; Defs. Mem. at 7-8.)  Under the Broker-Dealer Agreement,
MLPFS earned approximately $644,000 in addition to its other
compensation earned between the issuance of the ARS and the
auction failures in February 2008.  (Compl. ¶ 71.)

D.    <u>Merrill Lynch's Role as a Bidder</u>

Plaintiffs allege that MLPFS failed to disclose its bidding
practices in the ARS market.  LSED's central allegation is that
the operation of the recommended ARS structure entirely depended
on MLFPS's placing support bids[3] at every auction for which it
was the sole or lead underwriter/broker-dealer.  (<u>See id.</u> ¶¶ 91-
92, 108; <u>see</u> Pls. Mem. at 7, 9.)  Support bids ensured that all
the ARS for sale in any given auction would be purchased and
thus the auction would not fail.  (Compl. ¶ 91.)  Absent support
bids, LSED could not have obtained the low interest rates
promised by MLPFS because the auctions would have otherwise
failed, causing LSED to pay the failure rate of 12%.  (<u>See id.</u>
¶ 48; Pls. Mem. at 7-8.)

---

[3] "Support bids" are bids placed to ensure that the entire issue
of ARS in a given auction is purchased.  (Compl. ¶ 11; <u>see also</u>
<u>id.</u> at ¶¶ 91, 106.)

6

MLPFS's policy of placing support bids in every auction to prevent auction failures allegedly created a false impression of liquidity in the ARS market.  (See Compl. ¶¶ 96-97.)  From January 3, 2006, to May 27, 2008, 5,892 auctions throughout the ARS market would have failed but for MLPFS's support bids.  (Id. ¶ 96; Pls. Mem. at 7.)  Cumulatively, approximately 69% of the auctions for LSED's ARS would have failed but for MLPFS's support bids.  (Compl. ¶ 96.)  As it relates to LSED's ARS, Plaintiffs allege that MLPFS submitted a bid for 100% of LSED's bonds in 100% of the auctions to ensure no failures, and MLPFS's bids set the clearing rate in nearly every auction.  (Id. ¶ 91.)  Specifically, Plaintiffs allege that 76 of 98 Series 2006A auctions, 72 of 97 Series 2006B auctions, and 46 of 86 Series 2006C auctions would have failed without support bids.  (Id. ¶ 93-95.)  Furthermore, MLPFS's support bids set the clearing rate in all but 5, 5, and 16 of those auctions, respectively. LSED claims it did not learn any of this until the auctions failed.  (Id. ¶ 91.)

       E.   The 2006 SEC Order and Merrill Lynch's Website
            Disclosure

On May 31, 2006, following an investigation into the auction practices and procedures of numerous investment banks, including MLPFS, the Securities and Exchange Commission ("SEC") issued an "Order Instituting Administrative and Cease-and Desist

Proceedings, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order Pursuant to Section 8A of the Securities Act of 1933 and Section 15(b) of the Securities Exchange Act of 1934" (the "SEC Order").  (See id. ¶ 100; see also Defs. Mem. at 10.)  The SEC Order stated that various investment banks intervened in auctions for a variety of reasons, such as bidding to prevent auction failures or to affect the auctions' clearing rates, without proper disclosure. (See Compl. ¶ 101.)  The SEC Order listed MLPFS as a respondent and noted that each and every respondent engaged in violative activity with respect to ARS practices.  (SEC Order at 2-3.) The order created two tiers for penalty purposes, the first of which received larger penalties in part because those respondents "engaged in more types of violative practices." (Id. at 9.)  MLPFS was placed in the first tier.  (Id.)   The SEC determined that without proper disclosure, these types of conduct violated the prohibition on material misstatements and omissions in the offer and sale of securities.  (See id. at 3; Compl. ¶ 101.)  The order did not prohibit broker-dealers from bidding for their own accounts when properly disclosed.  (SEC Order at 6 n.6.)  Pursuant to the SEC Order, MLPFS entered into an agreement with the SEC in which MLPFS agreed, among other things, to post on its website a written description of its

auction practices and procedures that would be available to all issuers of ARS.[4]   (See id. at 9-11; Compl. ¶ 103.)

In compliance with the settlement, in August 2006, MLPFS posted a twenty-three page document on its website entitled "Description of Merrill Lynch's Auction Rate Practices and Procedures" (the "August Disclosure").   (See Compl. ¶ 103.) MLPFS's website posting disclosed, among other things, that MLPFS "may routinely place one or more bids in an auction for its own account . . . to prevent an auction failure."   (Id.) The posting further stated that MLPFS "may submit a bid in an auction to keep it from failing, but it is not obligated to do so."   (August Disclosure at 18.)   Finally, the website posting warned of the risk of an auction failure, stating, "[i]f sufficient bids have not been made, auction failure results, and holders that have submitted sell orders will not be able to sell in the auction all, and may not be able to sell any, of the securities subject to such submitted sell orders."   (Id.)

Both the August Disclosure and the SEC Order are incorporated by reference in the complaint and therefore may be considered in resolving this motion.   Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002).

---

[4]   Pursuant to the agreement with the SEC, MLPFS also agreed to be censured and to pay a civil penalty of $1,500,000.   (See Compl. ¶ 102; SEC Order at 9.)

F.    The Collapse of the ARS Market

From March 2006 until February 2008, the auctions functioned as MLPFS had predicted.  (See Compl. ¶ 108; see Pls. Mem. at 8.)  But on February 13, 2008, a wave of auction failures resulted in the collapse of the ARS market; consequently, LSED's interest rate climbed to the failed auction rate of 12%.  (See Compl. ¶ 108.)

G.    Procedural Background

LSED filed this suit in the Eastern District of Louisiana on January 22, 2009.  See Complaint, La. Stadium & Exposition Dist. v. Fin. Guar. Ins. Co., No. 09 Civ. 235 (E.D. La. Jan. 22, 2009).  On June 10, 2009, the United States Panel on Multidistrict Litigation transferred this action here for inclusion in coordinated or consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407.  LSED filed a second amended complaint on September 30, 2009.  After the Defendants sent LSED letters detailing perceived deficiencies in the second amended complaint, LSED filed a third amended complaint on December 10, 2009.  On February 8, 2010, Defendants filed a motion for judgment on the pleadings.  See Fed. R. Civ. P. 12(c).

"The standard for addressing a Rule 12(c) motion for judgment on the pleadings is the same as that for a Rule 12(b)(6) motion to dismiss for failure to state a claim."

Cleveland v. Caplaw Enters., 448 F.3d 518, 521 (2d Cir. 2006).
The Court so proceeds.

II.  STATUTE OF LIMITATIONS ANALYSIS

The Court addresses Defendants' federal, then state,
statute of limitations arguments below.

A.  Federal Claims

i.  Legal Standard

A statute of limitations defense may be raised by way of a
motion to dismiss if the defense appears on the face of the
complaint.  Staehr v. Hartford Fin. Servs. Grp., Inc., 547 F.3d
406, 425 (2d Cir. 2008).  The limitations period for Plaintiffs'
claims under the federal securities laws is governed by 28
U.S.C. § 1658(b), which provides that "a private right of action
that involves a claim of fraud, deceit, manipulation, or
contrivance in contravention of a regulatory requirement
concerning the securities laws . . . may be brought not later
than the earlier of 2 years after the discovery of the facts
constituting the violation or 5 years after such violation."  28
U.S.C. § 1658(b).  The parties agree that the two-year period is
the relevant period here.  (Pls. Mem. at 46.)  That statute of
limitations "begins to run once the plaintiff did discover or a
reasonably diligent plaintiff would have 'discover[ed] the facts
constituting the violation' — whichever comes first."  Merck &
Co. v. Reynolds, ___ U.S. ___, ___, 130 S. Ct. 1784, 1798 (2010)

(quoting 28 U.S.C. § 1658(b)(1)).  Plaintiffs filed the original complaint on January 22, 2009, so their claims would be time barred only if the statute of limitations began to run before January 22, 2007.  (See Pls. Mem. at 46.)

When used in this context, the term "discovery" is often used as a term of art derived from the "discovery rule," a doctrine delaying the accrual of a cause of action until the plaintiff has or should have uncovered "a complete and present cause of action."  Merck, 130 S. Ct. at 1793; see Dodds v. Cigna Sec. Inc., 12 F.3d 346, 350 (2d. Cir. 1993).  Although the "facts constituting the violation" certainly include scienter-related facts in an action under section 10(b), the Supreme Court has said "nothing about other facts necessary to support a private § 10(b) action."  Merck, 130 S. Ct. at 1796.  Nonetheless, a securities-fraud plaintiff must plead – and ultimately prove – economic loss.  See, e.g., Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 342-46 (2005); In re Omnicom Grp., Inc. Sec. Litig., 597 F.3d 501, 509-10 (2d Cir. 2010).

> ii.  Analysis

> 1.  Securities Fraud Claims

Defendants argue that the SEC Order and subsequent August Disclosure, no later than August 2006, put Plaintiffs on notice of the "central allegation[s]" in the complaint: "that MLPFS 'did not disclose and, therefore LSED was also unaware [of]

12

MLPFS' policy of placing blanket bids in every auction . . . .'"
(Defs. Mem. at 16 (quoting Compl. ¶ 2) (second alteration in
original)).  Be that as it may, Defendants cannot overcome a
fatal obstacle.  Whether or not Plaintiffs could have discovered
the other facts constituting the alleged violation within the
relevant time period, Plaintiffs suffered no economic loss prior
to the collapse of the ARS market in February 2008 according to
the allegations in the complaint.  The Plaintiffs' securities
fraud claims therefore could not have accrued before that time.
See Dura, 544 U.S. at 342-46; Omnicom, 597 F.3d at 509-10.  And
it would be fundamentally unfair to run the statute of
limitations from a time prior to when "a complete and present
cause of action" can accrue.  See Merck, 130 S. Ct. at 1793;
Lentell v. Merrill Lynch & Co., 396 F.3d 161, 168 (2d Cir. 2005)
("[T]he applicable statute of limitations should not precipitate
groundless or premature suits by requiring plaintiffs to file
suit before than can discover with the exercise of reasonable
diligence the necessary facts to support their claims."
(internal quotation marks omitted)).  Consequently, the federal
claims filed on January 22, 2009, are timely.

    Defendants argue that Plaintiffs "could have brought suit
seeking compensation for the difference in the market value of
their debt based on the purportedly different risk that they
faced."  (Defs. Mem. at 11.)  While that proposition could be

13

true in the abstract, it belies the reality here.  First of all, from an issuer perspective, any loss on the "market value" of debt is relevant primarily insofar as it relates to the pricing of the initial transaction between the issuer and underwriter – here, MLPFS.[5]  An allegation of the type of loss suggested by Defendants would be essentially immaterial in light of the facts here, where LSED received the negotiated "full value" (Pls. Mem. at 50) for its bonds from MLPFS.  Secondly — and more importantly — this argument misses the point of this action.  The relevant alleged economic harm here is increased debt service payments in the wake of auction failures.  (Compl. ¶¶ 4, 199.)  The central allegation is that MLPFS submitted bids in 100% of LSED's auctions and thereby prevented otherwise inevitable auction failures.  (Id. ¶ 91.)  Therefore, according to the complaint, only when MLPFS decided to stop supporting these auctions could LSED have suffered an economic loss.[6]  That occurred in February 2008, well after January 22, 2007.  Defendants, which allegedly controlled when Plaintiffs' loss occurred, cannot suggest that Plaintiffs somehow could have

---

[5] LSED makes no allegation that it repurchased any of its debt at an artificially high price.

[6] The complaint contains no allegation that the market set increased interest rates in the wake of MLPFS's disclosures. Indeed, the complaint suggests the opposite: because of MLPFS's pervasive intervention, rates remained artificially stable.

obtained a fully accrued cause of action prior to Defendants'
exercise of this power.

B.   <u>State-Law Claims</u>

i.   Legal Standard

When, as here, a federal district court sits in diversity,
state law governs the timeliness of state-law claims.   <u>Diffley</u>
<u>v. Allied-Signal, Inc.</u>, 921 F.2d 421, 423 (2d Cir. 1990).   In
Louisiana, "[d]elictual actions are subject to a liberative
prescription of one year.   This prescription commences to run
from the day injury or damage is sustained."   La. Civ. Code Ann.
art. 3492; Black's Law Dictionary 492 (9th ed. 2009) (defining
"delict" as a "violation of the law," particularly "a wrongful
act . . . giving rise to a claim for compensation," or a tort).
In the vernacular of this Court, actions sounding in tort in
Louisiana are subject to a one-year statute of limitations.
Similarly, actions for "redhibition" (breach of warranty) are
subject to a one-year statute of limitations.   <u>See</u> La. Civ. Code
Ann. art. 2534(B); Black's Law Dictionary 1391 (9th ed. 2009)
(defining redhibition).   As the parties agree, Plaintiffs' state
law causes of action in Counts Two and Three and Eight through
Ten are subject to a one-year statute of limitations.

ii.   Analysis

In Louisiana, "[p]rescription does not begin to accrue
until injury or damage is sustained."   <u>Luckett v. Delta</u>

<u>Airlines, Inc.</u>, 171 F.3d 295, 299 (5th Cir. 1999).  Therefore, as with the federal claims, Plaintiffs' February 2008 date of injury is dispositive.  This lawsuit was filed on January 22, 2009, which is within one year of the date of the alleged injury.  The statute of limitations does not bar these claims.[7]

III. PLEADING OF FEDERAL CLAIMS

    A.  <u>Legal Standard</u>

In assessing a motion to dismiss, the Court must accept all non-conclusory factual allegations as true and draw all reasonable inferences in the plaintiff's favor.  <u>Goldstein v. Pataki</u>, 516 F.3d 50, 56 (2d Cir. 2008) (internal quotation omitted).  To survive such a motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  <u>Iqbal</u>, 129 S. Ct. at 1949 (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)).  A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do."  <u>Twombly</u>, 550 U.S. at 555.  "Where a complaint pleads

---

[7] However, claims of damages occurring before the August Disclosure that are predicated on an alleged conflict of interest or nondisclosure of the SEC investigation contained in these counts are time barred.  The nondisclosure of the investigation and the conflict of interest became immediately apparent when the August Disclosure was released and were actionable, as to pre-disclosure damages, at that time.  <u>See</u> <u>In re Merrill Lynch ARS Litig.</u>, 704 F. Supp. 2d 378, 396 (S.D.N.Y. 2010); <u>Intracoastal Seafood Co. v. Scott</u>, 556 So. 2d 974, 977 (La. Ct. App. 1990).

facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" Iqbal, 129 S. Ct. at 1949 (quoting Twombly, 550 U.S. at 557) (internal quotation marks omitted). In securities fraud cases like this one, the complaint also must meet heightened pleading requirements under Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(b). ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007).

    B.   Analysis

    The federal claims posit liability (1) for material misstatements (Count Five), (2) for market manipulation (Count Six), and (3) under section 20 of the Exchange Act (Count Seven). Because liability under section 20 is solely derivative of a primary securities law violation, Dodds, 12 F.3d at 350 n.2, the Court first focuses on the other claims.

    To state a misrepresentation claim under Section 10(b) and Rule 10b-5, Plaintiffs must "allege that the defendant[s] (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the Plaintiffs' reliance was the proximate cause of its injury." ATSI, 493 F.3d at 105. To make out a market manipulation claim, the complaint must "allege (1) manipulative acts; (2) damage (3)

caused by reliance on an assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendant's use of the mails or any facility of a national securities exchange." Id. at 101; see 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5.

Because of the specific features of the transaction involved in this case, the Court's statute of limitations analysis, supra Part II, has a spillover effect.  Securities fraud claims require allegations of but-for and proximate cause, called "loss causation." Omnicom, 597 F.3d at 510.  Plaintiffs cannot demonstrate that the alleged misstatements and manipulative conduct were proximate causes of their losses, which occurred in February 2008.  (Pls. Mem. at 50 ("Plaintiffs suffered no economic harm until February 2008.").)  All the while after Defendants disclosed their bidding practices and ARS market risks in August 2006, Plaintiffs retained an option to convert their ARS to traditional fixed- or variable-rate instruments but failed to exercise it.  In short, Plaintiffs controlled their own destiny.  The Court explains briefly.

The Court of Appeals has refined the definition of proximate cause in this context.

> [A] misstatement or omission is the "proximate cause"
> of an investment loss if the risk that caused the loss
> was within the zone of risk concealed by the

18

> misrepresentations and omissions alleged by a
> disappointed investor.
>     Thus to establish loss causation, a plaintiff
> must allege . . . that the subject of the fraudulent
> statement or omission was the cause of the actual loss
> suffered . . . .

Lentell, 396 F.3d at 173 (second alteration in original)

(internal quotation marks and citations omitted).  This concept

applies with equal force in a market manipulation case,

particularly where, as here, the manipulation claim involves

nondisclosure, which "is usually essential to the success of a

manipulative scheme."  Santa Fe Indus., Inc. v. Green, 430 U.S.

462, 477 (1977); see also ATSI, 493 F.3d at 101 (stating that a

manipulation claim requires allegations of damages caused by

reliance on an assumption of an efficient market).

    Plaintiffs claim the primary cause of their damages was

that MLPFS was unable or unwilling to continue placing support

bids.  (See Compl. ¶¶ 242, 245, 247.)  Yet Plaintiffs were

informed of the risks involved in the ARS market, albeit after

they issued the bonds.  See In re Merrill Lynch ARS Litig., 704

F. Supp. 2d 378, 392 (S.D.N.Y. 2010).  The August Disclosure

revealed information about ARS liquidity and Defendants' bidding

practices that was at odds with what Plaintiffs allegedly knew

prior to the disclosure.  (See August Disclosure at 15-16, 18.)

The risks, even if "concealed" prior to these disclosures, were

no longer "concealed" after them.  See Lentell, 396 F.3d at 173.

As the Court has explained in a prior opinion in this MDL, following the SEC Order, Merrill disclosed its bidding practices.[8]  Merrill Lynch ARS, 704 F. Supp. 2d at 392.  Those disclosures, made in August 2006, were sufficient to "negate the Plaintiffs' claims that Merrill Lynch misled the market into believing that the price of the securities and the clearing rates set by the auctions were dictated by the natural interplay of supply and demand."  Id.; see August Disclosure at 15 (stating that MLPFS is "permitted, but not obligated, to submit orders in auctions for its own account either as a bidder or a seller, or both, and routinely does so in its sole discretion").  The disclosures alerted investors to potential liquidity problems and auction failures:

> There may not always be enough bidders to prevent an auction from failing in the absence of Merrill Lynch bidding in the auction for its own account or encouraging others to bid.  Therefore, auction failures are possible, especially if the issuer's credit were to deteriorate, if a market disruption were to occur or if, for any reason, Merrill Lynch were unable or unwilling to bid.

(August Disclosure at 18 (emphasis added).)  The disclosures specifically noted that "Merrill Lynch is not obligated to make a market in the securities, and may discontinue trading the securities in the secondary market without notice for any reason

---

[8] The fact that MLPFS could bid for its own account generally was disclosed in the Broker-Dealer Agreement (Defs. Mem. at 20), but such disclosures were inadequate given the allegations here. See SEC Order at 3.

at any time." (Id.)  Moreover, the August Disclosure specified
that "Merrill Lynch provides no assurance as to the outcome of
any auction." (Id.)  Finally, the disclosures noted that
Defendants possibly had differing interests in bidding and
conducting auctions and that, when bidding for their own
account, they "would likely have an advantage over other
bidders." (Id. at 15.)

When these very risks were realized, causing auction
failure and sending interest rates to 12%, Plaintiffs cried
foul.  However, for over a year following the disclosures, LSED
could have converted its bonds to a different interest rate
structure.  Rather than doing so, it was content to pay a lower
interest rate while the ARS market functioned as it had all
along. (Defs. Mem. at 12.)  Ultimately, the bet did not pay
off, but that does not amount to securities fraud.  Plaintiffs
contend that this ARS case is unique. (Compl. ¶ 3.)  That is
true: the specific features of LSED's ARS issuance inform the
Court's analysis in this case.

LSED was armed with (1) disclosures about the nature of the
ARS market and MLPFS's bidding practices and (2) the ability,
for over a year, to avoid entirely the risk of auction failure.
The interplay of these two facts is important.  When the
disclosures emerged, LSED, in effect, was presented with a
choice.  It could do nothing and accept the newly disclosed

risks (along with a more attractive interest rate) or chart a
safer course.  LSED chose the former.  The risks that
materialized were not then concealed from LSED, Omnicom, 510
F.3d at 513-14; Lentell, 396 F.3d at 173, and it chose to accept
those risks knowing it could opt out.  Cf. Bastian v. Petren
Res. Corp., 892 F.2d 680, 682-84 (7th Cir. 1990) (Posner, J.)
(suggesting that investors cannot allege securities fraud when
assuming the risk of the investment).  Thus, after the
disclosures were made, LSED assumed the risks of the investment
choices it made, like any other investor.[9]  See Bastian, 892 F.2d
at 686; see also New Haven Inclusion Cases, 399 U.S. 392, 492
(1970) ("[I]t is a fundamental aspect of our free enterprise
economy that private persons assume the risks attached to their
investments." (internal quotation marks omitted)).

Plaintiffs therefore cannot assert that the alleged
misstatements and market manipulation caused their losses.  See
Omnicom, 597 F.3d at 509-10, 513; Lentell, 396 F.3d at 173;
Citibank, N.A. v. K-H Corp., 968 F.2d 1489, 1495 (2d Cir. 1992)
("[A] plaintiff must show[] that the economic harm that it
suffered occurred as a result of the alleged
misrepresentations.").  To say otherwise would be akin to

---

[9] Indeed, Plaintiffs' brief acknowledges this reasoning.  They
state that it was the "liquidity risk" — of which they were told
by way of the disclosures, see Merrill Lynch ARS, 704 F. Supp.
2d at 392 — that "materialized" (Pls. Mem. at 32).

affirming that a sinking ship legally caused a passenger to drown even if the passenger had ready access to a seaworthy lifeboat.  See Omnicom, 597 F.3d at 513 ("[R]ecovery is limited to only the foreseeable losses for which the intent of the laws is served by recovery." (internal quotation marks omitted)).

Plaintiffs' contentions to the contrary are unpersuasive. First, they say that the disclosures were inadequate to disclose the true nature of the manipulation here.  (Pls. Mem. at 33.) That argument was rejected by this Court in this MDL.  Merrill Lynch ARS, 704 F. Supp. 2d at 392.  Second, they say there is no evidence that the disclosures were made available to them, meaning that there is no evidence that they made a conscious choice not to convert the bonds to another "mode."  (Pls. Mem. at 34.)  This conclusion, however, ignores the public record. Plaintiffs make no assertion that they were unaware of the SEC Order  (see id. at 46; Compl. ¶¶ 100-102), and the August Disclosure, which the SEC Order required, was equally available to Plaintiffs.  Merrill Lynch ARS, 704 F. Supp. 2d at 397 (stating that these same sources were "widely available" and "easily accessible"); see Staehr, 547 F.3d at 432.  The Court rejects the suggestion that Plaintiffs were unaware of the disclosures.  Merrill Lynch ARS, 704 F. Supp. 2d at 397.

The most Plaintiffs muster is two arguments about the conversion option itself.  First, they assert that MLPFS's

failure to advise them to convert the ARS' "mode" was unlawful. (See Compl. ¶¶ 113, 140, 156.)  But that is not a claim under the securities laws.  See Gurary v. Winehouse, 190 F.3d 37, 46 n.9 (2d Cir. 1999); see also Marine Bank v. Weaver, 455 U.S. 551, 556 (1982) ("Congress, in enacting the securities laws, did not intend to provide a broad federal remedy for all fraud."). In any case, following the August Disclosure, it would have been unreasonable for Plaintiffs to rely on such advice.  See In re Citigroup ARS Litig., 700 F. Supp. 2d 294, 307 (S.D.N.Y. 2009).

Second, they argue in their reply opposition that converting to another "mode" would have been "enormously expensive" and suggest that a loss was therefore inevitable. (Pls. Reply Mem. at 4.)  The problem is that Plaintiffs do not adequately make such an allegation in the complaint.  Indeed, the complaint suggests the opposite: it states that LSED will have to restructure the debt now, incurring additional costs, but had it been told of the "problems with the ARS market . . . prior to the auction failures, Plaintiffs could have effected a restructure on considerably better terms."  (Compl. ¶ 209.)

And to the extent that such an argument is intimated in the complaint, it falls short of Rule 9(b)'s requirement that allegations of fraud be pleaded with particularity.  There is no specific information in the complaint to determine whether restructuring, at any certain point in time, would have been

cheaper or more expensive than the status quo.  There is no allegation that any specific statement was made to induce LSED to retain the ARS structure.  Moreover, LSED issued the bonds knowing full well the terms and conditions of the conversion option, which was available to it at any time for any reason. The complaint also contains little information about what the market conditions would have dictated in terms of post-restructure interest rate pricing; what it does contain suggests that such a conversion would have been economically feasible. (Id. ¶ 140 (stating that when the bonds were rated AAA, conversion could have mitigated any exposure to auction failure rates, but, post-failure, conversion was "no longer practical").)  Given the "tangle of factors," Dura, 544 U.S. at 343, that could have affected LSED's choice not to convert, it is difficult to see how Plaintiffs have alleged "economic losses that misrepresentations actually cause[d]," id. at 344.  In short, the thrust of the complaint's federal allegations is to claim damages as a result of the failed auctions, not faulty post-issuance restructuring advice.  This argument fails.

    To be clear, MLPFS's disclosures could very well have presented LSED with a choice it did not want to make. Nevertheless, the securities laws were not designed to prevent investment risks from materializing or to provide investment

insurance.  Omnicom, 597 F.3d at 510, 513 (citing Dura, 544 U.S. at 345).

      That ends this aspect of the discussion.  Plaintiffs did not adequately allege loss causation, so their misstatement and market manipulation claims (Counts Five and Six) fail.  As this is the third amended complaint, they are dismissed with prejudice.  By extension, that dismissal mandates dismissal of Count Seven because it is a section 20 claim, dependent on the existence of a primary violation, which does not exist here. Dodds, 12 F.3d at 350 & n.2; see ATSI, 493 F.3d at 108.

IV.  STATE-LAW CLAIMS

      Counts One through Four and Eight through Ten allege state-law causes of action governed by Louisiana law.  Before the Court analyzes these claims, it addresses Defendants' argument that all the state-law claims should be dismissed because Plaintiffs do not adequately plead loss causation.  The Court rejects this argument.  Of course, Louisiana law generally requires a causal nexus between the alleged unlawful conduct and the harm, e.g., Keenan v. Donaldson, Lufkin & Jenrette, Inc., 575 F.3d 483, 491 n.15 (5th Cir. 2009), but Louisiana law requires no showing of "loss causation" as defined in the federal securities laws.  Indeed, loss causation is a specialized federal securities law concept.  See Lentell, 396 F.3d at 173-74 (stating that analogizing loss causation to the

"tort-law concept of proximate cause" is "imperfect"). Therefore, the Court's loss causation analysis is not applicable in wholesale to these state-law claims.

### A. Count One: Breach of Fiduciary Duty

Plaintiffs contend that MLPFS owed LSED a fiduciary duty as its "advisor, underwriter, broker-dealer, and investment banker" to provide "advice and recommendations regarding the optimal structure for their debt restructuring." (Pls. Mem. at 11.) They claim that this advisory role continued beyond the issuance. (Id. at 17; Compl. ¶¶ 113-114.)

Under Louisiana law, a breach of fiduciary duty claim requires proof of (1) the existence of a fiduciary duty, (2) an action taken by the fiduciary in violation of that duty, and (3) damages as a result of that action. Omnitech Int'l Inc. v. Clorox Co., 11 F.3d 1316, 1330 & n.20 (5th Cir. 1994). A mere contractual relationship is ordinarily insufficient to create a fiduciary duty. Id. at 1330. Instead, Louisiana law looks to the actual relationship of the parties and attendant facts and circumstances. Scheffler v. Adams & Reese, LLP, 950 So. 2d 641, 647 (La. 2007). Because the existence of a fiduciary duty is a fact-intensive inquiry, dismissal on the pleadings is usually inappropriate. Better Benefits, Inc. v. Prot. Life Ins. Co., No. 03 Civ. 2820, 2004 WL 633730, at *3 (S.D.N.Y. Mar. 30, 2004); see Scheffler, 950 So. 2d at 647.

Here, taking the allegations in the complaint as true, Plaintiffs have alleged sufficient facts to demonstrate the existence of a fiduciary duty.  The complaint alleges that MLPFS stated in a January 13, 2006, presentation, "The partnership between Merrill Lynch and LSED goes far beyond executing transactions."  (Compl. ¶ 46.)  In that presentation, MLPFS stated it would provide "Ongoing Support" in the form of "timely market valuations and analytics" and help "advise LSED as to the right structure for the current market" while "[d]escribing benefits and risks of any transaction . . . for LSED."  (Id.) The complaint alleges that MLPFS "obligated itself to work as a partner" with LSED and "to provide advice and recommendations . . . on the most economically beneficial structure."  (Id. ¶ 37.)  The complaint alleges that MLPFS "provided monitoring and advisory services regarding the bonds . . . after issuance, including whether to change the mode of issuance" and indicates that meetings occurred "at least quarterly." (Id. ¶¶ 38, 113-115.)  LSED alleges that it "relied heavily on the advice and recommendations of MLPFS." (Id. ¶ 60.)

While this relationship does not fall within the defined categories of fiduciary relationships under the Louisiana code, see Omnitech, 11 F.3d at 1330, the complaint alleges an advisory relationship beyond the underwriter-issuer contractual relationship.  Courts have considered such a relationship to be

a fiduciary one.[10]  See, e.g., EBC I, Inc. v. Goldman, Sachs & Co., 832 N.E.2d 26, 31 (N.Y. 2005) (stating that a breach of fiduciary duty claim may survive dismissal "where the complaining party sets forth allegations that, apart from the terms of the contract, the underwriter and issuer created a relationship of higher trust than would arise from the underwriting agreement alone"); Breakaway Solutions, Inc. v. Morgan Stanley & Co., Civ. No. 19522, 2005 WL 3488497, at *2 (Del. Ch. Dec. 8, 2005) ("To the extent that underwriters function, among other things, as expert advisors to their clients on market conditions, a fiduciary duty may exist.").

In an effort to deny that a fiduciary relationship exists, Defendants first point to a banking statute requiring a written agreement for a "financial institution" to assume a fiduciary duty.  La. Rev. Stat. Ann. § 6:1124.  Defendants overlook, however, the definition section of that statute, which provides that a "financial institution" is a "a bank, savings and loan association, savings bank[], or credit union."  Id. § 6:1121(4).  The statute does not apply here.  Defendants also point to boilerplate disclaimer language appended to the end of two presentations made by MLPFS to LSED.  (Declaration of Scott C. Musoff Ex. A, at 3 ("[MLPFS is] acting solely in the manner of

---

[10] Louisiana courts apparently have not opined on this question. (Defs. Mem. at 32.)

an arm's length counterparty and not in the capacity of your financial advisor or fiduciary.").)  However, several later presentations (Declaration of Lance C. McCardle Exs. 4, 6-8, 10-14 & 16) and MLPFS's original proposal contain no such language, and, in any event, it is the facts and circumstances of the relationship of the parties that governs whether a duty existed. See Scheffler, 950 So. 2d at 647.  Given the factual nature of the question, the Court cannot say as a matter of law that Plaintiffs have not alleged that a fiduciary relationship existed.

Plaintiffs also adequately allege a breach of this duty. They say that Defendants failed to disclose MLPFS's ubiquitous support-bidding practices during the proposal phase and failed to provide Plaintiffs with that information after the issuance. (Compl. ¶¶ 145, 151-153, 156.)  Finally, Plaintiffs argue that Defendants failed to disclose their conflicts of interest prior to the issuance.  (Id. ¶ 217.)  The gravamen of these allegations is that Plaintiffs issued bonds thinking that MLPFS's advice was "optimal" but only later found that what they were told was not true.  (Id. ¶ 212; Pls. Mem. at 16.) Defendants, in response, rely on their disclosure of their bidding practices to show that Plaintiffs did not allege any breach, but Defendants fail to acknowledge that, according to the complaint, any such disclosure occurred after the bonds were

issued.  And although Defendants argue that the risks of MLPFS's bidding were disclosed at the transaction's outset, the SEC Order suggests otherwise.  <u>See</u> SEC Order at 3; <u>see also</u> <u>Rombach v. Chang</u>, 355 F.3d 164, 173 (2d Cir. 2004).  Indeed, allowing a post-issuance disclosure to cure the alleged breach would, pared to its essence, condone a "bait and switch."  That is not the province of fiduciary duty law.

Defendants also argue that since any breach sounds in fraud, the complaint fails to meet Rule 9(b)'s particularity requirement.  This argument also fails.  The complaint references specific presentations made on specific dates by specific MLPFS employees to LSED.  (<u>E.g.</u>, Compl. ¶¶ 43-46, 51-55.)  Those presentations form the basis for Plaintiffs' breach allegations.

Finally, Plaintiffs allege damages in the form of increased interest payments and increased expenses for restructuring as a result.  (<u>Id.</u> ¶ 219.)  Taking the allegations in the complaint as true, Plaintiffs allege a claim under Louisiana law for breach of fiduciary duty.

C.   <u>Counts Two and Three: Intentional and Negligent Misrepresentation and Fraud</u>

In Louisiana, a claim for negligent misrepresentation requires a showing (1) of "a legal duty on the part of the defendant to supply correct information; (2) . . . a breach of

that duty, which can occur by omission as well as by affirmative
misrepresentation; and (3) [that] the breach must have caused
damages to the plaintiff based on the plaintiff's reasonable
reliance on the misrepresentation." Keenan, 575 F.3d at 490
n.15.  Unsurprisingly, intentional misrepresentation (or, in
Louisiana, "delictual fraud") requires that a party misrepresent
a material fact with the intent to deceive, causing justifiable
reliance with resultant injury. Murungi v. Tx. Guaranteed, 693
F. Supp. 2d 597, 604 (E.D. La. 2010).  Because "[i]ntentional
misrepresentation is essentially fraud" in Louisiana, Solow v.
Heard McElroy & Vestal, L.L.P., 7 So. 3d 1269, 1278 (La. Ct.
App. 2009), the Court's analysis covers Count Three (fraud) here
as well.  Fraud is "a misrepresentation or a suppression of the
truth made with the intention either to obtain an unjust
advantage for one party or to cause a loss or inconvenience to
the other." Id. (quoting La. Civ. Code Ann. § 1953).

The Court begins with the straightforward.  First,
Plaintiffs have alleged misrepresentations about the nature of
the ARS market itself and MLPFS's support bidding practice. See
supra Part I.D.  Those allegations, taken as true, are material;
Defendants' assertion that the facts about MLPFS's bidding
practices were properly disclosed is unfounded. See SEC Order
at 3.  Moreover, these facts were pleaded with particularity:
Plaintiffs cited specific facts about MLPFS's auction procedures

that were undisclosed at and after issuance.  See supra Part
I.D.

Second, after the August Disclosure, it would have been
unreasonable to rely on statements made by MLPFS in the ways
advanced by LSED here.  See Citigroup ARS, 700 F. Supp. 2d at
307.  Therefore, any of the state-law claims in Counts Two and
Three are dismissed to the extent that they are predicated on
alleged fraud or misstatements that occurred after the August
Disclosure.  See Abbott v. Equity Grp., Inc., 2 F.3d 613, 624
(5th Cir. 1993); Sun Drilling Prods. Corp. v. Rayborn, 798 So.
2d 1141, 1152-53 (La. Ct. App. 2001).

Third, the Court's breach of fiduciary duty analysis, supra
Part IV.C, applies to supply a duty to provide correct
information.  In addition, LSED and MLPFS had a contractual
relationship, which supplies such a duty in Louisiana.  See
Barrie v. V.P. Exterminators, Inc., 625 So. 2d 1007, 1015 (La.
1993).

Fourth, all three of these claims require a showing of
reasonable reliance.  See Sun Drilling, 798 So. 2d at 1153.
LSED adequately alleges reasonable reliance on pre-August
Disclosure omissions by MLPFS.  When omitted information is
material, as here, reliance may be presumed.  See Black v.
Finantra Capital, Inc., 418 F.3d 203, 209 (2d Cir. 2005); cf.
Falcon v. Bigelow-Liptak Corp., 356 So. 2d 507, 510 (La. Ct.

App. 1977) (res ipsa loquitur).  To counter that presumption, MLPFS offers only that the facts Plaintiffs claim were omitted were in fact disclosed at the outset.  That argument was rejected by the SEC, see SEC Order at 3, and the Court draws the same conclusion.  Although the issuing documents indicated that MLPFS could bid (Defs. Mem. at 20), those disclosures were inadequate in light of allegations of (1) a pervasive support bidding practice (2) necessary to keep the ARS market afloat. SEC Order at 3.

These four propositions tacked down, the Court concludes, accounting for Plaintiffs' damages allegations, that Plaintiffs alleged a claim for negligent misrepresentation.

The final question relevant to the remaining two claims here is whether Plaintiffs adequately alleged intent. Allegations of an "intent to obtain an unjust advantage or to cause damage or inconvenience to another" suffice.  Fenner v. DeSalvo, 826 So. 2d 39, 44 (La. Ct. App. 2002).  Plaintiffs allege that MLPFS had a long-standing support bid practice that predated the LSED issuance and was concealed from LSED, and that MLPFS stood to gain additional profit from selling ARS products over traditional bond products.  (Pls. Mem. at 25; Compl. ¶¶ 70-72, 174-182.)  LSED argues that because the facts about the nature of MLPFS's bidding in the ARS market were solely in the possession of MLPFS, there is no way it could have discovered

34

the truth ex ante.  Cf. La. Civ. Code. Ann. art. 1954 ("Fraud
does not vitiate consent when the party against whom the fraud
was directed could have ascertained the truth without
difficulty, inconvenience, or special skill.").  Knowingly
selling an unwitting client an allegedly more profitable but
flawed financial product raises an inference of an intent to
obtain an unjust advantage.  See, e.g., Shelton v. Standard/700
Assocs., 798 So. 2d 60, 65-66 (La. 2001).  Indeed, Plaintiffs
allege that MLPFS's compensation arising from the LSED ARS was
up to 5700% higher (over the life of the issuance) than an
underwriting transaction for a conventional bond.  (Compl.
¶ 246.)  Although Defendants correctly argue that a motive to
make a profit alone is insufficient to allege fraud (Defs. Mem.
at 22), that is not the allegation here.  Instead, Plaintiffs
allege that Defendants had an intent to sell ARS because MLPFS
would earn greater, different fees than in a traditional
transaction, all the while knowing the ARS market was a sham.
(Pls. Mem. at 28-30.)  That is enough to allege an intent to
defraud.  See Abu Dhabi Comm'l Bank v. Morgan Stanley & Co., 651
F. Supp. 2d 155, 179-80 (S.D.N.Y. 2009); In re Global Crossing,
Ltd. Sec. Litig., 322 F. Supp. 2d 319, 345-46 (S.D.N.Y. 2004).

    Given that Plaintiffs allege that these alleged
misrepresentations caused them damages, the above analysis
indicates that Plaintiffs have alleged a claim for fraud and

intentional misrepresentation arising from pre-August Disclosure misstatements or omissions.

D.   Count Four: Breach of Contract

Plaintiffs' breach of contract claim is that MLPFS's April 19, 2005, "Response to Solicitation for Offers for Senior Managing Underwriter" ("Proposal") was accepted as a contract governing MLPFS's alleged advisory role, separate and apart from the later-signed written contracts.  (See Compl. ¶¶ 30, 37, 232; Pls. Mem. at 22.)  Plaintiffs claim that the Proposal was effectuated by "several ancillary agreements entered between MLPFS and LSED that were component parts of MLPFS's larger obligation."  (Compl. ¶ 233.)

In order for a contract to be formed under Louisiana law, "an acceptance must be in all things conformable to the offer. An offer must be accepted as made to constitute a contract.  A modification in the acceptance of an offer constitutes a new offer which must be accepted in order to become a binding contract."  LaSalle v. Cannata Corp., 878 So. 2d 622, 624 (La. Ct. App. 2004).  Moreover, if "a proposal [is] to qualify as an offer, it must reflect the intent of the author to give to the other party the right of concluding the contract by assent." Delta Testing & Inspection, Inc. v. Ernest N. Morial New Orleans Exhibition Hall Auth., 699 So. 2d 122, 124 (La. Ct. App. 1997). Without this intent to make an offer acceptable by the offeree

36

as made, a proposal is "only an invitation to negotiate or an expression of willingness to receive offers from others." Id.

The Proposal was not meant to be accepted as a contract. In response to LSED's Solicitation, MLPFS's Proposal provided both a primary proposal (see Defs. Mem. at 20-24, Ex. D), as well as a number of alternative options (see id. at 25-26). MLPFS's Proposal could not have been and, indeed, was not "accepted as made." LaSalle, 878 So. 2d at 624. That LSED and MLPFS spent over five months negotiating written agreements ultimately signed signals that MLPFS's Proposal was not an offer to be accepted by LSED. (See, e.g., Compl. ¶ 42 ("During these five months [November 2005 to March 2006], MLPFS's representatives . . . were continually advising and making recommendations to the LSED Restructuring Group about how the borrowings should be structured.").) Plaintiffs also contend that the various presentations made by MLPFS supported the creation of a separate contract or created the contract in and of themselves. (See id. ¶ 59; Pls. Mem. at 22.) For the same reasons that the Proposal on its own could not form a separate contract, the presentations on their own or in conjunction with the Proposal likewise could not form such a contract. See LaSalle, 878 So. 2d at 624. The presentations do not provide details sufficient to constitute an offer acceptable by assent. See id.

37

In short, MLPFS's Proposal was not an offer as it could not
have been, and was not, assented to in full.  See id.
Ultimately, three related but independent written contracts were
consummated between the various parties.  (See Defs. Mem., Exs.
E, F, G.)  Plaintiffs point to no provision of any of the
written agreements MLPFS breached.  Those agreements each
contained explicit integration clauses and represented the full
agreement of the parties after almost a year of negotiations
between the parties.  To the extent Plaintiffs are asserting the
Proposal and presentations modified the final agreements rather
than formed a separate one, the Plaintiffs fail to point to
specific provisions of the final agreements that are ambiguous.
The parol evidence rule thus bars consideration of such
evidence.  Condrey v. SunTrust Bank of Ga., 429 F.3d 556, 566
(5th Cir. 2005).  Therefore, Plaintiffs' breach of contract
claim is dismissed.

    E.   Count Eight: Breach of Warranty

    Plaintiffs claim that MPLFS warranted that "the various
products that [MLPFS] sold as part of the structure that it
recommended were free from redhibitory defects and/or were fit
for their intended use to create a 'synthetic fixed rate'
borrowing." (Compl. ¶ 264 (citing La. Civ. Code Ann. art. 2520
(warranty against redhibitory defects); id. art. 2524 (thing fit
for ordinary use).)

To maintain a cause of action for breach of warranty (called redhibition in Louisiana), the Plaintiff must show that:

> (1) the seller sold the thing to him and that it is either absolutely useless for its intended purpose or its use so inconvenient or imperfect that had he known of the defect he would never have purchased it; (2) the thing contained a non-apparent redhibitory defect at the time of sale; and (3) the seller was given an opportunity to repair the defect.

Vincent v. Hyundai Corp., 633 So. 2d 240, 243 (La. Ct. App. 1993).

Louisiana does not apply the law of warranties against redhibitory defects to intangible "things" such as the financial structure at issue here. Guenin v. R.M. Homes, Inc., 424 So. 2d 485, 487 (La. Ct. App. 1982) ("The articles on redhibition . . . refer only to 'things' ('things sold' and 'inanimate things') and 'animals.'"). This understanding of the "things" to be warranted is further informed by what constitutes a defect. Harper v. Coleman Chrysler-Plymouth-Dodge, Inc., 510 So. 2d 1366, 1369 (La. Ct. App. 1987) ("The term 'defect' . . . means a physical imperfection or deformity; or a lacking of necessary components or level of quality."). The discussion of "physical imperfection" or a lack of "components" supports MLPFS's position that the law warranting against redhibitory defects applies to tangible items. See id. Plaintiffs assert that their claim arises because the financial structure was "lacking of necessary components or level of quality." (Pls. Mem. at

40.)  Yet Plaintiffs cite no authority for the proposition that the warranty against redhibitory defects applies to intangible "things."  Absent any Louisiana authority, the Court is reluctant to expand Louisiana law by applying a warranty against redhibitory defect to intangible products like those involved here.

Additionally, the financial products here worked for almost two years between the date of the bonds' issuance and the failure of the ARS market.  Plaintiffs were aware of the alleged "defects" and had the power to avoid these "defects" by conversion to another "mode."  See supra Part III.B.  Faced with this choice, LSED opted to absorb additional risk and reap the rewards of a lower interest rate by way of functioning swap agreements and credit enhancement.  The swap agreements and the credit enhancement, at the time of the sale, were not "absolutely useless for its intended purpose" or "so inconvenient or imperfect."  Vincent, 633 So. 2d at 243.  The breach of warranty claim is dismissed.

F.    Count Nine: Detrimental Reliance

Detrimental reliance is defined by statute in Louisiana.  "A party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was reasonable in relying."  La. Civ. Code Ann. art. 1967; Omnitech, 11 F.3d at

1329.  The Court is loath to apply detrimental reliance in light
of its equitable nature and the Court's holding with respect to
the fiduciary duty, misrepresentation, and fraud claims.
"Detrimental reliance is not favored in [Louisiana] law and is
sparingly applied as it bars the normal assertion of rights
otherwise present." Hibernia Nat'l Bank v. Antonini, 862 So. 2d
331, 336 (La. Ct. App. 2003).  Because the fiduciary duty,
misrepresentation, and fraud claims remain, Plaintiffs are able
otherwise to assert their rights. Id.  Moreover, "[d]etrimental
reliance is [an] equitable remedy." Hospitality Consultants,
LLC v. Angeron, 41 So. 3d 1236, 1242 (La. Ct. App. 2010).  As
discussed supra in Part III.B, Plaintiffs had a hand in their
own demise when LSED refused to convert to a different "mode."
Because detrimental reliance is an equitable remedy, the Court
concludes that the Plaintiffs' actions weigh against allowing
this claim to remain.  The cause of action for detrimental
reliance is dismissed.

    G.   Count Ten: Unjust Enrichment

    To plead unjust enrichment in Louisiana, "there must be no
other remedy at law available to plaintiff." Conerly Corp. v.
Regions Bank, No. 08 Civ. 813, 2008 WL 4975080, at *9 (E.D. La.
Nov. 20, 2008).  Plaintiffs have multiple surviving causes of
action, including the fiduciary duty, misrepresentation, and
fraud claims, and therefore have other remedies available.

Moreover, it is not material whether the other claims are successful, but rather that they exist.  Id.  Plaintiffs assert that they are pleading their unjust enrichment claim in the alternative, and, therefore, that it should be allowed to proceed.  (See Pls. Mem. at 41-42.)  This argument has been flatly rejected in similar circumstances.  Conerly Corp., 2008 WL 4975080, at *9.  Therefore, unjust enrichment is inappropriate.

Finally, similar to the detrimental reliance claim, the Court is disinclined to employ an unjust enrichment remedy. Louisiana courts hold that unjust enrichment is an "equitable remedy."  Hospitality Consultants, 41 So. 3d at 1242.  The Court therefore concludes that Plaintiffs' actions weigh against allowing an unjust enrichment claim to go forward.  The cause of action for unjust enrichment is dismissed.

V.   CONCLUSION

For the reasons elucidated above, Defendants' motion for judgment on the pleadings [dkt. no. 35 in No. 09 Civ. 5404; dkt. no. 28 in No. 09 Civ. 6770] as to Counts Four through Ten is GRANTED; those counts are dismissed with prejudice as the pleadings are closed.  The motion is DENIED as to Counts One through Three, although those claims may not be predicated on post-August Disclosure alleged misstatement or omissions for the reasons stated in Part IV.C., supra.  In keeping with the

42

Court's state-law statute of limitations analysis, see supra note 6, any state-law claims predicated on the nondisclosure of the SEC investigation or the alleged conflicts of interest that caused pre-August Disclosure damages are time barred.


SO ORDERED.

Dated:      December 7, 2010
            New York, New York

                                    _Loretta A Preska_
                                    LORETTA A. PRESKA
                                    Chief U.S. District Judge